**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**
ATLANTA DIVISION

_____

| | |
|---|---|
| **JANE DOE,** ) | |
| ) | Civil Action File No. |
| Plaintiff, ) | 1:18-cv-05278-SCJ |
| ) | |
| v. ) | |
| ) | |
| **GWINNETT COUNTY SCHOOL** ) | |
| **DISTRICT,** ) | |
| ) | |
| Defendant. ) | |

_____

### PLAINTIFF'S MOTION FOR SUMMARY
### JUDGMENT AND BRIEF IN SUPPORT THEREOF

Female students who are sexually assaulted in Gwinnett County schools, including by oral sodomy, are expected to keep their mouths shut, literally and figuratively. Gwinnett County School District ("District") made this clear in 2015 when Plaintiff Jane Doe was sexually assaulted by "MP" at Peachtree Ridge High School ("PRHS"). The morning after the assault, Ms. Doe reported to the school that MP exposed his penis to her, orally sodomized her, and masturbated in front of her, all without her consent. Five days later, Ms. Doe was suspended by the school for engaging in oral sex, the maximum penalty available under the school rules.

Ms. Doe contested the punishment at a brutal, nearly eight-hour long "hearing," where the school's own attorney, advocating against Ms. Doe and for

MP (the son of a school employee), formulated and posed these questions to her: "Now, when he went to put his penis in your mouth, what did you do to prevent him from doing that? [D]id you try to keep your mouth closed to avoid that or did you do anything to stop him?" "[Y]ou weren't surprised to find out that [MP] was a pervert, correct?" "Can you demonstrate for us how you had screamed when [MP] was attacking you?" "So how many times did you yell for him to stop?"[1]

Prior to and at this hearing, the District ignored, and failed to disclose to Ms. Doe, inconsistencies in MP's varied accounts of his sexual contact and communication with her; concealed the fact that MP's mother was a *school employee* and had written her son's official statement; and obstructed Ms. Doe's ability to support her claim of sexual assault. In the end, the District apparently concluded that Ms. Doe's response was inadequate, and instead accepted MP's contention that Ms. Doe "consented" to sex because of a "look in her eye" and her "blank" face "that didn't really have any expression." District administrators instructed the school police not to pursue criminal charges against MP, and Ms. Doe was suspended again. Even now, the District's bevy of lawyers continue to defend the hearings, discipline, and MP's story knowing that less than two months before he sexually assaulted Ms. Doe, MP expressed his inner thoughts about

---

[1] *See* Ms. Doe's Statement of Material Facts to Which There Is No Genuine Issue to Be Tried, herein after referred to as "SMF," at ¶ 218.

young women, claiming that he would "**Kill [C] but rape her before I kill her.**"[2]

When Ms. Doe finished serving her suspensions and attempted to return to school, she was sexually harassed by other students, and the District placed upon her the entire burden of maintaining her safety at PRHS. Not surprisingly, she fled the school to escape the hostile environment. As set forth in detail below, the undisputed material facts establish that, as a matter of law, the District is liable on Ms. Doe's claims under Title IX and 42 U.S.C. § 1983.

## BACKGROUND

Ms. Doe refers to her Statement of Material Facts to Which There Is No Genuine Issue to Be Tried, filed contemporaneously with this Brief, for a full and complete factual background.

## ARGUMENT

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists "if the evidence would allow a reasonable jury to find for the nonmoving party." *R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*, 114 F. Supp. 3d 1260, 1279 (N.D. Ga.

---

[2] *Id.* ¶ 299. The young woman in MP's text message is identified by an initial, "C."

2015). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Summary judgment is appropriate "when the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.*

## II.   The District Is Liable For Title IX Post-Report Discrimination

Title IX of the Education Amendments of 1972 prohibits sex discrimination in education. 20 U.S.C. §1681(a). Federal fund recipients may be held liable under Title IX for deliberate indifference to student-on-student sexual harassment. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). They may also be liable when sex discrimination, including sex stereotypes, "factored into the [defendant]'s 'decisional process.'" *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1241 (11th Cir. 2016) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989)). The District violated Title IX in both ways: it discriminated against Ms. Doe by (a) acting with deliberate indifference to her sexual assault report and (b) allowing sex stereotypes to factor into its decision to disbelieve her report and discipline her.

### A.   The District Is Liable for Acting with Deliberate Indifference to Ms. Doe's Sexual Harassment Reports

A school district is liable for student-on-student sexual harassment when (1) an "appropriate person" had actual knowledge of the alleged harassment, (2) the

harassment was "severe, pervasive, and objectively offensive," (3) the school district acted "with deliberate indifference to known acts of harassment in its programs or activities," and (4) the harassment "effectively barred the victim's access to an educational opportunity or benefit." *Hill v. Cundiff*, 797 F.3d 948, 970 (11th Cir. 2015).[3] Ms. Doe has established each of these elements.

### i. The District Had Actual Knowledge of Ms. Doe's Reports of Sexual Harassment

A school has "actual knowledge" or "actual notice" when harassment is reported to an "appropriate person . . . with authority to take corrective action to end the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).[4] "[A] school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision," meets the definition of an "appropriate person." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999).

The District had actual knowledge through PRHS Principal Matthews, who had authority to discipline students for misconduct and knew of Ms. Doe's report

---

[3] The District admits it is a recipient of federal funds (SMF ¶ 1).
[4] Under Title IX, courts use the terms "actual notice" and "actual knowledge" interchangeably. *See, e.g.*, *Gebser*, 524 U.S. at 290.

by February 10, 2015. SMF ¶¶ 146, 152. It is well-established that school principals are "appropriate persons" under Title IX. *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1255 (11th Cir. 2010).

In addition, the District had actual notice of Ms. Doe's report through at least *seven* other "appropriate persons," including Assistant Principals ("AP"s) Augmon, Stinson, and Weyher, who questioned Ms. Doe about her sexual assault report on February 5 and 6, 2015. SMF ¶¶ 59–63, 65, 67, 72–74, 116–17, 121, 124, 128, 132–34. Each had authority to implement remedial measures, by determining that students violated the Student Behavior Code and taking disciplinary action. *Id.* ¶¶ 2, 146, 148–56. As the school's Title IX Coordinator, AP Stinson had additional authority to take corrective action specifically for sexual harassment. *Id.* ¶ 4. High-ranking District officials – James Taylor, Executive Director of Academic Support, and Bob Burgess, Director of Discipline and Behavioral Interventions – also knew about Ms. Doe's report. *Id.* ¶¶ 166–70. Finally, Wayne Rikard, Chief of the District's School Police Department, and SRO Lockard – who had the authority to arrest a reported perpetrator of sexual assault – also knew of Ms. Doe's sexual assault allegation. *Id.* ¶¶ 5, 163–64. Actual notice by any one of these individuals establishes the District's actual knowledge.

The District also had actual notice of Ms. Doe's reports that she suffered on-

going sexual harassment after reporting sexual assault. Ms. Doe reported the subsequent harassment to several District officials, including but not limited to APs Stinson and Augmon. *Id.* ¶¶ 237–38, 240, 242–43, 253-57, 259–65, 267, 270. Even after Ms. Doe fled PRHS, students' continued harassment of Ms. Doe was reported to Title IX Coordinator Joyce Spraggs, Principal Matthews, and AP Stinson. *Id.* ¶¶ 282–85. This included reports of statements students posted online about Ms. Doe: "When Hoes don't use commons Sense"; "It's okay she was just trying to quench her thirst"; and "But it's not like she doesn't have enough in her mouth yunno." *Id.* ¶ 283.

Thus, the undisputed facts establish, as a matter of law, that the District had actual knowledge of Ms. Doe's multiple reports of sexual harassment.

### ii.   Ms. Doe Experienced Severe, Pervasive, and Objectively Offensive Sexual Harassment

The "severe, pervasive and objectively offensive" inquiry is contextual. "Whether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectation, and relationships,' including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) (quoting *Davis*, 322 F.3d at 651). The

relevant question is whether the discrimination is "so severe, pervasive, and objectively offensive that it denies its victims equal access to education." *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003).

Rape constitutes severe, pervasive, and objectively offensive conduct. *See, e.g.*, *Williams*, 477 F.3d at 1298; *Moore v. Murray State Univ.*, 2013 U.S. Dist. LEXIS 33768, at *9 (W.D. Ky. Mar. 12, 2013) ("[T]he type of sexual assault at issue here—an alleged rape—is the type so severe, pervasive, and objectively offensive that it could be said to deprive [plaintiff] of the educational opportunities and benefits provided by [the school]."); *see also Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967–68 (9th Cir. 2001). In addition, "a single instance of severe, sexual abuse of a plaintiff coupled with a defendant's 'pervasive deliberate indifference' may also constitute a 'severe, pervasive, and objectively offensive environment.'" *Doe v. Brighton Sch. Dist. 27J*, 2020 U.S. Dist. LEXIS 30848, at *17 (D. Colo. Feb. 24, 2020).

Here, it is undisputed that MP isolated Ms. Doe in the RVN editing room, closed the door, turned off the lights, stood between her and the door, and said that she could not leave unless she "sucked his dick." SMF ¶¶ 22–29. MP then exposed his penis to Ms. Doe and put his penis in her mouth, while she gagged and cried. *Id.* at ¶¶ 30–35. MP then masturbated in front of her and ejaculated. *Id.* at ¶¶ 36-39.

8

Ms. Doe did not consent to any of these acts.  *Id.*  ¶¶ 31, 35, 37–38. This series of events – beginning with MP exposing his penis to Ms. Doe, putting his penis in her mouth, and ending with his masturbating to ejaculation – are three separate acts of sexual assault, occurring within "one continuous series of events." *Williams*, 477 F.3d at 1298; *see also Hill*, 797 F.3d at 973; *Doe v. Merrill Cmty. Sch. Dist.*, 610 F. Supp. 2d 789, (E.D. Mich. 2009).

The harassment did not end there. After Ms. Doe reported MP's sexual assault, other students ostracized her, berated her with slurs, accused her of lying, and aggressively physically threatened her, even after she transferred out of PRHS to other schools in the District. SMF ¶¶ 237, 242, 255–57, 262–65, 282–85, 302–308. Students called her a liar and contended she "framed" MP, a belief fostered by District officials, who also expressed that they did not believe Ms. Doe. The ongoing sexual harassment and bullying further intensified the severe, pervasive, and objectively offensive harassment Ms. Doe suffered. *See Stinson*, 824 F. App'x at 858 ("the series of events" that occurred after plaintiff's rape, including students gossiping about the assault, "aggravated the effects" of the sexual assault); *Goodwin v. Pennridge Sch. Dist.*, 389 F. Supp. 3d 304, 315–16 (E.D. Penn. May 31, 2019) (student's report of sexual assault "triggered a course of harassment" that included other students spreading rumors about her sexual activity, calling her a

"slut" and "snitch," laughing and pointing at her, and threatening her); *King v. Curtis*, 2016 U.S. Dist. LEXIS 184737, at *27-30 (W.D. Mich. Nov. 1, 2016), *adopted* 2017 U.S. Dist. LEXIS 28429, at *14-15 (W.D. Mich. Mar. 1, 2017) (hostile education environment may exist where, after plaintiffs reported sexual assault, other students called them "bitch," "slut," and "liar"). Further, as discussed below, the undisputed facts demonstrate that the discriminatory conduct Ms. Doe suffered was systemic; it "so undermine[d] and detract[ed] from [Ms. Doe's] educational experience, that [she] has effectively been denied access to an institutions resources and opportunities." *Hawkins*, 322 F.3d at 1289.

Accordingly, it is clear that the sexual harassment Ms. Doe suffered as a student in the District was severe, pervasive, and objectively offensive.

### iii.   The District Responded to Ms. Doe's Sexual Harassment Reports With Deliberate Indifference

A funding recipient is "deliberately indifferent 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Hill*, 797 F.3d at 973 (quoting *Davis*, 526 U.S. at 648). For the deliberate indifference analysis, courts consider the facts cumulatively and contextually. *See Hill*, 797 F.3d at 975; *Broward Cty.*, 604 F.3d at 1263; *Bibb Cty.*, 126 F. Supp. 3d at 1379. A school cannot escape Title IX liability by responding

only minimally, or in a clearly inadequate manner, to a report of sexual assault. *See Broward Cty.*, 604 F.3d at 1263; *Doe v. Dekalb Cty. Sch. Dist.*, 2018 U.S. Dist. LEXIS 199284, at *16 (N.D. Ga. Nov. 26, 2018); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1356 (M.D. Ga. 2007); *A.G. v. Autauga Cty. Bd. of Educ.*, 506 F. Supp. 2d 927 (M.D. Ala. 2007).

The Eleventh Circuit has "repeatedly recognized that a school district's reasonable response to sexual harassment may include corrective action such as monitoring and admonishing an accused teacher or student despite the inconclusive nature of the school's investigation into the misconduct." *Broward Cty.*, 604 F.3d at 1262. "[I]nconclusive investigations are common, especially when alleged harassment occurs behind closed doors. Therefore, a reasonable response under the known circumstances may include taking informal corrective action in an abundance of caution to ensure that future misconduct does not occur." *Id.*

### a.   The District Did Not Treat Ms. Doe's Report as One of Sexual Assault or a Title IX Matter

The District's clearly unreasonable response began the moment Ms. Doe reported that MP had orally raped her. Despite Ms. Doe's unequivocal report that she had been sexually assaulted, the District simply refused to treat her report as one of sexual assault. This is the epitome of deliberate indifference. *See Hill*, 797 F.3d at 974 (finding school could be deliberately indifferent where it misclassified

11

reports of sexual harassment). The District never assessed Ms. Doe's report as a claim that MP forced her to have oral sex. SMF ¶ 208. The District never even inquired about Ms. Doe's report that MP had masturbated in front of her immediately after he had exposed himself to her and placed his penis in her mouth. *Id.* ¶¶ 143–44. Instead, the District opted to pursue her report to determine which school rules Ms. Doe may have violated. *Id.* ¶¶ 73–74, 146–55. Even though Ms. Doe consistently stated that she was sexually assaulted and District officials admittedly "**really didn't know what happened**," they nonetheless suspended Ms. Doe for "participating in oral sex" with MP, before conducting a disciplinary hearing. *Id.* ¶¶ 147–152. PRHS officials never even considered *not* charging Ms. Doe with violation of a school rule and, instead, punished her with the **most severe sanction** available to them.  *Id.* ¶¶ 148, 153–55, 171.

Moreover, despite the clear Title IX implications of Ms. Doe's report of sexual assault, the District did not confer with the District Title IX Coordinator, did not inform Ms. Doe or her parents about her rights under Title IX, and – admittedly – did not even consider the possibility that it may be violating Ms. Doe's federal civil rights.  *Id.* ¶¶ 75–77, 139–40, 142, 231–32.

**b.      School Officials Disbelieved and Brutally Interrogated
Ms. Doe, While They Spoon-Fed Answers to MP**

School administrators interviewed Ms. Doe in a manner vastly different

from how they interviewed MP. The District's investigation and disciplinary

hearing was deeply biased and designed to discredit Ms. Doe's report that MP

sexually assaulted her, in favor of MP's assertion that the sexual contact had been

consensual. SRO Lockard immediately assumed Ms. Doe was "twisting this story"

and admonished her about the consequences of doing so. SMF ¶ 58. The District

repeatedly interrogated Ms. Doe with questions devised to prove that she was

lying, had not done enough to fight off the alleged assault, or had even invited it.

*Id.* ¶¶ 56–58, 62, 123, 127–28, 131–34. In stark contrast, District employees never

asked MP any similar questions. *Id.* ¶ 145.

The District's insistence that Ms. Doe reenact her assault, in the room where

it had occurred less than 48 hours earlier – while *three* school officials skeptically

interrogated her with repetitive questions about how loud she screamed, what she

did to fight MP off, why she did not do more, and why she did not tell someone

sooner – was not just unreasonable, it was unconscionable. *Id.* ¶¶ 119-22.  The

interrogation continued in another room, where *four* school officials shot questions

at Ms. Doe, including asking *18 times* if she sat on MP's lap or straddled him –

which she repeatedly explained she did not do. *Id.* ¶132. They even questioned

13

why she "high-fived" MP before walking with him to the RVN room. *Id.* ¶ 131

Where school officials interrogated and challenged Ms. Doe, they offered answers and explanation to MP. *Id.* ¶¶ 89–90, 96, 99. For example, AP Weyher asked MP if he knew what "consensual" meant, and when MP responded, "kind of," Weyher provided MP with the answer. *Id.* ¶ 96. Another time, Weyher asked MP why he thought Ms. Doe told him not to tell anyone about their encounter. *Id.* ¶ 99. When MP responded unequivocally, "I have no idea," Weyher provided MP with an explanation: "You think it's because she's got a boyfriend." *Id.* MP immediately changed his answer to parrot Weyher's proposed answer: "Right. And so I feel like the way that she's saying I forced her to do that is because so she and her boyfriend, you know, can stay together." *Id.* Thus, the District not only sought to discredit Ms. Doe's report, but actually bolstered MP's version of events by spoon-feeding him the "correct" answers.

> ### c.   The District Ignored Every Consistency in Ms. Doe's Report, and Accepted All Inconsistencies in MP's Version of Events

Ms. Doe's account of the assault was consistent from the moment she first reported through the disciplinary hearing against her. *Id.* ¶¶ 49–51, 53, 66, 72, 214. Yet school officials ignored those consistencies. *Id.* ¶ 198. By contrast, they accepted MP's version of events, which morphed over time, even when it was

illogical or contradicted by other evidence. *Id.* ¶¶ 92. For example, MP claimed he and Ms. Doe were in the RVN room for only 6–7 minutes. *Id.* ¶ 93. But surveillance video confirmed they were in the room for nearly 14 minutes, which corresponded precisely to Ms. Doe's account. *Id.* ¶ 125. MP also claimed he did not ejaculate, yet subsequent forensic testing identified his seminal fluid on the carpet of the editing room, exactly where Ms. Doe reported that MP had assaulted her and masturbated in front of her. *Id.* ¶¶ 39, 92, 126. MP initially denied receiving any text messages from Ms. Doe's stepfather, but later admitted that he had. *Id.* ¶¶ 100, 209. Similarly, MP's story that he and Ms. Doe had previously exchanged "Kik" messages changed significantly from his initial interview to the disciplinary hearing.  *Id.* ¶¶ 204–05.

### d.    The District Justified MP's Behavior

 Rather than correct MP's harmful views about sex and consent, school officials adopted them to justify MP's behavior. SRO Lockard validated MP's expectation that taking Ms. Doe to the RVN room could result in sexual contact, as MP was "15 years old" and "a teenage boy."[5] *Id.* ¶ 97. Weyher and Lockard accepted – without argument or correction – MP's explanation that a supposed kiss

---

[5] SRO Sokol similarly excused RH's conduct saving child pornographic images of Ms. Doe, stating "I can't blame a teenage boy for not deleting them." SMF ¶ 292.

from Ms. Doe in middle school and a "look" in her eye indicated she consented to MP exposing his penis to her, putting his penis in her mouth, and masturbating in front of her. *Id.* ¶¶ 97–98. The same occurred at the disciplinary hearing: Weyher testified that MP had told him "he could tell by [Ms. Doe's] eyes that she wanted to be with him." *Id.* ¶ 200. The District also credited MP's preposterous claims that he could tell Ms. Doe wanted sex based on text messaging allegedly exchanged with her *six weeks earlier*. *Id.* ¶¶ 200, 205–07, 210.

### e. The District Encouraged and Allowed MP's Mother to Write Her Son's Official Statement, and Misrepresented this Fact

District officials not only allowed MP's mother – a District employee – to write MP's official statement for him, but in fact *suggested* she do so. *Id.* ¶¶ 104–08. Worse yet, the statement did not accurately reflect everything MP had told school officials. *Id.* ¶ 110. The District never disclosed that MP had not written his own statement, then falsely insisted that he had. *Id.* ¶¶ 109, 111–14, 199, 221. This statement, written by MP's mother, was relied upon by PRHS officials in making the initial determination to charge and suspend Ms. Doe, the Hearing Officers' decision to further suspend Ms. Doe, and law enforcement officers in criminally investigating MP. *Id.* ¶¶ 104, 114.

### f. The Disciplinary Hearing Was a Biased, Inequitable Sham

The District's tactics continued during a sham disciplinary hearing, where

the District's attorney, Mr. Lancaster, joined forces with MP's attorney advocating for MP and against Ms. Doe, an inequitable structure. *Id.* ¶¶ 180–81, 213, 215–18, 223–24. Key school officials were absent from the hearing, despite the District having told Ms. Doe that they would testify. *Id.* ¶¶ 177, 183, 185. The District's attorney also denied Ms. Doe her right to request subpoenas for witnesses or evidence, refusing to enforce the subpoenas she had issued. *Id.* ¶¶ 178, 181–84, 190. Additionally, AP Weyher testified falsely or misleadingly on at least four occasions. *Id.* ¶¶ 199, 201–03. The hearing officers even permitted MP's attorney to attempt to physically reenact the assault with Ms. Doe. *Id.* ¶ 216.

### g.   The District Placed the Burden on Ms. Doe to Protect Herself, Privileging MP's Education Over Hers

The District refused to provide Ms. Doe any support, accommodations, or resources in response to her sexual assault report. *Id.* ¶¶ 69–70, 138, 157–58, 234. The District ignored Ms. Doe's statement that she feared going to school with MP, her alleged rapist.  *Id.* ¶¶ 235–36. The District also ignored Ms. Doe's reports of peer harassment following the assault. *Id.* ¶¶ 237–38, 240–43, 246, 253–67. Instead, the District compounded its deliberate indifference to the sexual harassment Ms. Doe suffered by placing the burden solely on her to avoid MP and any other students who were harassing her, change her classes, reduce her time at

school, or withdraw from PRHS altogether. *Id.* ¶¶ 244, 247–51. Even when Ms.

Doe attempted to leave PRHS, the District refused to assist her transition to any

other school. *Id.* ¶¶ 268–74.

In contrast, when a teacher suggested that Ms. Doe seeing MP on the school

news would be "extremely difficult" for Ms. Doe, Principal Matthews responded:

"MP has served his consequences and he is moving on . . . we are not going to

limit his activities in the manner she is suggesting. We are not in the business of

administering double consequences to any student." *Id.* ¶¶ 266-67.

### h.   The District's Deliberate Indifference Subjected Ms. Doe to Further Discrimination

The undisputed facts establish that the District's "deliberate indifference to

the initial discrimination subjected [Ms. Doe] to further discrimination." *Hill*, 797

F.3d at 973. To "subject" a plaintiff to further discrimination, a school's response

must "cause [students] to undergo harassment or make them liable or vulnerable to

it." *Davis*, 526 U.S. at 645. Here, the District's deliberate indifference did both.

First, the District's deliberate indifference to Ms. Doe's report of sexual

assault made Ms. Doe vulnerable to further harassment by MP. SMF ¶¶ 235–36.

Because the District refused to address Ms. Doe's sexual assault report, she lived

in constant fear of encountering MP when she returned to school. *Id.* ¶¶ 235–36.

18

The District did nothing to protect Ms. Doe from MP. *Id.* ¶¶ 247–51. *See Williams*, 477 F.3d at 1297 (school's failure to "take any precautions to prevent future attacks" by the same perpetrators was discriminatory); *Kinsman v. Fla. St. Univ. Bd. of Trs.*, 2015 U.S. Dist. LEXIS 180599, at *11 (N.D. Fla. Aug. 12, 2015) ("[T]he possibility of further encounters 'between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities.'"). Given the school's treatment of her report, Ms. Doe had good reason to fear MP could sexually assault her again without consequence, particularly when the District made clear that it was her responsibility to stay away from MP. SMF ¶¶ 249–50.

Second, the District's deliberate indifference to Ms. Doe's report of rape subjected Ms. Doe to ongoing harassment from other students at PRHS, which the District refused to remediate. SMF ¶¶ 236–38, 244, 247–50, 253–56, 259–65. Through its deliberate indifference to Ms. Doe's sexual assault report, the District directly subjected Ms. Doe to further harassment from other students who vilified her for "lying." *See, e.g.*, *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *57–58. The District abdicated any responsibility to address the continuing peer harassment directly, and instead proposed only solutions in which Ms. Doe would further disrupt her education by changing her schedule or withdrawing from PRHS

19

altogether. SMF ¶¶ 244, 246, 269–74.

Finally, "while the 'further discrimination' may be sexual harassment the plaintiff experienced, this need not be the case." *Doe v. Bibb Cty. Sch. Dist.*, 126 F. Supp. 3d 1366, 1380 (M.D. Ga. 2015), *aff'd* 688 F. App'x 791 (11th Cir. 2017). "Further discrimination" occurs when a school's deliberate indifference prevents the plaintiff from continuing to attend the school. *Williams*, 477 F.3d at 1296–97; *Bibb Cty.*, 126 F. Supp. 3d at 1380. That is precisely what happened here.[6]

### iv.   The Sexual Harassment and the District's Deliberate Indifference Effectively Barred Ms. Doe's Access to Educational Opportunities

The final element requires Ms. Doe to establish that the harassment and/or the District's deliberate indifference effectively barred her access to an educational opportunity or benefit. *Williams*, 477 F.3d at 1298. The effect of the harassment on Ms. Doe was both "real and demonstrable." *Hawkins*, 322 F.3d at 1289 n.13; *see also Davis*, 526 U.S. at 634.

The undisputed facts show that Ms. Doe's education suffered significantly after the sexual assault and the District's deliberate indifference to her report. The District not only "effectively" denied Ms. Doe access to her education, it *directly*

---

[6] Circuits are split on "further harassment." *See Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613 (6th Cir. 2019); *Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019). The Eleventh Circuit has endorsed the latter position. *See Williams*, 477 F.3d at 1296–97. But the Court need not address that issue because Ms. Doe was, in fact, subject to further harassment after her report.

denied her such access by suspending her twice after she reported the assault. The District first suspended her from February 10 until her February 18 disciplinary hearing, after deciding, without proving notice of the allegation or any hearing, that she had violated school rules. SMF ¶¶ 149–152, 155. Then the District suspended her a second time after the disciplinary hearing. *Id.* ¶¶ 225–29.

Even after returning from her suspensions, Ms. Doe continued to miss days of school when the District failed to offer her services of any kind or protect her from ongoing harassment. SMF ¶¶ 234–36, 238, 241. Ms. Doe eventually missed more than a month of school. *Id.* ¶ 280. She also experienced suicidal thoughts, depression, anxiety, and panic attacks, and was diagnosed with Post-Traumatic Stress Disorder (PTSD). *Id.* ¶¶ 238, 245, 248, 256, 372–82. Ms. Doe had to drop or change classes to escape harassment that the District refused to remedy*, id.* ¶ 246, and she missed classes when the harassment became too much to bear, *id.* ¶¶ 238, 256, 264–65. Ms. Doe also struggled academically and fell behind in her classes. *Id.* ¶ 277. For example, her chemistry grade dropped from a 91% to a 55%. *Id.* ¶ 278. These consequences were the result of the sexual harassment she experienced and the District's clearly unreasonable response to her attempts to seek help. *Hill*, 797 F.3d at 976.

Ultimately, Ms. Doe withdrew from PRHS because of the sexual harassment

and the District's own misconduct in responding to her reports. SMF ¶¶ 268–69, 275. This effectively barred Ms. Doe's access to education, just as if the District had formally dismissed her. *See Williams*, 477 F.3d at 1298; *Hill*, 797 F.3d at 975–76 ("Doe's withdrawal does not bar a finding that the Board denied her an opportunity to continue attending Sparkman."). Indeed, faced with the knowledge Ms. Doe had—that she had been punished twice for reporting sexual assault and that the District would do nothing to protect her from MP or stop the ongoing hostile environment she faced day after day—"her withdrawal was reasonable and expected." *Hill*, 797 F.3d at 975–76; *see also Williams*, 477 F.3d at 1298.

Even when Ms. Doe sought to escape the hostile environment by transferring schools, the District continued to bar her equal access to education. After refusing to allow Ms. Doe to transfer to another school in the District, Ms. Doe and her parents were told—again—that the burden was on them to seek out alternative solutions. SMF ¶¶ 269–71, 274. Eventually, Ms. Doe had no other option but to attend online school—a far from equal alternative to traditional, in-person learning. *Id.* ¶¶ 275. Ms. Doe had to drop two of the four classes she had been taking at PRHS, and lost the benefits of in-person interaction and activities with her teachers and peers. *Id.* ¶ 280. Because of her plummeting grade in chemistry, Ms. Doe had to start the class over and struggled to complete it. *Id.*

¶ 279. Ms. Doe eventually failed her online chemistry course and had to retake it again in summer school, just to ensure she could graduate on time. *Id.* ¶ 281.

Because the undisputed facts prove each element, Ms. Doe is entitled to summary judgment on her Title IX deliberate indifference claim.

### B.    The District Is Liable Because Sex Stereotypes Motivated Its Treatment of Ms. Doe

The District is also liable under Title IX because sex stereotypes motivated its response to Ms. Doe's sexual assault report. Sex stereotyping—unfavorable treatment based on assumptions about how people should act based on their sex— is a form of prohibited sex discrimination. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1734–43 (2020); *Price Waterhouse*, 490 U.S. at 250–51.[7] A defendant may be liable for sex discrimination if "discriminatory input," including sex stereotypes, "factored into" its decision. *Quigg*, 814 F.3d at 1241 (quoting *Price Waterhouse*, 490 U.S. at 272); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (considering whether sex was "*a* motivating factor in university's decision to discipline a student" (emphasis added)); *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (same).

Here, the undisputed facts establish that sex stereotypes "factored into" the

---

[7] In defining the contours of Title IX, courts look to Title VII case law. *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992).

District's decision not to credit Ms. Doe's report of sexual assault. In deciding not to charge MP with sexual assault, but instead to charge both students with participating in oral sex, the District found Ms. Doe less credible than MP because she failed to live up to three stereotypes about how women respond to sexual assault: (1) they physically resist rape, (2) they complain immediately after they are raped, and (3) only sexually "pure" women are believable rape victims.

First, until recently American law assumed women would fend off rape with all their strength, and any woman who could not show she fought back was lying. Michelle J. Anderson, *Reviving Resistance in Rape Law*, 1998 U. Ill. L. Rev. 953, 962–68 (1998); *State v. Rusk*, 289 Md. 230, 255 (1981) (Cole, J., dissenting). In fact, only a small fraction of rape victims physically resist their attacker. Anderson, *Revising Resistance*, at 958.[8]  By its own telling, the District did not believe Ms. Doe's sexual assault report because she did not conform to the stereotype that women physically resist with all their strength. SMF ¶¶ 56–57, 123, 127, 218. In fact, the District *stated* that justification: Mr. Lancaster, on the District's behalf, explained at the disciplinary hearing that "the fact that [Ms. Doe] . . . chose not to scream louder and louder as this was going on, leads me to believe [MP]. Based on

---

[8] The "utmost resistance" stereotype relies on another stereotype: that women "cry rape" rather than admit to consensual sex. *See* Susan Ehrlich, *Representing Rape: Language and Sexual Consent* 65–67 (2001).

the fact that she has no physical injuries leads me to believe [MP]." *Id.* ¶ 224.

Second, courts incorrectly assumed for years that women who were raped reported immediately and any delay was proof the assault did not occur. *See State v. Hill*, 578 A.2d 370, 374–75 (N.J. 1990). This requirement relied on stereotypes: "The natural instinct of a female thus outraged and injured prompts her to disclose the occurrence, at the earliest opportunity. . . ." *State v. Neel*, 60 P. 510, 511 (Utah 1900); *see also People v. Lawler*, 568 N.E.2d 895, 901 (Ill. 1991) ("[I]t is entirely natural that the victim of forcible rape would have spoken out regarding it, and the fact that she did not do so would in effect be evidence of the fact that nothing violent had occurred."). The undisputed facts show that, although Ms. Doe reported the assault the next morning, the District disbelieved her because she did not complain sooner. SMF ¶¶ 49, 51–53. SRO Lockard repeatedly asked Ms. Doe why she had not immediately reported, and Mr. Lancaster based the school's credibility determination turned on Ms. Doe's perceived delay: "the fact that [Mr. Doe] didn't report this immediately after it happened despite the fact that she walked straight to her mother's car leads me to believe [MP]." *Id.* ¶¶ 46, 123, 224.

Finally, prior to rape shield laws, women were considered less credible if they were "unchaste." Michelle J. Anderson, *From Chastity Requirement to Sexuality License: Sexual Consent and A New Rape Shield Law*, 70 Geo. Wash. L.

Rev. 51, 72–80 (2002). Some courts viewed a woman's unchaste reputation

evidence that she had consented. *Id.* at 75–78 (collecting cases). Others endorsed a

rule that a woman's prior sexual experience made her less credible. *Id.* (collecting

cases). The District clearly adopted the view that Ms. Doe's past sexual conduct

undermined her credibility. To justify its disciplinary decision, the District sought

out irrelevant information about Ms. Doe's sexual history and preferences, and

relied on alleged messages between MP and Ms. Doe that were never found, but

that MP claimed indicated Ms. Doe had *once* been sexually interested in him, as

reason to discipline Ms. Doe. SMF ¶¶ 290–96.

Because the undisputed facts establish that sex stereotypes motivated the

District's treatment of Ms. Doe, she is entitled to summary judgment on her Title

IX discrimination claim.

## III.   The District Is Liable on Ms. Doe's Title IX Retaliation Claim

"Retaliation against a person because that person has complained of sex

discrimination is another form of intentional sex discrimination encompassed by

Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S.

167, 173 (2005). The Court explained the vital importance prohibiting retaliation

against those who report sexual harassment: "Reporting incidents of discrimination

is **integral** to Title IX enforcement and would be discouraged if retaliation against

those who report went unpunished." *Id.* at 180-81 (emphasis added).

To succeed on a Title IX retaliation claim, "plaintiffs must show that they engaged in protected activity, that they suffered an adverse [] action, and that there was a causal link between the two." *Terry v. Young Harris Coll.*, 106 F. Supp. 3d 1280, 1297 (N.D. Ga. 2015).[9]

## A.   <u>Ms. Doe Engaged in Protected Activity</u>

A student engages in "protected activity" if she "opposes practices made unlawful by the relevant statute" or "participates in any manner in an investigation under the relevant statute." *Kocsis*, 788 F. App'x at 686. Reporting and participating in an investigation of sexual harassment constitutes protected activity. *Id.* at 687; *Jackson*, 644 U.S. at 180.

The undisputed facts establish Ms. Doe engaged in protected activity when:

- She reported sexual assault to the District, on February 5, 2015;

- She opposed the District's disciplinary actions against her, including at the disciplinary hearing held on February 18, 2015;

- She and her parents reported to the District the peer sexual harassment and hostile education environment she suffered after she returned to school following her two suspensions;
- She informed the District, through her legal counsel, on March 10, 2015 that it had violated her Title IX rights.

---

[9] The Title VII retaliation framework applies to Title IX retaliation claims. *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1359 (M.D. Ga. 2007).

SMF ¶¶ 49, 51, 53, 60, 66-67, 72, 117, 118–19, 123–24, 126, 225–30, 238, 240, 242, 246, 255–57, 259, 265, 270, 272–73, 285. Ms. Doe has established, as a matter of law based on the undisputed facts, that she engaged in protected activity.

### B.    Ms. Doe Suffered Material Adverse Actions

An adverse action is material if it is "harmful to the point that [it] could well dissuade a reasonable [student] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006); *see also Kocsis*, 788 F. App'x at 686. As a matter of law, suspending a student from school qualifies as an "adverse action." *See, e.g.*, *Marcum v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist.*, 727 F. Supp. 2d 657, 670 (S.D. Ohio 2010) (holding there was "no question" that plaintiff suffered a material adverse action when she was suspended from school and later expelled); *cf. Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920 (11th Cir. 1993). There is no doubt that the threat of <u>two</u> suspensions would dissuade a reasonable student "from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 68.

It is undisputed that after reporting sexual assault to the District, Ms. Doe was charged with violating a school rule and suspended <u>twice</u> from PRHS. SMF ¶¶ 149–55, 225, 229. Thus, she suffered material "adverse actions." Moreover, the District was well aware that disciplining a student who reported sexual assault

could have a "chilling effect" on other students reporting sexual assault. *Id.* ¶ 78.

Hearing Officer Graves also knew that suspending a student who reports sexual

assault can be retaliation. *Id.* ¶ 233. Yet the District did exactly that: Soon after Ms.

Doe reported the assault, the District determined she had violated Rule 9G and

punished her with out-of-school suspension—the most severe sanction available—

then submitted the charge for a disciplinary hearing, where it imposed additional

severe sanctions on her. *Id.* ¶ 146, 149, 152, 154–56. This is the very same conduct

that the U.S. Supreme Court described as devastating to Title IX enforcement and

unlawfully retaliatory. *Jackson*, 544 U.S. at 180–81. During the disciplinary

hearing, Ms. Doe herself expressed the chilling effect of the District's actions:

"When people find out about this and girls do get sexually assaulted, they're not

going to come forward and tell someone, because they're going to be scared

they're going to get suspended and they have to go through all of this." SMF ¶ 230.

Accordingly, as a matter of law based on the undisputed facts, Ms. Doe has

established that the District took material adverse actions against her.

## C.   There Is an Obvious Causal Link Between Ms. Doe's Protected Activity and the Adverse Actions the District Took against Her

The "causal link requirement [is interpreted] broadly; 'a plaintiff merely has

to prove that the protected activity and the negative [school] action are not

completely unrelated.'" *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068,

1074 (11th Cir. 1995) (citation omitted). Discriminatory intent may be shown by direct or circumstantial evidence. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). "Direct evidence is 'evidence, that, if believed, proves [the] existence of [discriminatory intent] without inference or presumption.'" *Id.* (citations omitted). Circumstantial evidence of discriminatory intent includes: "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination," including "among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated [students], and (3) that the [school's] justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Here, there is undisputed <u>direct</u> evidence of a causal link between Ms. Doe's report of sexual assault and the District charging her with violation of a school rule and suspending her twice. The District <u>admitted</u> (a) administrators would not have charged Ms. Doe with violating a school rule – and punished her with the most severe sanction available – if she had not reported sexual assault, and (b) they did so knowing the retaliatory impact it would have: chilling similar reports of student sexual assault. SMF ¶¶ 153, 233.

Alternatively, circumstantial evidence establishes causation, and no

reasonable jury could find otherwise.  With respect to timing, the District

suspended Ms. Doe just five days after she reported sexual assault. *Id.* ¶ 159. The

District's statements about the investigation were "ambiguous": administrators

stated, "they really didn't know what happened," yet still punished Ms. Doe with

out-of-school suspension. *Id.* ¶¶ 151, 155.  School officials never considered <u>not</u>

charging Ms. Doe with violating a school rule even though, as they admitted, they

would not have charged or punished a similarly situated student who, for example,

reported an incident of theft that the administration determined to be unfounded.

*Id.* ¶¶ 79, 148. The District cannot offer any legitimate justification for the actions

it took against Ms. Doe. Any attempt to do so would be nothing more than easily

dispelled pretext.  *See Lewis*, 934 F.3d at 1185.

Ms. Doe has established each element of her retaliation claim and is

therefore entitled to summary judgment.[10]

## IV.   <u>The District Is Liable on Ms. Doe's § 1983 Failure-to-Train Claim</u>

The District is liable under 42 U.S.C. § 1983 for depriving Ms. Doe of her

Fourteenth Amendment equal protection rights. U.S. Const. amend. XIV, § 1. The

District is a local government entity for purposes of § 1983. *See Broward Cty.*, 604

---

[10] After Ms. Doe formally complained that the District violated her Title IX rights,
the District's private police force sought out, viewed, and saved child pornographic
images of her. SMF ¶¶ 234-73, 282-93. It is hard to imagine any action a school
could take that would more likely dissuade a student from reporting sexual assault.

F.3d at 1263. Nor is it controversial that sex discrimination, including unremedied sexual harassment, violates a student's equal protection rights. *Hill*, 797 F.3d at 976. Where, as here, a school district has a custom, policy, or practice of acting with "deliberate indifference" to student-on-student sexual harassment, the district is liable under § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

The District's failure to train its employees how to prevent, recognize, and respond to peer sexual harassment constituted deliberate indifference. A school is liable where it "inadequately trains or supervises its employees, [that] failure to train or supervise is a [municipal] policy, and that [] policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Here, the undisputed facts establish that the District provided little to no sexual harassment training; this failure demonstrated deliberate indifference to students' rights to be free from sex discrimination in school; and the failure caused Ms. Doe to suffer ongoing sexual harassment and retaliation in violation of the Equal Protection Clause. *See, e.g.*, *Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 579-81 (E.D. Tenn. 2018); *Doe v. Russell Cty. Sch. Bd.*, 292 F. Supp. 3d 690, 711 (W.D. Va. 2018); *Doe v. Forest Hills Sch. Dist.*, 2015 U.S. Dist. LEXIS 175321, at *53-55 (W.D. Mich. Mar. 31, 2015) (granting summary judgment for plaintiff on failure-to-train claim).

### A.   <u>The District Failed to Provide Adequate Title IX Training</u>

It is undisputed that the District provided no (or woefully inadequate) training to school employees on how to respond to, address, and remedy reports of student-on-student sexual harassment. SMF ¶¶ 193, 318–360, 371; *see also id.* ¶¶ 369–71. In general, the District limited any training almost exclusively to employee-on-employee and adult-on-student sexual harassment, focusing on employees maintaining proper boundaries with students. *Id.* ¶¶ 320, 322, 324. The training did not include how to investigate student reports of sexual harassment or the District's policy on student sexual harassment. *Id.* ¶ 325. Indeed, the District's Title IX Coordinator – despite recognizing the importance of proper training – could not recall providing any training to school-level Title IX Coordinators before 2015 on how sexual assault victims respond, how to avoid victim-blaming, or the District's student sexual harassment grievance policy. *Id.* ¶¶ 326, 330.

More importantly, none of the key school officials involved in handling Ms. Doe's sexual assault report had any relevant training on how to handle incidents of student-on-student sexual assault. It is undisputed that the District provided <u>no</u> Title IX training for disciplinary hearing officers. *Id.* ¶ 328. Nor did the District train APs Augmon and Weyher on necessary topics, including how to interview students who report sexual assault, how victims of sexual assault respond, what

constitutes retaliation or victim-blaming, and other similar topics. *Id.* ¶¶ 332, 357–59. Augmon was not "trained to qualify" what constitutes sexual assault, and did not know whether forced oral sex is sexual assault. *Id.* ¶ 193, 354–55. SRO Lockard, the "primary" investigator for the District, received <u>no training</u> on Title IX prior to 2016 and, as of 2020, did not know whether the District had any policies addressing peer sexual harassment. *Id.* ¶¶ 192, 348-49, 345-46. He was not trained to interview minors who report sexual assault, or on the many impacts of trauma on sexual assault victims. *Id.* ¶¶ 345-46. Not even PRHS's designated Title IX Coordinator, AP Stinson, had any training on investigating reported sexual harassment, the District's policies on student-against-student sexual harassment, or retaliation. *Id.* ¶¶ 4, 335, 337, 338, 339–41.

Moreover, it is undisputed that the District failed to provide any training or education to students or parents on Title IX or student-on-student sexual harassment. *Id.* ¶¶ 361–62. Neither the school- nor District-level Title IX Coordinator provided any Title IX training or education to students. *Id.* The District's Student/Parent Handbook did not identify the District-level Title IX Coordinator. *Id.* ¶¶ 363–65, 368. The Handbook did not even state if PRHS had a Title IX Coordinator; did not provide any definition or description of Title IX or a student's rights under Title IX; and did not explain that sexual harassment can

34

constitute discrimination under Title IX. *Id.* ¶¶ 366–67, 377–79.

**B.      The District's Failure Resulted
from Its Policy, Custom, or Practice**

The undisputed evidence establishes that the District's failure to train

resulted from District policy. Because a municipality "rarely will have an express

written or oral policy of inadequately training" its employees, "a plaintiff may

prove a [municipal] policy by showing the municipality's failure to train evidenced

a 'deliberate indifference'" to constitutional or federal rights. *Gold*, 151 F.3d at

1350. Deliberate indifference, in turn, is established by "evidence that the

municipality knew of a need to train . . . in a particular area and the municipality

made a deliberate choice not to take any action." *Knight v. Miami-Dade Cty.*, 856

F.3d 795, 820 (11th Cir. 2017). A school may know of a need to train if "the need

for a particular type of training" is "so obvious" because employees "face clear

constitutional duties in recurrent situations." *Thomas v. Clayton Cty. Bd. of Educ.*,

94 F. Supp. 2d 1290, 1321 (N.D. Ga. 1999).

Decades of Supreme Court precedent placed the District on notice of the

severity and prevalence of student-on-student sexual harassment, and the District's

responsibilities under Title IX. *See Gebser*, 524 U.S. at 292; *see also Jackson*, 544

U.S. at 173; *Davis*, 526 U.S. at 654. Guidance from the U.S. Department of

Education similarly instructed schools that they "need to ensure that employees are

35

trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials." *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) at 13;[11] *see also, e.g.*, Dep't of Educ., Office for Civil Rights*, Dear Colleague Letter: Retaliation* (2013) (schools may not retaliate against students who complain about a civil rights violation);[12] Dep't of Educ., Office for Civil Rights, *Sexual Harassment: It's Not Academic* (Sept. 2008) at 3–8.[13]

The District not only knew that sexual harassment in schools was a nationwide issue, but also that peer sexual harassment was rampant in the District. In the 2014–2015 school year, when Ms. Doe reported sexual assault, the District received approximately 405 reports of high school student-on-student sexual misconduct. SMF ¶ 317. In the two prior academic years, the District received 487 and 596 reports, respectively, of high school student-on-student sexual misconduct.

---

[11] https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. The 2001 Guidance was rescinded in August 2020 to the extent it conflicts with new regulations; the quoted language does not. *See* 85 Fed. Reg. 30026, 30535 (May 19, 2020).
[12] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.html.
[13] https://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.html. The District received other relevant policy letters. *See* Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Sexual Violence* (2011) at 2 (noting "deeply troubling" data showing the prevalence of school sexual violence). Some have been rescinded since, but they still served as notice of the frequency of peer sexual harassment.

*Id.* ¶¶ 315–16. With nearly 1,500 *reported* incidents of student-on-student sexual misconduct over a three-year period, no competent school administrator could deny the magnitude of the problem of student sexual harassment.

There was no doubt as to the necessity and urgency of adequate training – and the perilous consequences of failing to train and educate both employees and students – in light of the high predictability, inevitable recurrence, and pervasive presence of sexual assault and harassment in schools. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409–10 (1996). "Because sexual assault claims arise frequently in the public high school context, it is certainly foreseeable that the failure to train school staff on how to handle such claims would cause disastrous results." *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *55. "Just like failing to train a police officer on when to use his or her gun, failing to train a school principal on how to investigate sexual assault allegations constitutes deliberate indifference." *Id*. Nonetheless, the District failed to provide adequate training.

### C.  The District's Policy of Inadequate Training Caused the Violation of Ms. Doe's Constitutional Rights

The final element of a § 1983 failure-to-train claim requires proof that the "deficiency in training actually caused the [] offending conduct." *Doe v. City of Demopolis*, 799 F. Supp. 2d 1300, 1313 (S.D. Ala. 2011). In other words, the District's failure to train must have been the "moving force" behind the violation

of Ms. Doe's constitutional rights. *Canton*, 489 U.S. at 389. It was. If District employees had been adequately trained, they would have responded appropriately to Ms. Doe's reports. Rather than subjecting Ms. Doe to further sex discrimination, they would "would have prevented [her] injuries, at least in some measure." *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *56.

First, with proper training, District employees would have conducted a procedurally sound investigation and hearing, rather than a biased, sham inquiry. They would not have repeatedly asked Ms. Doe humiliating and offensive questions. SMF ¶¶ 56, 57, 123, 127, 131, 132. They would have preserved interviews and notes, as well as the scene of the assault. *Id.* ¶¶ 54, 141, 198, 202, 309-14. And they would not have allowed MP's mother—a District employee—to write his statement for him. *Id.* ¶¶ 61, 86–88, 104, 106-12, 114, 199. With proper training, District employees would not have required Ms. Doe to reenact her sexual assault, in the room where it happened, the day after it occurred. *Id.* ¶¶ 119–21.

Second, with proper training, District employees would not have engaged in a concerted effort to discredit Ms. Doe based on sex stereotypes and ignorance about sexual violence. *Id.* ¶¶ 58, 96–97, 99; *see also* ¶¶ 195–96. The hearing would not have focused on confirming MP's version of events and discrediting Ms. Doe's—even where MP's claims were patently absurd, like he could tell from the

38

blank look on Ms. Doe's face that she wanted to have oral sex. *Id.* ¶¶ 200, 206–07, 209. The District would not have allowed its own employees to perpetuate blatantly sexist and outdated rape myths. *Id.* ¶¶ 220, 223–24. At the very least, proper training would have allowed District employees to know what kind of conduct constitutes sexual assault, and that Ms. Doe's report should have been treated as implicating her Title IX rights. *Id.* ¶ 193.

Third, with proper training, District employees would not have retaliated against Ms. Doe for reporting sexual assault by punishing her with suspension, twice. *Id.* ¶¶ 73–74, 146–49, 152–55, 159, 163, 225, 229. AP Weyher did not believe it was possible for the District to retaliate against a student for reporting sexual assault; in his view, only students were capable of retaliation. *Id.* ¶ 334.

Fourth, with proper training, District employees would have promptly taken effective steps to prevent and remedy the peer harassment Ms. Doe faced when she returned to school. *Id.* ¶¶ 235–38, 242, 244, 249–51, 253–56, 259–65, 282–86, 302–08. There is no question that the District's treatment of Ms. Doe perpetuated the incorrect notion among students that she had lied about MP's sexual assault. *Id.* ¶¶ 237–38, 242, 255, 284, 303. And with proper training for students, Ms. Doe's peers would have been aware of the consequences of retaliating against a classmate. *See Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *57–58.

Fifth, with proper training, the District would have offered Ms. Doe services or accommodations to address and remedy the ongoing effects of the sexual assault. SMF ¶¶ 138, 157–58, 244, 246, 269–74.

As Ms. Doe's expert Nan Stein has opined, "Had [the District] provided proper training to administrators . . .  Jane Doe likely would not have suffered the abusive aftermath from the school administrators." *Id.* ¶¶ 369–71. The undisputed facts make this clear. Ms. Doe is, therefore, entitled to summary judgment on her failure-to-train claim.

## **CONCLUSION**

For the reasons set forth above, Plaintiff Jane Doe respectfully requests this Court **GRANT** her motion for summary judgment in its entirety.

Respectfully submitted,

Date:  December 21, 2020

/s/ Monica H. Beck
Monica H. Beck
Chloe M. Neely
Douglas E. Fierberg
*Admitted Pro Hac Vice*
THE FIERBERG NATIONAL LAW
GROUP, PLLC
161 East Front Street, Suite 200
Traverse City, MI 49684
(231) 933-0180 (T)
(231) 252-8100 (F)
mbeck@tfnlgroup.com
cneely@tfnlgroup.com
dfierberg@tfnlgroup.com

Adele P. Kimmel
Alexandra Brodsky
*Admitted Pro Hac Vice*
PUBLIC JUSTICE, P.C
1620 L Street, NW, Suite 630
Washington, DC 20036
202-797-8600 (T)
202-232-7203 (F)
akimmel@publicjustice.net
abrodsky@publicjustice.net

Michael E. Kramer (Bar No. 428976)
Anita Bala (Bar No. 372029)
BUCKLEY BEAL LLP
600 Peachtree Street NE, Suite 3900
Atlanta, GA  30308
404-781-1100 (T)
866-699-1515 (F)
mekramer@buckleybeal.com
abala@buckleybeal.com

*Attorneys for Plaintiff Jane Doe*

## **LOCAL RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that the foregoing document was prepared using Times New Roman 14 point font as approved by Local Rule 5.1(B).

Dated:  December 21, 2020

/s/ Monica H. Beck
Monica H. Beck
Chloe M. Neely
Douglas E. Fierberg
*Admitted Pro Hac Vice*
THE FIERBERG NATIONAL LAW GROUP, PLLC
161 East Front Street, Suite 200
Traverse City, MI 49684
(231) 933-0180 (T)
(231) 252-8100 (F)
mbeck@tfnlgroup.com
cneely@tfnlgroup.com
dfierberg@tfnlgroup.com
*Attorneys for Plaintiff Jane Doe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

Dated: December 21, 2020

/s/ Monica H. Beck

Monica H. Beck
Chloe M. Neely
Douglas E. Fierberg
*Admitted Pro Hac Vice*
THE FIERBERG NATIONAL LAW
GROUP, PLLC
161 East Front Street, Suite 200
Traverse City, MI 49684
(231) 933-0180 (T)
(231) 252-8100 (F)
mbeck@tfnlgroup.com
cneely@tfnlgroup.com
dfierberg@tfnlgroup.com
*Attorneys for Plaintiff Jane Doe*