**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHTERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

_____

| | |
|---|---|
| **JANE DOE,** ) | |
| ) | No. 1:18-CV-05278 |
| Plaintiff, ) | |
| ) | Hon. Steve C. Jones |
| v. ) | |
| ) | |
| **GWINNETT COUNTY SCHOOL** ) | |
| **DISTRICT,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

_____

**PLAINTIFF JANE DOE'S STATEMENT OF MATERIAL
<u>FACTS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED</u>**

Plaintiff Jane Doe submits this Statement of Material Facts to Which There Is No Genuine Issue to Be Tried, pursuant to Fed. R. Civ. P. 56 and LR 56.1(B), NDGa.

## General Background

1.     Defendant Gwinnett County School District ("District") is a recipient of federal funds.  (Doc. 58 at 7 ¶14.)

2.     During the 2014-2015 academic year, Jon Weyher was an Assistant Principal and Athletic Director at Peachtree Ridge High School ("PRHS"), a school in the District.  (Ex. 1 (Weyher Dep.) at 11-12.)  He has been employed by the District since 2000.  (*Id.* at 11.)  PRHS Assitant Principals were responsible for disciplining students who engaged in misconduct.  (*Id.* at 17-18.)

3.     During the 2014-2015 academic year, Lee Augmon was an Assistant Principal at PRHS.  (Ex. 2 (Augmon Dep.) at 11-12.)  She has been employed by the District since February 2000.  (*Id.* at 9.)

4.     During the 2014-2015 academic year, LaShawnia Stinson was an Assistant Principal and the school-level Title IX Coordinator at PRHS.  (Ex. 3 (Stinson Dep.) at 11-13.)  Her only responsibility as the PRHS Title IX Coordinator was to "investigate any type of report dealing with Title IX."  (*Id.* at 15.)  She was employed by the District from 2002 through 2017.  (*Id.* at 10.)  As

1

the school-level Title IX Coordinator, she – and the Principal of PRHS – were responsible for determining disciplinary consequences for students who enaged in sexual harassment.  (Ex. 1 (Weyher Dep.) at 16.)

5.      During the 2014-2015 academic year, Anthony Lockard was employed by the District as a School Resource Officer ("SRO") at PRHS.  (Ex. 4 (Lockard Dep.) at 20, 31.)   He has been employed by the District since 2004.  (*Id.* at 20, 31.)  Lockard had the ability to arrest a perpetrator of reported student-on-student sexual assault.  (Id. at 52.)

6.      From 2013 to 2019, Joyce Spraggs was the District-level Title IX Coordinator and Director of Equity and Compliance.  (Ex.5 (Spraggs Dep.) at 12.) She has been employed by the District since 1984.  (*Id.* at 9.)

**On February 4, 2015, Ms. Doe Suffered MP's Unwelcomed Sexual Conduct**

7.      In February 2015, Ms. Doe was a 16-year-old sophomore at PRHS. (Ex. 6 (Jane Doe Decl.) at 1 ¶ 2.)  Ms. Doe is bi-racial and of Asian and African American descent.  (*Id.* at 1 ¶ 3.)

8.      Up to that point in time, the only schools Ms. Doe had attended, including elementary and middle school, were in the District.  (Ex. 7 (Jane Doe Interrog. Answer) at 12.)

9.     Male student MP was also a student at PRHS. (Doc. 1 (Orig. Compl.) at 6 ¶ 16; Doc. 55 (Am. Compl. incorporating all numbered paragraphs of Orig. Compl.); Doc. 58 (Am. Answer) at 8 ¶ 16.)

10.     According to MP's student profile, his ethnicity is "white." (Ex. 8 (Student Profile) at GCSD00000061.)

11.     MP was a baseball player and he appeared on the PRHS morning school news program, which was part of the PRHS Ridge Vision News ("RVN") program. (Ex. 9 (Hr'g Tr.) at Plaintiff 000379, 439; Ex. 10 (Mar. 2, 2015 email) at GCSD00008596; Ex. 6 (Jane Doe Decl.) at 1 ¶¶ 6-7.)

12.     As unknown by Ms. Doe and her family prior to discovery in this litigation, MP is the son of a teacher employed by the District. (Ex. 1 (Weyher Dep). at 40-41; Ex.6 (Jane Doe Decl.) at 2 ¶ 8; Ex. 11 (Julie Doe[1] Decl.) at 1 ¶ 3; Ex. 12 (John Doe[2] Decl.) at 6 ¶ 30.)

13.     MP and Ms. Doe were friends from middle school and had never dated. (Ex. 13 (Tr. of GCSD00000018 video) at 16-17.)

14.     MP thought that Ms. Doe was cute and someone he always wanted to "fool around" with, but not date. (Ex. 9 (Hrg. Tr.) at Plaintiff 000476-81.)

---

[1] In order to protect Ms. Doe's identity, her mother is referred to herein as "Julie Doe."
[2] In order to protect Ms. Doe's identity, her stepfather is referred to herein as "John Doe."

15.     On February 4, 2015, after school ended, Ms. Doe was in the main lobby of PRHS, waiting for her mother to pick her up from school.  (Ex.14 (Pl's 2d Stmt.) at Plaintiff 000117; Ex. 15 (GCSD00000015 Video); Ex. 6 (Jane Doe Decl.) at 2 ¶ 11.)

16.     MP approached Ms. Doe and informed her that he was going to the RVN Room.  (Ex. 15 (GCSD00000015 Video); Ex.16 (MP Mother Stmt.) at GCSD00000063-64; Ex. 13 (Tr. of GCSD00000018 video) at 3,6-7.)

17.     Ms. Doe went with MP to the RVN room because she had never seen the RVN room before.  (Ex. 17 (Pl's 1st Stmt.) at Plaintiff 000286; Ex. 14 (Pl's 2d Stmt.) at Plaintiff 000117.)

18.     As captured on PRHS video surveillance, MP and Ms. Doe entered the RVN room at 4:24 p.m.  (Ex. 4 (Lockard Dep.) at 94.)

19.     The RVN room was supposed to be locked after hours, and MP was not supposed to be in the RVN room after school hours.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000380-81.)

20.     The RVN room has a classroom, a studio, control booths, and an "editing room" also referred to as the "control room."  (Ex. 9 (Hrg. Tr.) at Plaintiff 000334, 344; Ex. 4 (Lockard Dep.) at 62-63, 90-91.)

21.     Ms. Doe spoke to male student "R" who was in the adjoining computer classroom working on a project, with a door connecting the two.  (Ex. 4 (Lockard Dep.) at 108-09, 122-23; Ex. 18 (GCSD00000910 video); Ex. 19 (Tr. of GCSD0000910 video) at 4-5.)  Student R asked Ms. Doe to close the door connecting the rooms.  (Ex. 19 (Tr. of GCSD0000910 video) at 5.)  Student R was wearing headphones.  (Ex. 4 (Lockard Dep.) at 122-23.)

22.     Jane Doe and MP went to a smaller room that adjoins the RVN room, the "editing room."  (Ex. 4 (Lockard Dep.) at 62-63,90-91; Ex. 18 (GCSD00000910 video); Ex. 20 (GCSD00000019 video).)

23.     MP had placed a chair in the editing room, where he regularly slept during mornings at school.  (Ex. 21 (Tr. of GCSD0000019 video) at 3; Ex. 20 (GCSD00000019 video).)

24.     Ms. Doe was looking at all of the equipment in the editing room.  (Ex. 13 (Tr. of GCSD0000018 video) at 9; Ex. 21 (Tr. of GCSD0000019 video) at 3, 29); Ex. 9 (Hrg. Tr.) at Plaintiff 000548-49.)

25.     MP turned the lights off in the main room.  (Ex.9 (Hrg. Tr.) at Plaintiff 000548; Ex. 4 Lockard Dep. at 91.)

26.     MP turned off the lights in the editing room.  (Ex. 13 (Tr. of GCSD0000018 video) at 10-11; Ex. 19 (Tr. of GCSD0000910 video) at 6-7, 11-12; Ex. 4 (Lockard Dep.) at 88-89)

27.     MP closed the door to the room.  (Ex.19 (Tr. of GCSD0000910 video) at 6-7, 11-12; Ex. 21 (Tr. of GCSD0000019 video) at 10-11; Ex. 4 (Lockard Dep.) at 88-89.)

28.     MP stood between Ms. Doe and the closed door to the room.  (Ex. 18 (GCSD00000910 video) at 6:15-8:10[3]; Ex. 20 (GCSD00000019 video); Ex. 9 (Hrg. Tr.) at Plaintiff 000454.)

29.     MP told Ms. Doe she could not leave unless she "sucked his dick." (Ex. 22 (Jane Doe. Dep.) at 28, 35-37; Ex. 17 (Pl's 1st Stmt.) at Plaintiff 000286; Ex. 14 (Pl's 2d Stmt.) at Plaintiff 000118.)

30.     MP pulled his pants down and exposed his privates to her.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000445, 470.)

31.     MP did not ask whether he had Ms. Doe's permission to do that, and Ms. Doe did not ask him to take his pants down or expose his privates.  (Ex. 9 (Hrg. Tr.) at Plaintiff 484-86.)

---

[3] Reference is made to the time stamps that appear in the lower right corner of each video.

32.     MP put one leg up on the chair and had his other leg on the ground, standing in front of Ms. Doe.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000580; Ex. 18 (GCSD00000910 video) at 6:15-8:10.)

33.     MP's penis was in Ms. Doe's mouth.  (Ex. 13 (GCSD00000018 video Tr.) at 3-4; Ex. 14 (Pl's 2d Stmt.) at Plaintiff 000118.)

34.     Ms. Doe gagged and cried.  (Ex. 14 (Pl's 2d Stmt.) at Plaintiff 000119.)

35.     Ms. Doe did not say she wanted to have oral sex with MP in the room that day.  (Ex. 9 (Hrg. Tr.) at Plaintiff 484.)

36.     MP masturbated himself in front of her.  (Ex. 14 (Pl's 2d Stmt.) at Plaintiff 000119; Ex. 9 (Hrg. Tr.) at Plaintiff 000552, 000572-74.)

37.     Ms. Doe did not say "yes" to MP masturbating in front of her.  (Ex. 6 (Jane Doe Decl.) at 2 ¶ 12.)

38.     Ms. Doe did not consent to or welcome MP masturbating in front of her.  (Ex. 6 (Jane Doe Decl.) at 2 ¶ 12.)

39.     Forensic DNA testing identified MP's seminal fluid on the carpet of the room where Ms. Doe reported that MP masturbated in front of her.  (Ex. 4 (Lockard Dep.) at 156-57, 162-63.)

40.     While MP was masturbating, Ms. Doe left the editing room.  (Ex. 19 (Tr. of GCSD0000910 video) at 15-17.)  School security camera footage shows that Ms. Doe left the RVN room at 4:38 p.m., 14 minutes after she entered the room.  (Ex. 4 (Lockard Dep.) at 94; Ex. 9 (Hrg. Tr.) at Plaintiff 000423.)

41.     MP left the RVN room approximately two to three minutes after Ms. Doe exited the room.  (Ex. 13 (Tr. of GCSD0000018 video) at 12.)

42.     Ms. Doe walked to the front of the school, where her mother had pulled up, got in the car, and left campus.  (Ex. 22 (Jane Doe Dep.) at 15.)  Ms. Doe was shocked and crying.  (Ex. 19 (Tr. of GCSD0000910 video) at 12-14, 18.) Ms. Doe was embarrassed and did not know what to say to her mother.  (*Id.* at 18.)

43.     MP's phone records show that on the night of February 4, 2015, at 11:13 p.m., he sent the following text message to one of his contacts (not Ms. Doe):

> **Just feels like every time I try to change, something always gets me right back into my <u>bad ways</u>.  U know?  I am trying hard not to do <u>bad things</u> but I guess I just needa try a little harder. . . <u>Im talking like girls and stuff</u>.  Its like so hard not to do stuff.**

(Ex. 23 (MP's text messaging) at GCSD00002409 (emphasis added); Ex. 4 (Lockard Dep.) at 114-17 (authenticating messaging).)

## Ms. Doe Reported the Sexual Assault to the District on February 5, 2015

44.     The next morning, February 5, 2015, Ms. Doe was at school and she told her female friend, FM, that MP had sexually assaulted her.  (Ex. 22 (Jane Doe Dep.) at 16-17.)  Student FM told Ms. Doe that she should tell someone about it. (*Id.* at 17.)

45.     Another female friend, RC, saw Ms. Doe crying, and Ms. Doe told her about MP's sexual assault.  (Ex.22 (Jane Doe Dep.) at 17.)

46.     Ms. Doe also told her boyfriend, A, about MP's sexual assault, and then she went to her first class of the day, chemistry.  (Ex. 22 (Jane Doe Dep.) at 17-18.)

47.     Ms. Doe's chemistry teacher, Kristen Powell, observed that Ms. Doe was crying and upset.  (Ex.9 (Hrg. Tr.) at Plaintiff 000528-29.)

48.     Ms. Doe was so upset that she could not take the test scheduled in her chemistry class that morning.  (Ex. 22 (Jane Doe Dep.) at 18-19.)

49.     Ms. Doe told Ms. Powell that she was "basically raped" the previous day.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000528-29.)

50.     Ms. Doe called her mother, crying, and told her mother about the sexual assault.  (Ex. 22 (Jane Doe Dep.) at 26.)  Ms. Doe's mother said she would come to the school to pick her up.  (*Id.* at 20.)

51.    Ms. Doe then went to speak with Linda Brimmer, an early childhood education teacher at PRHS.  (Ex. 22 (Jane Doe Dep.) at 20; Ex. 9 (Hrg. Tr.) at Plaintiff 000364.)  Ms. Doe felt like she could talk to Ms. Brimmer because she was a warm person and felt like a mom to Ms. Doe.  (Ex. 22 (Jane Doe Dep.) at 20.)  Ms. Brimmer, who had taught Ms. Doe for two years, stated that when Ms. Doe came into her classroom, "I immediately knew something was wrong."  (Ex. 9 (Hrg. Tr.) at Plaintiff 000532-33.)  Ms. Doe was distraught and upset.  (*Id.* at Plaintiff 000533-34.)  Ms. Doe told Ms. Brimmer about the sexual assault, that MP had forced her to put her mouth on his penis, and started crying.  (Ex. 22 (Jane Doe Dep.) at 21; (Ex. 9 (Hrg. Tr.) at Plaintiff 000534-35.).)

52.    At approximately 8 a.m., Ms. Brimmer took Ms. Doe to SRO Lockard's office.  (Ex. 22 (Jane Doe Dep.) at 21; Ex. 4 (Lockard Dep.) at 61-63; Ex. 9 (Hrg. Tr.) at Plaintiff 364-65)

53.    Ms. Doe told SRO Lockard that the previous day, in the afternoon at around 4:15 pm, she was in the lobby area at PRHS when MP approached her and asked her if she wanted to see the RVN Ridge Vision News room, they walked to the RVN room, went into the editing room, and MP forced her to perform oral sex on him.  (Ex. 4 (Lockard Dep.) at 62-63, 86.)

54.    SRO Lockard did not record the interview.  (*Id.* at 63.)

55.     SRO Lockard interviewed Ms. Doe outside the presence of her parents.  (*Id.* at 63-64.)

56.     The interview with SRO Lockard was "absolutely horrible" for Ms. Doe; he asked her inappropriate and humiliating questions and made clear that he did not believe her.  (Ex. 22 (Jane Doe Dep.) at 21-22; Ex. 9 (Hrg. Tr.) at Plaintiff 000254-56.)  He asked what she was wearing that day, why she didn't tell her parents earlier, why she didn't bite MP's penis, and why she didn't grab MP's "balls."  (Ex. 9 (Hrg. Tr.) at Plaintiff 000255-56; Ex. 4 (Lockard Dep.) at 87.)  SRO Lockard asked, "**are you sure his penis was in your mouth**?"  (Ex. 9 (Hrg. Tr.) at Plaintiff 000560-61.)

57.     Ms. Doe testified regarding SRO Lockard's questioning as follows:

Q.  Okay.  Tell me what happened when you went to see Officer Lockard please.

A.  I told him what happened, and then he started asking me a whole bunch of questions.

Q.  Do you remember any of the questions?

A.  Yeah.  They're like very inappropriate.  **He was like are you sure that you didn't want it**.  And he kept asking me the same question over and over again.  **And then he had asked me like why didn't you fight harder, why didn't you scream louder, why didn't you try to hurt him**.  Yeah.

(Ex. 22 (Jane Doe Dep.) at 21-22)

58.     SRO Lockard said to Ms. Doe, "**if you're twisting this story, then, you know, you can get – you can get that guy in big trouble**."  (Ex. 9 (Hrg. Tr.) at Plaintiff 000560-61.)

59.     SRO Lockard then took Ms. Doe to meet with Assistant Principals Augmon and Stinson, so that – in Lockard's own words – the female administrators "could provide emotional support" to Ms. Doe.   (Ex. 4 (Lockard Dep.) at 64-68.)

60.     Assistant Principal Stinson questioned Ms. Doe on her own, and Ms. Augmon subsequently joined them.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000364-65.)

61.     Assistant Principal Augmon knew that MP's mother worked for the District.  (Ex. 2 (Augmon Dep.) at 14.)

62.     Ms. Doe described the questioning of Assistant Principals Augmon and Stinson as follows during her deposition:

> Q.  Okay.  But you remember that your next meeting with the school administrators about this incident was with Ms. Augmon and Ms. Stinson?
>
> A.  Yes.
>
> Q.  Okay.  Could you tell me about that meeting please.
>
> A.  Well, again, I mean I just told them what happened, and Ms. Stinson was asking me kind of the same questions that Officer Lockhard [sic] was asking me, **trying to make sure that I didn't really want it.  And she had asked me what I was wearing** . . ."

12

(Ex. 22 (Jane Doe Dep.) at 23.)

63.    Assistant Principals Augmon and Stinson conducted part of their interview of Ms. Doe outside the presence of either of her parents.  (Ex. 22 (Jane Doe Dep.) at 25-26; Ex. 24 (Julie Doe Dep.) at 32.)

64.    Ms. Doe's mother arrived at PRHS, and she learned that SRO Lockard had asked her daughter inappropriate questions, including whether she had squeezed MP's "balls"during the incident.  (Ex. 24 (Julie Doe Dep.) at 32-33.)

65.    Assistant Principals Augmon and Stinson had Ms. Doe complete a written statement, which she did on her own, without her mother's assistance.  (Ex. 24 (Julie Doe Dep.) at 31.)

66.    Ms. Doe's written statement states as follows:

I was waiting for my mom to pick me up and then [MP] was like "Do you want to go to the RVN Room [student R] is in there."  I was like sure (because I've never been in there before) and we went in there and [R] was in the computer room and I talked to him for a few minutes and then I went back and he had took me to the backroom and turned out the lights and he pressed against the the door he pushed me on the chair and I screamed "no stop!" and he was like "can't you be single for like 2 seconds" and I was like "No I'm not going to do this!"  [H]e said, "if you don't suck my dick I won't let you leave." So he had me on the chair and I had to do it and he was against the door.  I tried to push him off.  Then after he let me go and I took my stuff and left.

(Ex. 22 (Jane Doe. Dep.) at 35-37; Ex. 17 (Pl's 1st Stmt.).)

67.     Ms. Doe provided the written statement to Assistant Principals Stinson and Augmon.  (Ex. 24 (Julie Doe Dep.) at 34.)

68.     The school administrators told Ms. Doe that if she remembered anything else she should write it down.  (Ex. 24 (Julie Doe Dep.) at 34; Ex. 9 (Hrg. Tr.) at Plaintiff 000336, 000425.)

69.     According to District Title IX Coordinator Spraggs, when a student reported sexual assault, she or he was supposed to be able to talk to and have the help of a counselor in obtaining accommodations during the investigation process. (Ex. 5 (Spraggs Dep.) at 23.)

70.     However, at that point in time, the District did not provide, offer, recommend, or coordinate any health, psychological, counseling or academic assistance or services for Ms. Doe.  (Ex.6 (Jane Doe Decl.) at 3 ¶ 13; Ex. 11 (Julie Doe Decl.) at 2 ¶ 8; Ex. 12 (John Doe Decl.) at 2 ¶ 4.)

**Ms. Doe Wrote a Second Statement with Additional Details**

71.     Ms. Doe went home and wrote a second statement.  (Ex. 22 (Jane Doe Dep.) at 28, 35-37; Ex. 14 (Pl's 2d Stmt.).)  Ms. Doe's parents told her to be forthright, complete, and focus on the details, but they did not discuss with her what should go into the statement.  (Ex. 25 (John Doe Dep.) at 27; Ex.24 (Julie Doe Dep.) at 39-40; Ex. 22 (Jane Doe Dep.) at 28, 35-37.)

72.     Ms. Doe's second written statement reports the following:

So I was waiting for my mom to pick me up, and I was waiting in the lobby in 4:15 pm and I was sitting in the chair and [MP] went up to me and we just talked for a minute and then he said, "I'm going to the RVN room with [R], he's in there.  Wanna come?"  And I said, "Sure I've never been in there before!"  So we walk there and I notice that his eyes are like bloodshot red.  So we get there and we stand the door and he says "hold on real quick" and he leaves for a second then he comes back and then we go into the room.  So I was looking at the cameras and equipment while [MP] went to talk to [R] on the other room, and then I went over there and talked to [R] for a minute and then we went back into the main room.  [MP] goes to the back room and turns on the lights and sits in the chair & I stand at the doorway and we talked for a minute.  He grabs my hips and pulls me in while he touches my butt and he starts pulling down my yoga pants and I push him away and say "no, stop! What are you doing?"  And he jumps up from the chair and grabs both of my wrists and spins around so that I'm in the chair and he's on top of me and he says "can't you be single for 2 seconds?"  I say "No!  I'm faithful.  I can't do this.  Let me go!  Stop!"  He tries to kiss me and shoves his tongue in my mouth and turns off the lights and shuts the door while he was still on me.  The chair is so close to the door that he didn't have to get off of me.  He was on me the whole time.  He says "well you can't leave until you suck my dick."  While he was still on me he unzips his pants and puts 1 [one] leg on the chair next to my left thigh and the other leg on the floor between my legs.  He grabs my head and hair and shoves his dick in my mouth.

I was gagging and crying at the same time.  This lasts for like 4 minutes.  [F]inally he gets off of me, and stands up and starts jacking off and I get up and open the door and grab my bookbag and belongings while I said stop and I left the room and I sped walked to the parent pick up and wiped my tears and my mom pulled up just in time.  I got in and went home.

(Ex. 22 (Jane Doe Dep.) at 28, 35-37; Ex. 14 (Pl's 2d Stmt.).)

**PRHS Officials Investigated to Determine if Ms. Doe Violated a School Rule**

73.     SRO Lockard and Assistant Principals Weyher, Stinson, and Augmon decided to review the school rules to see if Ms. Doe or MP had violated any school rule.  (Ex. 3 (Stinson Dep.) at 57-58.)  The school rules are set forth in the Student Conduct Behavior Code.  (*See* Ex. 26 (Student/Parent Handbook) at GCSD00009289-300; Ex. 5 (Spraggs Dep.) at 120-21.)

74.     As Assistant Principal Weyher explained, in determining whether any rules were broken, "we've got a female student saying this and a male student saying this.  Is one story more credible than the other?"  (Ex. 13 (GCSD00000018 video Tr.) at 32.)

75.     The PRHS officials did not confer with Title IX Coordinator Spraggs regarding Ms. Doe's report or their investigation.  (Ex. 4 (Lockard Dep.) at 133; Ex. 5 (Spraggs Dep.) at 64-66.)

76.     The PRHS officials did not discuss whether Ms. Doe's Title IX rights might be implicated as a result of an administrative or criminal investigation.  (Ex. 4 (Lockard Dep.) at 131-32.)

77.     Assistant Principal Augmon had no concern they might be implicating or violating Ms. Doe's Title IX rights by charging her with violation of a school

rule.  (Ex. 2 (Augmon Dep.) at 53-54.)  Even PRHS Assistant Principal / Title IX

Coordinator Stinson did not bring that up.  (*Id.*)

78.    Assistant Principals Weyher and Stinson had discussed and were

aware that disciplining a student who reported sexual assault could have a

"**chilling effect"** on other students similarly reporting sexual assault.  (Ex. 1

(Weyher Dep.) at 35-36.)

79.    In other circumstances, for example if District officials investigated a

student's report that her iPod was stolen by another student, and the school

officials could not determine whether that other student stole the iPod, the student

who reported the theft would not be found in violation of the Student Conduct

Code.  (Ex. 1 (Weyher Dep.) at 83-84.)

## PRHS Officials Interviewed MP

80.    The morning of February 5, 2015, MP discovered that Ms. Doe had

reported his sexual assault to another student and that Ms. Doe's boyfriend was

"really mad" and looking for him.  (Ex. 13 (Tr. of GCSD0000018 video) at 23-28.)

81.    MP left school and went home, explaining in a text message, "I had to

leave and talk to my parents."  (Ex. 23 (MP's text messaging) at GCSD00001619-

20; Ex. 4 (Lockard Dep.) at 114-17 (authenticating messaging).)

82.     Ms. Stinson and Ms. Augmon requested that Mr. Weyher find and interview MP.  (Ex. 1 (Weyher Dep.) at 46.)

83.     Mr. Weyher arranged for MP to come back to the school later that day, after school had ended, with his parents.  (Ex. 4 (Lockard Dep.) at 71.)

84.     MP and his parents came to PRHS at approximately 3 p.m.  (Ex. 4 (Lockard Dep.) at 88.)

85.     SRO Lockard and Assistant Principal Weyher interviewed MP with both of his parents present.   (Ex. 4 (Lockard Dep.) at 72-73.)  SRO Lockard videotaped the interview, conducted in a school conference room and in the RVN room.  (Exs. 21, 27 (GCSD0000018-19 videos); Ex. 13 (Tr. of GCSD0000018 video); Ex. 21 (Tr. of GCSD0000019 video); Ex.4 (Lockard Dep.) at 99-101,107-08 (authenticating videos).)

86.     MP's mother was a District employee, and Assistant Principal Weyher knew her prior to this time.  (Ex. 1 (Weyher Dep). at 40-41.)

87.     Prior to discovery in this litigation, the Does were never informed or knew that MP's mother was a District employee or that Assistant Principal Weyher knew her.  (Ex.6 (Jane Doe Decl.) at 2 ¶¶ 8-9; Ex. 11 (Julie Doe Decl.) at 1-2 ¶¶ 3-4; Ex. 12 (John Doe Decl.) at 6 ¶¶ 30-31.)

88.     Assistant Principal Weyher knew MP "pretty well."  (Ex. 13 (Tr. of GCSD0000018 video) at 14.)

89.     Assistant Principal Weyher informed MP and his parents: "I'm telling you the accusations because that's what due process is.  We've got to tell you what you're being accused of and give you an opportunity to rebut that or tell us – tell us what in the world's going on."  (Ex. 13 (Tr. of GCSD0000018 video) at 2.)

90.     MP claimed he and Ms. Doe kissed, and Assistant Principal Weyher asked, "like French"?  (Ex. 13 (Tr. of GCSD0000018 video) at 10.)

91.     MP admitted to then turning off the lights and closing the door to the editing room.  (Ex. 4 (Lockard Dep.) at 88-89.)

92.     MP claimed the oral sex lasted six seconds and that he did <u>not</u> ejaculate or orgasm.  (Ex. 4 (Lockard Dep.) at 89; Ex. 13 (Tr. of GCSD0000018 video) at 15.)  He agreed he never got the "feeling" that he should stop or that he was forcing himself on her.  (Ex. 13 (Tr. of GCSD0000018 video) at 15.)

93.     MP claimed he and Ms. Doe were in the entire RVN room together for six to seven minutes.  (Ex. 4 (Lockard Dep.) at 102-03; Ex. 13 (Tr. of GCSD00000018 video) at 8.)

94.     MP informed the school officials, with respect to the chair in the editing room – the chair and room that Ms. Doe had described in her report – that

19

"I bring it in here every morning because this is where I sleep because I get to school early."  (Ex. 20 (GCSD00000019 video; Ex. 21 (Tr. of GCSD0000019 video) at 3.)

95.    Despite reportedly being "shaky" and "scared" by what occurred in the editing room, MP did not tell student R about what happened, even though he walked by him to exit the RVN room.  (Ex. 4 (Lockard Dep.) at 123.)

96.    Assistant Principal Weyher asked MP if he knew what "consensual" meant.  (Ex. 13 (Tr. of GCSD0000018 video) at 14.)  When MP responded, "kind of," Assistant Principal Weyher provided MP with the answer: "[b]oth agree." (*Id.*)

97.    SRO Lockard and Weyher subsequently conducted the following line of questioning with MP:

Lockard:  Have you guys ever messed around before?

MP:  No.

Lockard:  After a football game, kissing, anything like that?

MP:  We have – **she kissed me after school one day in middle school**.

Lockard:  Okay.

MP:  Just out of the blue. . . . That's when I got the attention that, you know, she kind of – or I guess liked me, and so –

<u>Weyher</u>:  In middle school when she kissed you?

<u>MP</u>:  I guess I kind of – right.  **I guess I kind of remembered that yesterday, and I was like, oh, I guess.  You know, maybe she wants to do something**.

<u>Lockard</u>:  So do you think when you said, you know – and I'm sorry.  Did you – did you ask her let's go down to the RVN room?  Or she just –

<u>MP</u>:  She asked – she asked me if she could see it.

<u>Lockard</u>:  Okay.

<u>MP</u>:  That's where I was going, down there.

<u>Lockard</u>:  Okay.  Okay.  **When you went down there, were you, you know, kind of in the back of your mind thinking, hey, there may be a chance we can** –

<u>MP</u>:  I mean, yeah, maybe –

<u>Lockard</u>:  -- **do something?**

<u>MP</u>:  -- **in the back of my mind because, I mean, we – from that kiss, and I was like (indiscernible) someone to do it with, I guess**.

<u>Lockard</u>:  Yeah.  **You're – I mean, you're what, 15 years old?  I mean, yeah.  You're a teenage boy**."

(Ex. 13 (Tr. of GCSD0000018 video) at 17-18; Ex. 27 (GCSD0000018 video).)

98.    MP also stated:

<u>MP</u>:  You know when you like – when you look a someone, and you can tell like they want to do something?

<u>Lockard</u>:  Yeah.

21

MP:  Like their facial expressions change.

Lockard:  Yeah.

MP:  So she kind of had like that, I guess like that look in her eyes.

(Ex. 20 (GCSD0000019 video); Ex. 21 (Tr. of GCSD0000019 video) at 4-5.)

99.     MP claimed that Ms. Doe told him not to tell anyone.  (Ex. 21 (Tr. of GCSD0000019 video) at 16.)  Assistant Principal Weyher asked MP why Ms. Doe would say that.  (*Id.* at 16-17.)  **When MP said, "I have no idea," Assistant Principal Weyher supplied the answer:  "You think it's because she's got a boyfriend."**  (*Id.*)  MP then changed his answer to: "Right.  And so I feel like the way that she's saying I forced her to do that is because so she and her boyfriend, you know, can stay together."  (*Id.* at 17.)

100.   MP denied receiving any text messaging from Ms. Doe's stepfather. (Ex. 4 (Lockard Dep.) at 109; Ex. 21 (Tr. of GCSD0000019 video) at 15, 18-19.)

101.   MP claimed that he and Ms. Doe exchanged explicit messaging via an app called "Kik" during the prior Christmas break.  (Ex. 1 (Weyher Dep.) at 57-58; Ex. 21 (Tr. of GCSD0000019 video) at 15-16, 17-19.)  Assistant Principal Weyher never saw the messages, as the app automatically deletes messaging, and they were not otherwise saved.  (Ex. 1 (Weyher Dep.) at 59; Ex. 9 (Hrg. Tr.) at Plaintiff 000459-61.)

102.   MP admitted to sending pornographic images of himself to others once or twice.  (Ex. 4 (Lockard Dep.) at 110; Ex. 21 (Tr. of GCSD0000019 video) at 18-19.)  MP stated he did not send them to Ms. Doe, and SRO Lockard did not ask MP who he sent the photos to or if the recipient wanted MP to send those photos.  (Ex. 4 (Lockard Dep.) at 110-11; Ex. 21 (Tr. of GCSD0000019 video) at 19.)

103.   SRO Lockard did not ask MP what he meant when he texted the night of February 5, 2015, "just feels like every time I try to change, something always gets me right back into my bad ways, you know.  I am trying hard not to do bad things, but I guess I just need to try a little harder."  (Ex. 4 (Lockard Dep.) at 116-18.)

**Assistant Principal Weyher Suggested
MP's Mother Write Her Son's Official Statement**

104.   During the February 5, 2015 interview of MP, Assistant Principal Weyher stated, "Now, you do a statement form.  Basically, a statement is a written version of what you told me, okay. . . Just articulate the same thing that you told us. . .. Officer Lockard's taking notes, and I'm taking notes.  This is more of an **official document** for you."   (Ex.13 (Tr. of GCSD0000018 video) at 30.)

105.   These types of written statements are gathered as part of the criminal investigation process and are also relied on in the District's disciplinary proceedings.  (Ex. 4 (Lockard Dep.) at 53-54; Ex. 2 (Augmon Dep.) at 34.)

106.   Assistant Principal Weyher then asked MP's mother, a District employee, if she wanted to write her son's written statement.  (Ex. 13 (Tr. of GCSD0000018 video) at 30-31; Ex 27 (GCSD0000018 video) at 26:00-26:30.)

107.   Assistant Principal Weyher provided MP the statement form and told MP, "you fill out the top, and then we'll give it to Mom."  (Ex.13 (Tr. of GCSD0000018 video) at 35; Ex 27 (GCSD0000018 video) at 30:11-15.)

108.   Weyher and SRO Lockard left the room while MP's mother was writing her son's statement.  (Ex. 27 (GCSD0000018 video) at 30:15-32:28.)

109.   The statement itself does not disclose that it was written by MP's mother, a District employee, instead of by MP himself.  (Ex. 16 (MP Mother's Stmt.) at GCSD00000063-64; Ex. 1 (Weyher Dep.) at 53-54.)

110.   The statement did not include everything that MP told the school officials.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000451.)

111.   During Assistant Principal Weyher's deposition, he was untruthful regarding the statement attributed to MP.  (Ex. 1 (Weyher Dep.) at 53-54.)  He testified that MP wrote out the statement in front of him.  (*Id.*)  When asked if it

was MP's handwriting in the document, as it was very neat for a 16-year-old boy, Weyher maintained that it was MP's handwriting.  (*Id.*)

112.   The Gwinnett County School Police Investigative Report also claims that the "suspect completed a written statement."  (Ex. 4 (Lockard Dep.) at 84-90; Ex. 28 (Inv. Report) at GCSD00000924.)  The report does not disclose that MP's mother, a District employee, wrote the statement.  (*See* Ex. 28 (Inv. Report).)

113.   Assistant Principal / Title IX Coordinator Stinson testified that she was never informed that MP's mother had written her son's statement or that MP admitted, when walking to RVN room, he had in back of his mind Ms. Doe might be somebody to do it with, and she testified those things would have been relevant to her.  (Ex. 3 (Stinson Dep.) at 56.)

114.   Assistant Principal Augmon stated that she relied on MP's written statement because she was not in the initial interview with him.  (Ex. 2 (Augmon Dep.) at 68-69.)  She was not made aware that MP's mother wrote her son's statement, and said she would be concerned if what was written in the statement did not match what MP stated.  (*Id.* at 68-72.)

### The District Conducted Additional Interviews of Ms. Doe

115.   The school administrators required Ms. Doe to return to PRHS for additional interviews on February 6, 2015.  (Ex.1 (Weyher Dep.) at 74; Ex.6 (Jane

Doe Decl.) at 3 ¶ 14; Ex. 11 (Julie Doe Decl.) at 2 ¶ 9; Ex. 12 (John Doe Decl.) at 2 ¶ 5.)

116.   Ms. Doe and her father, John Doe, met with SRO Lockard and Assistant Principals Weyher, Stinson, and Augmon at PRHS.  (Ex. 4 (Lockard Dep.) at 74; Ex.6 (Jane Doe Decl.) at 3 ¶ 15; Ex. 11 (Julie Doe Decl.) at 2 ¶ 9; Ex. 12 (John Doe Decl.) at 2 ¶ 5.)

117.   Ms. Doe provided her second written statement to the PRHS officials. (Ex.6 (Jane Doe Decl.) at 3 ¶ 16.)

118.   The school officials conducted another interview of Ms. Doe, which was videotaped by SRO Lockard.  (Exs. 18, 29, 30 (GCSD 00000910-12 videos); Ex. 4 (Lockard Dep.) at 73-74,123-25, 129-30 (authenticating videos); Exs.19, 31, 32 (Trs. of GCSD 00000910-12 videos).)

119.   The school officials made Ms. Doe go back to the RVN room and reenact the assault.  (Ex. 22 (Jane Doe Dep.) at 30; Ex. 18 (GCSD 00000910 video); Ex. 2 (Augmon Dep.) at 38-39.) Ms. Doe did not want to do that.  (Ex. 22 (Jane Doe Dep.) at 30-31.)  Ms. Doe expressed to her mother that the reenactment made her really uncomfortable.  (Ex. 24 (Julie Doe Dep.) at 43-44.)

120.   PRHS Assistant Principal / Title IX Coordinator Stinson did not recall doing a walkthrough of the scene of a reported assault with any other student who reported sexual assault.  (Ex. 3 (Stinson Dep.) at 94.)

121.   Assistant Principal / Title IX Coordinator Stinson roleplayed the sexual assault with Ms. Doe; Stinson sat in the chair pretending to be Ms. Doe, and Ms. Doe stood in front of her, acting as MP.  (Ex. 18 (GCSD 00000910 video) at 6:15-8:10; Ex. 2 (Augmon Dep.) at 38-39.)

122.   At least one District administrator has admitted that asking a victim of a sexual assault to go back to the scene of the assault and roleplay the assault could be harmful to the victim.  (Ex. 33 (Graves Dep.) at 44-45.)

123.   While in the editing room, SRO Lockard asked Ms. Doe the following questions:

Lockard:  And – I'm sorry – **did you – I mean, scream, holler, push him off?**"

Ms. Doe:  **I was trying to push him off . . .  I was pushing him off, and I was like stop.  Like I was saying stop the whole time**.

Lockard:  **How loud were you saying stop?**

Ms. Doe:  [demonstrating how loud she said stop] Stop.  Like that.  And then I said it that loud.  . . .

Lockard:  Okay.  **Did you strike him in any way?  Did you hit him in the – hit him in the privates?**  I mean –

27

<u>Ms. Doe</u>:  I just to push – get him off of me.

<u>Lockard</u>:  Okay.  **Can I ask you why you didn't?**

<u>Ms. Doe</u>:  It was – I was so scared.  Like I didn't know – I was like so shocked.  I didn't think to do that.  And I was scared that if I would have done that, that he would like try to beat me or something like that.

                                        ***

<u>Lockard</u>:  Okay.  **And still, you don't have any type of defensive punching?  You don't grab his testicles and squeeze?  I mean, you know that's an extremely sensitive area.  You don't grab and squeeze?  You don't punch, scratch him?**  You know, especially – like you said, his – you're – his leg is right in between yours.

                                        ***

<u>Lockard</u>:  Okay.  **Why'd you not call 911 or anything right then?**  I mean, you're –

<u>Ms. Doe</u>:  My phone was all the way over there.

<u>Lockard</u>:  Okay, **but even after you got your phone.**

<u>Ms. Doe</u>:  I was so shocked.  I didn't even know what – like when I got in the car, I was like, what just happened?  My mom's like, is something wrong?  I was like no . . . It's so – it's so embarrassing.  I didn't know what to say to her.

(Ex. 19 (Tr. of GCSD 00000910 video) at 12-14, 18.)

124.   The school officials then continued the interview in a conference room, where SRO Lockard and Assistant Principals Augmon, Stinson, and Weyher all asked Ms. Doe questions.  (Exs.29, 30, 31, 32 (GCSD00000911-12 videos and trs. of same).)

125.    Ms. Doe stated that she and MP were in the RVN room for a total of 15 minutes.  (Ex. 31 (GCSD0000911 Tr.) at 5.)  SRO Lockard reviewed videotape and confirmed that Ms. Doe was in the RVN room for approximately 14 minutes. (Ex. 4 (Lockard Dep.) at 94.)

126.    Ms. Doe reported that MP masturbated in front of her.  (Ex. 4 (Lockard Dep.) at 112-13.)

127.    The videotape of the school officials' interview of Ms. Doe shows SRO Lockard – while imitating the motions Ms. Doe made to show how she tried to push MP away – again questioning her on what she was doing with her hands and if she tried to "slap his penis away."  (Ex. 29 (GCSD00000911 video) at 27:00-28:28; Ex. 31 (GCSD0000911 Tr.) at 12-14.)

128.    Assistant Principal Stinson asked "[d]id you try to reach for the door?"  (Ex. 31 (GCSD0000911 Tr.) at 11.)

129.    The Does informed the school officials that MP had sent Ms. Doe inappropriate text messages.  (Ex. 25 (John Doe Dep.) at 19-20; Ex. 31 (GCSD0000911 Tr.) at 5; Ex. 4 (Lockard Dep.) at 90-93.)

130.    When Ms. Doe was in the ninth grade, John Doe discovered that MP had sent his daughter a "very crude and disgusting" text message about what sort of sexual favors she could offer MP, which Mr. Doe regarded as highly

disrespectful and predatory.  (Ex. 25 (John Doe Dep.) at 19-20.)  Mr. Doe sent MP

a text message instructing him to stay away from Jane Doe.  (Ex. 25 (John Doe

Dep.) at 20-22; Ex. 4 (Lockard Dep) at 75-76; Ex. 31 (GCSD0000911 Tr.) at 5;

Ex. 12 (John Doe Decl.) at 1 ¶ 3.) John Doe soon provided the text messaging to

the District.  (Ex. 12 (John Doe Decl.) at 5 ¶ 21.)

131.    SRO Lockard asked Ms. Doe why she high-fived MP in the lobby and

why she went to the RVN room, as follows:

> Lockard:  No, hold on.  When he says, you know, let's go down to the
> RVN room, why are you – **I don't understand why you would even
> go with him.**

> Ms. Doe:  I mean, we used to be friends, and I trusted him.  We'd
> been friends . . . He's friends with [A] too.  Like I'd stay after with
> [A] sometimes, and [MP] would talk to both of us.

> Lockard:  Okay.  So that's what I'm saying.  **I don't understand –
> you know, if I'm not friends with someone really, and they've
> done inappropriate things in the past, sending text messages or
> something that, you know, your stepdad**—

> Ms. Doe:  I didn't think he was going to do what he did.

> Lockard:  Well, that's what I'm trying to –

> John Doe:  Because she's too trusting.

> Lockard:  Because that's what I'm trying to see.   Why –

> John Doe:  She's too naïve and too trusting.

Lockard:  Okay.  One second, please.  Okay.  So that's what I'm trying to see, why you would – because when I – when I –

Ms. Doe:  Because I didn't –

Lockard:  -- when I watched the video, I mean, it's like you guys are almost like best friends.  He walks up, and you give like each other a high fi[v]e and – high five and stuff.

Ms. Doe:  Yeah, like –

Lockard:  Yeah.  I mean, it's not like a – when I watched it on the video, I was like, well, these are like two people that don't really have much to do with each other.  He just kind of walks up.

Ms. Doe:  I'm really friendly.  Like if you see random people at school, I give everyone a high five.

Lockard:  Yeah.

Ms. Doe:  I go up to random people, I say hi [to] people.

Lockard:  Okay.

Ms. Doe:  Everyone says I'm a social butterfly.

Lockard:  Yeah.

Ms. Doe:  I didn't know he was going to do that to me . . . And I just wanted to see the room because I've never been in there before.

(Ex. 31 (GCSD0000911 Tr.) at 22-24.)  Ms. Doe was crying during this questioning.  (Ex. 4 (Lockard Dep). 127.)

132.   The school officials told Ms. Doe, "[MP] is saying that you – this is something you wanted to do.  You sat on him, straddled him." (Ex. 31

31

(GCSD0000911 Tr.) at 33.)  They asked her at least _**18 times**_ whether she "sat" on MP's lap or "straddled" him." (*Id.* at 8-9, 12, 26, 28-34.)  Ms. Doe repeatedly responded that MP pulled her onto his lap and into the chair, and she explained, "I don't really think of that as sitting."  (*Id.*)

133.   The school officials repeatedly questioned Ms. Doe about what exactly she said to student R, who was in a separate part of the RVN room, and whether she said to R that he and his brother were cute or hot.  (Ex. 31 (GCSD0000911 Tr.) at 3-4, 16.)

134.   The PRHS school officials' additional questioning of Ms. Doe included the following:

> <u>Weyher</u>:   . . . Now if he's forcing you, that's different than if you're volunteering.  You see, that's what we're trying to say is it something that you offered to do or that he pulled you and made you sit down on top of him . . .
>
> <u>Ms. Doe</u>:  **Why would I volunteer when I have a boyfriend, and I was trapped in there because he had closed the door even though that bothered me?**
>
> <u>Stinson</u>:  **But at first you weren't trapped in there**.
>
> <u>Ms. Doe</u>:  No.
>
> <u>Stinson</u>:  You were playing with the equipment, right?
>
> <u>Ms. Doe</u>:  Yeah.

<u>Stinson</u>:  Okay.  That what – **as a female**, that's why I'm asking certain questions because – that's why I wondered who turned the light out?  You know, if he – **we're trying to figure out at what point did you feel uncomfortable?**  That's all.  That's why I'm trying to make the determination at what point did you feel – because sometimes we'll get . . **Our radar will go off, like okay, something's not right.  So that's why I'm like who turned the light off?**  When he turned the light off, did you have a feeling?  When – at what point – you know, you were in the room, when you came in did you get the feeling?  **At what point did you get the feeling?**  That's why I was really trying to, you know, ask questions just to say when – Oh, my goodness.  Something isn't right.

<u>Ms. Doe</u>:  I got that feeling when I was standing at the doorway, and then right when I got that feeling, that's when it happened.

(Ex. 31 (GCSD000911 Tr.) at 34-35; Ex. 32 (GCSD00000912 Tr.) at 2.)

135.    Ms. Doe informed the PRHS officials that MP may have been high.

(Ex. 32 (GCSD00000912 Tr.) at 3-4.)

136.    Ms. Doe consistently denied texting or communicating via Kik with

MP in December or over the Christmas break.  (Ex. 32 (GCSD00000912 Tr.) at 4-

8; *see also* Ex. 9 (Hrg. Tr.) at Plaintiff 000542.)  She explained that MP had asked

her "why wouldn't you text me?"  She told him that she was not allowed to do so.

(Ex. 32 (GCSD00000912 Tr.) at 7.)

137.    School officials stated they were seeking the messages MP claimed

existed between him and Ms. Doe.  (Ex. 32 (GCSD00000912 Tr.) at 4, 8-9.)

33

138.   The District did not provide, offer, recommend or coordinate any health, psychological, counseling or academic assistance or services to Ms. Doe at this time.  (Ex.6 (Jane Doe Decl.) at 3 ¶ 17; Ex. 11 (Julie Doe Decl.) at 3 ¶ 10; Ex. 12 (John Doe Decl.) at 2 ¶ 6.). At the end of the interview, Ms. Doe was instructed to go and talk to her teacher "real quick" and do her work over the weekend.  (Ex. 32 (GCSD00000912 Tr.) at 12.)

139.   At <u>no time</u> did the school officials inform the Does that Assistant Principal Stinson was the Title IX Coordinator for PRHS.  (Ex. 22 (Jane Doe Dep.) at 14; Ex. 24 (Julie Doe Dep.) at 25, 34.)  Ms. Doe did not know that Ms. Stinson was the PRHS Title IX Coordinator.  (Ex. 22 (Jane Doe Dep.) at 14.)  The District Student/Parent Handbook for 2014-2015 did not identify any Title IX Coordinator for PRHS.  (*See* Ex. 26 (Student/Parent Handbook).)

140.   At no time did any of the District administrators mention Title IX or inform Ms. Doe or her parents of her rights under Title IX.  (Ex. 22 (Jane Doe Dep.) at 24; Ex.6 (Jane Doe Decl.) at 4 ¶ 23; Ex. 11 (Julie Doe Decl.) at 4 ¶ 16; Ex. 12 (John Doe Decl.) at 3 ¶ 12.)  At no time did the administrators inform the Does of – or refer them to – the District's policy on student reports of sexual harassment and discrimination.  (Ex.6 (Jane Doe Decl.) at 4 ¶ 24; Ex. 11 (Julie Doe Decl.) at 4 ¶ 17; Ex. 12 (John Doe Decl.) at 3 ¶ 13.)

141.   Assistant Principal / Title IX Coordinator Stinson did not fill out or complete any documentation or report regarding Ms. Doe's complaint that MP had sexually assaulted her.  (Ex. 3 (Stinson Dep.) at 38-39, 60.)  She took notes during interviews with Ms. Doe, but she threw them away two years ago, although a preservation letter was sent to her on March 16, 2015.  (*Id.* at 39; Ex. 34 (Gomez 30(b)(6) Dep.) at 19-21.)  The District did not make any attempt to collect those notes.  (Ex. 34 (Gomez 30(b)(6) Dep.) at 19-21.)

142.   At no time did SRO Lockard or any other District employee inform Ms. Doe or her parents of the following:

a.     the Georgia Crime Victim's Bill of Rights, which includes that Ms. Doe had a right to refuse to submit to an interview by MP or his attorney;[4]

b.     that Gwinnett County Police Department had a Special Victim's Unit that investigated sexual assault claims;

c.     that Ms. Doe could have a forensic interview at the County Sexual Assault Center; or

d.     that Ms. Doe could have a forensic medical examination.

(Ex. 4 (Lockard Dep.) at 64-67; Ex. 12 (John Doe Decl.) at 4 ¶ 16.).)

---

[4] *See* O.C.G.A. 17-17-8.1 (2010).

35

143.   The PRHS officials never asked MP if – as Ms. Doe reported – he masturbated in the RVN editing room or if he believed that Ms. Doe consented to it.  (Ex. 4 (Lockard Dep.) at 112-13; Ex. 1 (Weyher Dep.) at 96-97.)

144.   The District's Student Behavior Conduct Code prohibits "lewd exposure" and lewd caressing or indecent fondling/touching of a student's own body.  (Ex. 26 (Student/Parent Handbook) at GCSD00009298.)  However, the District administrators did not investigate MP for lewd exposure or masturbating in front of Ms. Doe without her consent.  (Ex. 2 (Augmon Dep.) at 53; Ex. 3 (Stinson Dep.) at 72-73.)

145.   Moreover, at <u>no time</u> did the PRHS school officials ask <u>MP</u>, a male student, the types of questions they asked Ms. Doe during this interview, such as the following:

a.   Whether MP had a girlfriend or whether he was romantically interested in any girl in February 2015;

b.   If he lied about the assault because he was afraid his girlfriend would find out, afraid criminal charges would be filed against him, or was afraid of Ms. Doe's boyfriend;

c.   Why he went to the RVN room after school hours on February 4, 2015;

d.   Why he did not stay away from Ms. Doe, as Ms. Doe's father instructed him to do;

e.   Why he high-fived Ms. Doe in the school lobby;

36

f.     Why he went into the editing room with Ms. Doe;

g.     Why he turned the lights off in the larger part of the room;

h.     Why he turned the lights off in the editing room;

i.     Why he closed the door to the editing room;

j.     If he thought it was appropriate to pull his pants down in front of Ms. Doe;

k.     If he had ever taken any other girl into the editing room or engaged in any other sexual conduct with a girl in the editing room;

l.     About his sexual history; or

m.     If he thought it was okay to masturbate in front of a girl.

(Ex. 4 (Lockard Dep.) at 118-22; Ex. 1 (Weyher Dep.) at 89-92; Ex. 2 (Augmon Dep.) at 43-51; Ex. 3 (Stinson Dep.) at 78-80, 93.)

## The District Found Ms. Doe in Violation of Rule 9 G and Suspended Her

146.   Bob Burgess (the District's Director of Discipline and Behavioral Interventions), SRO Lockard, PRHS Principal Jeff Matthews, and Assistant Principals Weyher, Stinson, and Augmon collectively determined that Ms. Doe violated Student Conduct Behavior Code Rule 9G.  (Ex. 1 (Weyher Dep.) at 75-77; Ex. 35 (Burgess Dep.) at 11, 42.)  Principal Matthews, like the PRHS Assistant Principals, had the authority to discipline students for misconduct. (Administrator's Discipline Guidelines Handbook) at GCSD00009475.)

147.   The District's 2014-2015 Student/Parent Handbook describes Rule 9G as follows: "Oral sex or any act of sodomy."  (Ex. 26 (Student/Parent Handbook) at GCSD00009298; Ex. 35 (Burgess Dep.) at 35-36).)  There is nothing in Rule 9G that specifies whether oral sex or sodomy must be consensual, welcome, unwelcome, or forced.  (*See id.*; Ex.33 (Graves Dep.) at 70-72) As explained by Mr. Burgess, the conduct prohibited by Rule 9G is a "**behavior**."  (Ex. 35 (Burgess Dep.) at 39-40.)

148.   The group never considered whether, instead of charging Ms. Doe with violation of a school rule, it should simply find that MP did not force Ms. Doe to have sex and that he did not violate the Student Conduct Code.  (Ex.1 (Weyher Dep.) at 82.)

149.   On February 10, 2015 – five days after Ms. Doe reported that MP sexually assaulted her – school officials met with Ms. Doe and her parents, and they informed the Does that they found Ms. Doe to have violated Rule 9G.  (Ex. 24 (Julie Doe Dep.) at 46; Ex. 36 (Discipline Referral) at Parent 000153-54; Ex.6 (Jane Doe Decl.) at 3 ¶ 18; Ex. 11 (Julie Doe Decl.) at 3 ¶ 11; Ex. 12 (John Doe Decl.) at 2 ¶ 7.)

150.   Although the District had informed MP of his "due process" rights and what he had been "accused of" (Ex. 13 (Tr. of GCSD0000018 video) at 2), at

no time prior to this meeting had the District ever informed Ms. Doe or her parents

that, by reporting sexual assault, Ms. Doe could be found in violation of a school

rule.  (Ex. 1 (Weyher Dep.) at 84; Ex. 4 (Lockard Dep.) at 66-67; Ex. 3 (Stinson

Dep.) at 61; Ex.6 (Jane Doe Decl.) at 4 ¶¶ 20-22; Ex. 11 (Julie Doe Decl.) at 3-4 ¶¶

13-15; Ex. 12 (John Doe Decl.) at 3 ¶¶ 9-11).)

151.    During the meeting, the school administrators said, "**they really**

**didn't know what happened** and so it was, so they're going to do it at the hearing

and have the hearing officers decide."  (Ex. 24 (Julie Doe Dep.) at 46-47.)

152.    In a February 10, 2015 letter from Principal Jeff Matthews, the

District explained "[t]he basis of this charge is that on Wednesday, February 4,

2015, [Jane Doe] **participated in oral sex with [MP] after school in the RVN**

**studio**."  (Ex. 37 (Feb. 10, 2015 Letter) at Parent 00087-89; Ex.6 (Jane Doe Decl.)

at 5 ¶ 27; Ex. 11 (Julie Doe Decl.) at 4 ¶¶ 20-21; Ex. 12 (John Doe Decl.) at 4 ¶

18.)

153.    The District would not have charged Ms. Doe with violation of a

school rule if she had not reported sexual assault.  (Ex. 2 (Augmon Dep.) at 54-55.)

154.    The school administrators had discretion with respect to disciplinary

measures they could impose against Ms. Doe, which included an in-school

suspension ranging from 4 to 9 days.  (Ex. 38 (Rutledge Dep.) at 15; Ex. 26

(Student/Parent Handbook) at GCSD00009306; Ex. 39 (Administrator's Discipline Guidelines Handbook) at GCSD00009478.)

155.   However, the District punished Ms. Doe with the most severe disciplinary measure available to it: an out-of-school suspension from February 10, 2015 through the date of a disciplinary hearing, to be held on February 17, 2015. (Ex. 1 (Weyher Dep.) at 84-86; Ex.37 (Feb. 10, 2015 Letter) at Parent 000153; Ex. 26 (Student/Parent Handbook) at GCSD00009306 (describing different levels of discipline); Ex. 39 (Administrator's Discipline Guidelines Handbook) at GCSD00009478.)

156.   In the District, a disciplinary hearing was required in order to suspend a student for more than 10 days.  (Ex. 38 (Rutledge Dep.) at 19-20; Ex. 35 (Burgess Dep.) at 71.)  The purpose of the disciplinary hearing was to determine, on behalf of the Gwinnett County Board of Education, whether a student had violated a rule and if **"further consequences"** were warranted.  (Ex. 38 (Rutledge Dep.) at 19-20.)

157.   The District did not provide, offer, recommend or coordinate any health, psychological, counseling, or academic assistance or services to Ms. Doe at this time.  (Ex.6 (Jane Doe Decl.) at 4 ¶ 19; Ex. 11 (Julie Doe Decl.) at 3 ¶ 12; Ex. 12 (John Doe Decl.) at 2-3 ¶ 8).

158.   Instead, Ms. Doe was responsible for "making arrangements and completing makeup work within the time line specified by [her] local school." (Ex. 36 (Discipline Referral) at Parent 000154.)

159.   Ms. Doe explained she was very upset "because I was being suspended for reporting an assault."  "I literally told the administration what happened, and they gave me a referral for it, like that's like punishing me.  If I, if I didn't tell anyone about that I wouldn't have gotten suspended for it."  (Ex. 22 (Jane Doe Dep.) at 39.)

**The Does Sought Assistance from the District and Law Enforcement**

160.   On February 12, 2015, John Doe called the District Superintendent, and "left a note with his assistant, desperately asking for his help, that my family was in a real crisis," but the Superintendent did not respond.  (Ex. 25 (John Doe Dep.) at 50.)

161.   Ms. Doe's parents also attempted to reach the District's Title IX Coordinator in advance of the disciplinary hearing but were told to speak with PRHS Principal Jeff Matthews.  (Ex. 11 (Julie Doe Decl.) at 5 ¶ 24; Ex. 12 (John Doe Decl.) at 5 ¶ 19.

162.   On February 12, 2015, Ms. Doe and her mother spoke with Officer Wilson at the Gwinnett County Police Department, and they asked for a separate

investigation by law enforcement, apart from that conducted by the District and its employees.  (Ex. 7 (Jane Doe Interrog. Answers) at 9-10.)  This request was denied because – as Ms. Doe was informed – SRO Lockard was designated as the sole investigator.  (*Id.*)

### The District Instructed Its Police Department and Administrators to Pursue a Major Rule Violation against Ms. Doe and MP, but Not Criminal Charges, As In the Mill Creek Case

163.    On February 16, 2015, James Taylor, the Executive Director of Academic Support for the District, instructed Wayne Rikard and Mr. Burgess to treat Ms. Doe's report of sexual assault as follows:

> Let's treat this Peachtree Ridge case using the same approach as we will with the Mill Creek case.  **The school will not pursue a criminal charge of rape but rather a major violation of a school rule**.

(Ex. 35 (Burgess Dep.) at 45-48; Ex. 40 (Feb. 16, 2015 email) at GCSD00008423 (emphasis added).)

164.    Mr. Rikard was Chief of the Gwinnett County School Police Department.  (Ex. 41 (GCPS Sup. Ref. Tel. Interview) at GCSD00012037.)

165.    At the time, as stated above, Mr. Burgess was the District's Director of Discipline and Behavioral Interventions.  (Ex. 35 (Burgess Dep.) at 11.)

166.    Mr. Burgess was also the supervisor of Cindy Antrim Rutledge and Cora Graves, who were the hearing officers designated to preside over the

District's disciplinary hearing against Ms. Doe.  (Ex. 38 (Rutledge Dep.) at 17; Ex. 35 (Burgess Dep.) at 15-16; Ex. 33 (Graves Dep.) at 15-16, 35)  The hearing officers' role was to decide a student's "guilt or innocence" with respect to a rule violation and "determine the consequences."  (Ex. 36 (Discipline Referral) at Parent 000154.)

167.    The Mill Creek case referred to in Mr. Taylor's email was one in which "a female student reported through a friend that there was inappropriate sexual contact in the elevator at Mill Creek High School after school."  (Ex. 34 (Gomez 30(B)(6) Dep.) at 13.)  The female student reported the male student had "vaginally penetrated her in the elevator and that they had made out and fondled." (*Id.*)

168.    In that case, the female student was taken to the Sexual Assault Center for a forensic interview.  (*Id.* at 13-14.)

169.    In the Mill Creek case, the District found the female student to have violated Rule 9J, for kissing, and she was punished with two days of out-of-school suspension.  (*Id.* at 14.)  The District found the male student to have violated Rule 9E, which prohibits "lewd carress," and 10C, which is "AWOL;" a disciplinary hearing was held against him; and he was suspended.  (*Id.* at 14-15.)

43

170.   In the Mill Creek case, much like here, Mr. Burgess was consulted, Ms. Antrim Rutledge was the hearing officer at the disciplinary hearing, and attorney Creighton Lancaster represented the school at the hearing.  (*Id.* at 17-18.)

171.   The District's "practice" with respect to any student misconduct that has a "criminal component" was for the school to focus on whether the students involved violated a school rule, apparently with no exception for a student who reported being the victim of sexual assault.  (*Id.* at 15-17.)

### The District's Disciplinary Hearing against Ms. Doe

172.   The District's disciplinary hearing against Ms. Doe was scheduled for February 17, 2015.  (Ex. 37 (Feb. 10, 2015 Letter) at Parent 00087-89.)

173.   The disciplinary hearing was also held against MP, despite the fact that he had admitted to violating Rule 9G.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000464, 000601.)

174.   Typically, a student typically has approximately ten days to prepare for a disciplinary hearing.  (Ex. 33 (Graves Dep.) at 34-35.)

175.   As originally scheduled, Ms. Doe would have had only seven days to prepare for the disciplinary hearing.  (Ex. 37 (Feb. 10, 2015 Letter) at Parent 00087-89.)

176.   However, the hearing was delayed by a day due to inclement weather, and Ms. Doe still had only eight days to prepare for the disciplinary hearing, which was conducted jointly against her and MP on February 18, 2015.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000307, 328)

177.   The District's February 10, 2015 letter informed the Does that, at the disciplinary hearing, "Assistant Principals Jon Weyher, LaShawnia Stinson and Lee Augmon, SRO Tony Lockard" and additional students are "expected to present oral and/or written testimony in support of the charges."  (Ex. 37 (Feb. 10, 2015 Letter) at Parent 00087-89.)

178.   The District's letter also informed the Does that, "upon timely request made to the Office of Student Discipline and Behavior Interventions at Lawrenceville East (770/513-6607), you are entitled to have subpoenas issued to you for your disbursement for the appearance of witnesses and the production of other evidence on your behalf."  (*Id.*)

179.   Attorney Richard Capriola represented Ms. Doe at the disciplinary hearing.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000311.)

180.   The law firm of Thompson, Sweeny, Kinsinger & Pereira, P.C. is the general counsel for the District and was the District's general counsel in 2015.

(Ex. 42 (Lancaster Decl.) at 1.)  Creighton Lancaster and Victoria Sweeny are

attorneys from that law firm who represent the District.  (*Id.* at 1-2.)

181.   On February 13, 2015, Mr. Capriola notified the District that Mr.

Burgess and Mr. Lancaster claimed that – despite the District's representation –

subpoenas could only be used for individuals, and not records or evidence, and that

Mr. Lancaster "had undertaken a campaign of obstruction and obfuscation in an

intentional effort to interfere with and hinder Ms. [Doe's] ability to gather evidence

on her behalf within a reaonable time prior the hearing."  (Ex. 43 (Feb. 13, 2015

Letter) at GCSD00000239-42.)

182.   Prior to the hearing, Mr. Capriola – pursuant to the District's

procedures – issued subpoenas for appearance at the hearing by, among others,

SRO Lockard, and that he bring with him "all records you have regarding the

disciplinary hearing of [Ms. Doe] including your complete investigative file all

notes, recordings, video recordings and audio recordings relevant to this hearing."

(Ex. 44 (Feb. 16, 2015 Letter & Subpoena) at Parent 000258-61.)

183.   One of SRO Lockard's duties was to "[b]e on call" to testify at

disciplinary hearings.  (Ex. 4 (Lockard Dep.) at 29-30; Ex. 45 (Job Description at

GCSD 000010195).)  He had appeared at approximately 20 other disciplinary

hearings to testify, and a school administrator usually informed him of the need for

his appearance.  (Ex. 4 (Lockard Dep.) at 143-44.)  However, neither Mr. Lancaster nor any school administrator informed SRO Lockard that he had been subpoenaed to appear at the hearing or produce the requested records, and – despite the District's representation to the Does that he would present testimony at the hearing – he did not do so.  (Ex. 4 (Lockard Dep.) at 139-42.; Ex. 44 (Feb. 16, 2015 Letter & Subpoena); Ex. 37 (Feb. 10, 2015 Letter) at Parent 00087-89.)

184.   The videos taken by SRO Lockard of school administrators' interviews of MP and Ms. Doe were not provided in response to Ms. Doe's subpoena, and they were not reviewed at the disciplinary hearing.  (Ex. 33 (Graves Dep.) at 42; Ex. 11 (Julie Doe Decl.) at 5 ¶ 24; Ex. 12 (John Doe Decl.) at 5 ¶ 20.)

185.   Despite the District's representation to the Does that Assistant Principal Stinson, the self-described "lead investigator" in the matter, would present testimony at the hearing, she did not because she was "not asked to."  (Ex. 3 (Stinson Dep.) at 73; Ex. 37 (Feb. 10, 2015 Letter) at Parent 00087-89.)

186.   Creighton Lancaster represented the District at the disciplinary hearing.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000311-12.)  Mr. Lancaster's firm provided training to the hearing officers on how to conduct hearings.  (Ex. 38 (Rutledge Dep.) at 26.)

187.   Mr. Lancaster also met with Assistant Principals Weyher and Augmon to prepare them for the disciplinary hearing.  (Ex. 1 (Weyher Dep.) at 101; Ex. 2 (Augmon Dep.) at 80-81.)

188.   Formal court processes and procedures, including, for example, the formal rules of evidence, are not utilized at District disciplinary hearings.  (Ex. 33 (Graves Dep.) at 16-17.)

189.   During a District disciplinary hearing, if any attorney does not want a student to answer any question, he or she can simply tell the student not to answer the question; there are no limitations on the instruction.  (Ex. 33 (Graves Dep.) at 95-96; Ex. 9 (Hrg. Tr.) at Plaintiff 000501-02.)

190.   Mr. Lancaster submitted a motion to quash Ms. Doe's subpoena for records.  The motion was provided to Ms. Doe's attorney only five minutes before the hearing began.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000325.)  MP's attorney, Torin Togut, also submitted a motion to quash, which had not been provided to Ms. Doe's attorney.  (*Id.* at Plaintiff 000324-25.)  The motions were granted by the hearing officers.  (*Id.* at Plaintiff 000330.)

191.   Shortly into the hearing, Ms. Doe had to leave the room because, as she explained, "I felt like I was going to die . . . [b]ecause I was in the same room

as the guy that assaulted me." (Ex. 9 (Hrg. Tr.) at Plaintiff 000333; Ex.22 (Jane

Doe Dep.) at 47.)

192.   Assistant Principal Augmon testified for the District at the hearing.

(Ex. 9 (Hrg. Tr) at Plaintiff 000330-31.)  She read Ms. Doe's written statements

into the record.  (*Id.* at Plaintiff 000338-43.)

193.   Assistant Principal Augmon testified as follows:

Q.  Ms. Augmon, who was the primary person responsible for the
investigation by the school system?

A.  I don't know that there was a primary school staff member, but our
primary person was Officer Lockard.
* * *
Q.  Okay.  How many similar investigations have you done regarding
allegations of sexual assault?

A.  I haven't done any prior to this incident.

Q.  And you would agree that that could potentially involve criminal
consequences?

A.  For sexual assault, yes, sir.
* * *
Q.  So – and she told you that she had been sexually assaulted?

A.  She told me that she was forced to perform oral sex on [MP].

Q.  That would be a sexual assault in your book?

A.  I don't know that I'm trained to qualify what is sexual assault.

(Ex. 9 (Hrg. Tr) at Plaintiff 000373-74, 378.)

49

194.   Ms. Doe's attorney asked Assistant Principal Augmon whether she had any training in conducting such an investigation, to which Mr. Lancaster objected, and the hearing officers – in accordance with Lancaster's objection – disallowed the questioning.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000374-76.)

195.   Although Assistant Principal Augmon testified that Ms. Doe's demeanor was relevant to her determination whether Ms. Doe violated a school rule, she did not bother to speak with either Ms. Brimmer or Ms. Powell, the two teachers Ms. Doe spoke with before speaking with SRO Lockard.  (Ex. 9 (Hrg Tr.) at Plaintiff 000397-98, 000413-14.)

196.   When asked whether the school had the burden of proof of showing that Ms. Doe consented to oral sex, Augmon responded:  "The school has the burden to prove that the act occurred, from the way that I understand it, and we bring the charges before the hearing officer to determine whether the rule was violated.  I don't think the school's burden was to prove consent . . . ."  (Ex. 9 (Hrg Tr.) at Plaintiff 000401-02.)  Hearing Officer Graves agreed with this.  (Ex. 33 (Graves Dep.) at 75-76.)

197.   Mr. Capriola asked Augmon whether the matter was reported to the school's Title IX officer.  (Ex. 9 (Hrg. Tr.) at Plaintiff 000402-03.)  Mr. Lancaster objected and stated, "[a]nd I respond that the school is not on trial here.  The

question is whether or not [Ms. Doe] and [MP] violated the rules they are charged with, not whether the school followed all of the federal requirements that may be required to perform.  That would be for a separate tribunal if there were such an allegation." (*Id.* at Plaintiff 000402-03.)  The Hearing Officers upheld Mr. Lancaster's objection.  (*Id.* at Plaintiff 000403.)

198.   Assistant Principal Augmon – who claimed she took no notes during interviews of Ms. Doe and MP – focused on supposed inconsistencies in Ms. Doe's reports, based on her <u>memory</u> of Ms. Doe's verbal statement compared to the written statements, and ignored consistencies in Ms. Doe's verbal and written statements.  (Ex.9 (Hrg Tr.) at Plaintiff 000392, 398-99.)

199.   The written statement attributed to MP – which was in fact composed by his mother  – was read into the record by Assistant Principal Weyher.  (Ex. 9 (Hrg Tr.) at Plaintiff 000432-36.)  Weyher testified – falsely – that it was a statement he took from MP.  (*Id.*)

200.   Ms. Doe's attorney questioned Assistant Principal Weyher about MP's written statement, in which he claimed he and Ms. Doe were kissing, and then he got up and turned off the light and pulled down his pants.  (Ex. 9 (Hrg Tr.) at Plaintiff 000445-56.)  The questioning went as follows:

> Q.  Do you think it was consistent with kissing someone to immediately turn the lights off and pull your pants down?

51

A.  Sir, they're 15 years old.  I can't tell you the answer to that question.

Q.  Did you question him about that?

A.  Yes.

Q.  What did he say?

A.  He told me that he saw in her eyes that it was – he could tell by her eyes that she wanted to be with him.

Q.  That she wanted to give him oral sex?

A.  I didn't say that sir.  I said be with him.

Q.  Did he ever say that [Ms. Doe] said I want to give you oral sex?

A.  No.

Q.  Did he ever say that [Ms. Doe] said I want to have sex with you?

A.  No.

Q.  Did he ever say [Ms. Doe] said pull your pants down?

A.  Did [MP] say?

Q.  Yes.

A. No.

(Ex. 9 (Hrg Tr.) at Plaintiff 000446-47.)

201.   Assistant Principal Weyher testified that MP informed him that he left campus the morning of February 5, 2015 because he was sick, and that MP's

mother confirmed MP was sick.  (Ex. 9 (Hrg Tr.) at Plaintiff 000449.)  In fact, MP

never claimed he was sick, and MP's mother said he was "sick because he was

worried."  (Ex. 13 (GCSD00000018 Tr.) at 19-23.)

202.    Assistant Principal Weyher testified that there was no recording of the

interview that he, SRO Lockard, and Assistant Principals Augmon and Stinson of

conducted of Ms. Doe.  (Ex. 9 (Hrg Tr.) at Plaintiff 000452-53.)  This is false.

(*See* Exs. 18, 29, 30 (videos).)

203.    When asked whether Ms. Doe told him that she screamed, Assistant

Principal Weyher answered, "[s]he did not tell me," even though – as evidenced by

the video recording of Ms. Doe's interviews – Ms. Doe repeatedly answered

school officials' questions as to whether she screamed, how loud she screamed,

and how many times she screamed.  (Ex. 9 (Hrg Tr.) at Plaintiff 000457; Ex. 18

(GCSD 00000910 video); Ex. 19 (Tr. of GCSD 00000910 video) at 12-14, 18.)

204.    MP's story regarding the purported content of the never-found

supposed Kik messaging between him and Ms. Doe – which Ms. Doe denied ever

doing – changed significantly from what he told Assistant Principal Weyher and

SRO Lockard during his February 5, 2015 interview.  (*Compare* Ex. 21 (Tr. of

GCSD 00000019 video) at 15-18 *and* Ex. 9 (Hrg Tr.) at Plaintiff 000466.)

205.    During MP's February 5, 2015 interview with Assistant Principal

Weyher and SRO Lockard, he was asked about the content of the supposed Kik

messages, and he claimed Ms. Doe wrote she would do "**stuff to me**," and that he

"**implied everything meaning sex and all that**."  (Ex. 21 (Tr. of GCSD 00000019

video) at 15-16.)  He stated that he <u>never</u> texted Ms. Doe, "I want you to suck my

dick."  (*Id.* at 17.)  He also claimed, "I guess I just implied, you know, that would

be fun, you know.  That I'd probably do the same – you know, I wouldn't, you

know, have sex, but you know, just messing around would be fun, I guess."  (*Id.* at

18.)

206.    However, at the disciplinary hearing, MP testified with respect to the

purported Kik messages:

> A. Yes, sir.  And those messages did contain sexual text messages of, you
>    know, back and forth of me and her both saying, you know, that – of
>    what we would be willing to do to each other.
>
> Q.  Would you be a little bit more explicit?
>
> A.  Of her sucking my dick, of making out, that really covers it, of just – and
>    she agreed that she would be willing to do stuff like that.
>                                    ***
> Q.  In those Kik messages, you were propositioning, and she was
>    propositioning you is that what you said?
>
> A.  Yes.
>
> Q.  And what were you propositioning her with sexually?

A.  Sucking my dick, just fooling around, like making out and stuff that she
had agreed to.

Q.  And you say she had agreed to it?

A.  Yes.

Q.  In December, before Christmas?

A.  Right.

(Ex. 9 (Hrg Tr.) at Plaintiff 000465-66.)

207.   When asked how his conduct evolved from kissing Ms. Doe "and
looking into her eyes to pulling down [his] pants," MP referenced those Kik
messages purportedly exchanged two months prior to the reported assault and
"knowing that it was okay, that she would do those kind of things . . . And also, the
– like Mr. Weyher was saying about what I said, the look that [Ms. Doe] had on
her face, that I could just tell that she wanted to do something more . . . **it was a
blank face that didn't really have any expression, just wanted to do stuff**."
(Ex. 9 (Hrg Tr.) at Plaintiff 000472, 000483-84.)

208.   MP confirmed that Assistant Principals Weyher and Augmon <u>never</u>
accused him of forcefully having oral sex with Ms. Doe.  (Ex. 9 (Hrg Tr.) at
Plaintiff 000474-75.)

209.   Whereas MP had previously denied receiving any messaging from
Ms. Doe's stepfather, at the disciplinary hearing he changed his story and admitted

55

he had received such a message.  (*Compare* Ex. 4 (Lockard Dep.) at 109; Ex. 21

(Tr. of GCSD 0000019 video) at 15, 18-19; *and* Ex. 9 (Hrg Tr.) at Plaintiff

000478-79.)

210.   MP's additional testimony at the hearing included the following:

Q. She never said in that room or any time on the 4th, I want to have oral sex
with you?

A.  No, but she did over the break.

Q. Talking about before Christmas, in December of 2014, right?

A.  Right.

Q. I'm talking about the day of?

A.  The day of.

Q.  She never said I would like to have oral sex with you or any words to
that effect, did she?

A.  No.

Q.  She never said take down your pants, did she?

A.  No.

Q.  She never said I want to have sex with you?

A.  No.

Q.  You could just see in it in her eyes that she wanted it; is that what you're
saying?

A.  Well, the face that she had, I mean, I could tell.  But I'm just saying again, I'll restate what I said again, the messages that we had texted each other inferred that that's what – I don't want to say – it's more of a what was okay to do.

Q.  And this inference from something that happened over six weeks earlier was what you used to justify taking your pants down?

A.  Correct.

Q.  So before you took your pants down, you took them down, your underwear and all, right?

A.  Uh-huh (affirmative).

* * *

Q.  Your private parts were exposed?

A.  Yes.

Q.  And you did that without asking permission of her, correct?

A.  No, I did not.  But it was okay from what she had said earlier over the break.

Q.  Six weeks earlier?

A.  Right.

(Ex. 9 (Hrg Tr.) at Plaintiff 000484-86.)

211.   MP also stated, "I mean, like, while someone is giving or doesn't want to suck a dick, I mean, obviously you're going to try to do something to get away, push, scratch."  (Ex. 9 (Hrg Tr.) at Plaintiff 000487.)

212.   Ms. Doe's attorney requested that text messaging between MP and a friend from the day after the assault – in which MP discussed his guilt – be read into the record, and the hearing officers – without providing any grounds – would not allow it simply because MP's attorney did not want to place it in the record. (Ex. 9 (Hrg Tr.) at Plaintiff 000491-500.)

213.   Mr. Lancaster "briefly" examined MP in a way that supported MP's version of the reported assault.  (*See* Ex. 9 (Hrg Tr.) at Plaintiff 000514-15.)

214.   Ms. Doe also testified at the hearing, and her testimony was consistent with her prior report.  (*See* Ex. 9 (Hrg Tr.) at Plaintiff 000537-64.)

215.   MP's attorney cross-examined Ms. Doe and asked her the following questions:

    a.  "And when you left the room . . . you didn't scream, did you?"

    b.  "You didn't go right next door to [R] an tell him what happened, right?"

    c.  "You didn't scream to him, right?"

    d.  "Do you have any pictures, any marks to show any bruises, any marks where he grabbed you?"

(Ex. 9 (Hrg Tr.) at Plaintiff 000564-86.)

216.    MP's attorney, Mr. Togut, attempted to physically recreate the reported sexual assault with Ms. Doe.  (Ex. 9 (Hrg Tr.) at Plaintiff 000578-81, 00605-06; Ex. 24 (Julie Doe Dep.) at 52-53; Ex. 25 (John Doe Dep.) at 33.)

217.    Ms. Doe was visibly distraught during Mr. Togut's cross-examination. (Ex. 33 (Graves Dep.) at 104-05.)

218.    Mr. Lancaster cross-examined Ms. Doe and asked her the following questions:

a.  "Now, when you went back to the control room with [MP] on February the 4th, you weren't surprised to find out that he was a pervert, correct?"

b.  "Now, you were asked earlier if you had any bruises, and you said you didn't, is that correct?  . . . And you didn't have any other physical injuries after the encounter with [MP]?"

c.  "And you mentioned that you had screamed.  Can you demonstrate for us how you had screamed when [MP] was attacking you?"

d.  "Did you try to yell louder in an attempt to get the other student's attention, [R]?"

e.  "So how many times did you yell for him to stop?"

f.  "Did you yell louder or did you yell at the same tone?"

g.  " . . . did you try to get away from him?

h.  "How did you try to get away from him?"

i.  "Did you try to push him with both arms, just one arm?"

59

j.   "Now, when he went to put his penis in your mouth, what did you do to prevent him from doing that?  In other words, did you try to keep your mouth closed to avoid that or did you do anything to stop him?"

(Ex. 9 (Hrg Tr.) at Plaintiff 000586-91.)

219.   John Doe, Ms. Doe's father, also testified at the hearing.  (Ex. 9 (Hrg Tr.) at Plaintiff 000592.)  He testified that MP sent a sexually inappropriate text message to Ms. Doe on February 22, [2014], when Ms. Doe was in the ninth grade, and it was not a Kik message.  (*Id.* at Plaintiff 000592-93)  John Doe texted to MP that he did not "appreciate the way you talk to my daughter."  (*Id.* at Plaintiff 000596.)  When MP realized he was texting with Ms. Doe's father, MP wrote, "I think we have a misunderstanding.  I'm sorry for talking to your daughter like the way that I was, but I didn't mean one word of it.  I joke around a lot.  I would never expect something from your daughter.  She's way too good a friend of mine."  (*Id.*)  MP's father wrote, "damn right you are sorry.  Stay away from her."  (*Id.*)  MP responded, "You got it."  (*Id.*)

220.   During the disciplinary hearing, Hearing Officer Graves reviewed video footage of Ms. Doe at school, in which Ms. Graves perceived that Ms. Doe did not look "distraught," and Ms. Graves "did not gather [Ms. Doe] was a victim."  (Ex. 33 (Graves Dep.) at 124-25.)

221.   During her deposition, Hearing Officer Graves stated that at a disciplinary hearing it is important for her to be able to consider all evidence, and she depends on school administrators and other parties who testify at a hearing to be accurate and disclose facts.  (Ex. 33 (Graves Dep.) at 42-43.)  However, during the disciplinary hearing against Ms. Doe, no District official, including Assistant Principal Weyher, informed her of the following:

a.  Assistant Principal Weyher knew MP and his mother.  (*Id.* at 63.)

b.  MP's mother, and not MP, wrote MP's statement that was read into the record and reviewed by the hearing officers.  (*Id.* at 41-42, 83-84.)

c.   During school officials' interviews, MP initially denied receiving text messages from MP's stepfather (*Id.* at 103), a story he changed during the hearing.

222.   Throughout the proceeding, the hearing officers agreed with the District's attorney, Mr. Lancaster, with respect to his position on objections (Ex. 9 (Hrg. Tr.) at Plaintiff 00032-30, 000374-76, 000394-96, 000402-04, 000406-07, 000458, 000507).

223.   MP's attorney made a closing statement referencing men who are "falsely accused" by women, he made "no apologies for my conduct in cross-examining [Ms. Doe]," and he stated it was clear that none of the school

administrators who interviewed Ms. Doe believed her.   (Ex. 9 (Hrg Tr.) at Plaintiff

000602-03.)  In his closing statement, Mr. Lancaster verified Mr. Togut's assertion

and stated, "**The school obviously believes that [MP] is the most credible of the**

**two witnesses who testified to what happened in that room**."  (*Id.* at Plaintiff

000607.)

224.   Mr. Lancaster also stated:

**Based on the fact that [Ms. Doe] knew that [R] was only ten feet**
**away, or in a room ten feet away, when this was going on, and yet**
**chose not to scream louder and louder as this was going on, leads**
**me to believe [MP].  Based on the fact that she has no physical**
**injuries leads me to believe [MP].  Based on the fact that she**
**didn't report this immediately after it happened despite the fact**
**that she walked straight to her mother's car leads me to believe**
**[MP].**

(Ex. 9 (Hrg Tr.) at Plaintiff 000608.)

225.   The hearing officers, after deliberating just ten minutes, complied

with the District's request by finding Ms. Doe "in violation of 9G, oral sex or any

act of sodomy."  (Ex. 9 (Hrg Tr.) at Plaintiff 000610; Ex.6 (Jane Doe Decl.) at 5 ¶

28; Ex. 11 (Julie Doe Decl.) at 5 ¶ 25; Ex. 12 (John Doe Decl.) at 5 ¶ 22.)

226.    The elements of a Rule 9G violation are "oral sex or acts of sodomy."

(Ex. 33 (Graves Dep.) at 124-25.)

227.   The hearing officers made no determination whether Ms. Doe

"welcomed" oral sex with MP.  (Ex. 38 (Rutledge Dep.) at 33.)

228.   After the hearing officers found that Ms. Doe had violated 9G, the hearing moved on to a penalty phase. (Ex. 9 (Hrg Tr.) at Plaintiff 000610.)

229.   During that phase, the the hearing officers reviewed reports from Ms. Doe's teachers describing her as "curious," "young and naïve," and "very sweet," the hearing officers punished Ms. Doe with an **additional** out-of-school suspension. (Ex. 9 (Hrg Tr.) at Plaintiff 000611-12, 000616-17; Ex. 46(Feb. 18, 2015 Letter) at Plaintiff 000272-73.)

230.   Ms. Doe was allowed to make a statement after she learned that the District again suspended her, and she informed the District:

> I just feel betrayed by the school.  Like, I used to like Peachtree Ridge but but I hate it.  I thought Peachtree Ridge was all about protecting kids and putting the kids first.  But, like, now I see that's not the case.  And like, you can tell that, like, this whole thing, they're just trying to cover this up so the school doesn't look bad.  What about other girls that go to Peachtree Ridge.  This is a bad example.  I don't want any girls to have to go through this, ever.
>
> **When people find out about this and girls do get sexually assaulted, they're not going to want to come forward and tell someone, because they're going to be scared they're going to get suspended and they have to go through all of this.**  Do you know how hard it is?  How much I have to repeat my story over and over and over, and that's just so hard.  And then at the end, I get suspended for this.  It just – like, it doesn't make any sense.  And then I have to come in and you guys say y'all don't believe me.  Then [MP's] attorney is yelling at me.  I didn't ask for this.  I didn't ask to get sexually assaulted.  I didn't ask to get suspended.  It's just not fair.  My parents have spent so much money to get an attorney and everything.  And then you guys are going to do this to

63

> me, do this to our family.  You don't know how emotional it is at
> home.  I have nightmares every night.  I have nightmares of my
> own boyfriend date raping me.  I feel like nobody can protect me,
> no one believes me.

(Ex. 9 (Hrg Tr.) at Plaintiff 000614-16.)

231.   Hearing Officer Graves testified that the disciplinary hearing against

Ms. Doe was "long" and "out of the ordinary."   (Ex. 33 (Graves Dep.) at 35.)

232.   During her deposition, Cindy Antrim Rutledge, who served as the lead

hearing officer at the disciplinary hearing against Ms. Doe, testified that, with

respect to the hearing, she had no concern that Ms. Doe's civil rights under Title

IX were implicated.  (Ex. 38 (Rutledge Dep.) at 29.)  She did not consult with the

District's Title IX Coordinator prior to hearing.  (*Id.* at 30.)

233.   Hearing Officer Graves admitted that suspending a student who

reports sexual assault could constitute retaliation.  (Ex. 33 (Graves Dep.) at 31-32.)

### Ms. Doe Attempted to Return to PRHS

234.   Upon Ms. Doe's return to school on February 23, 2015, the District

still did not provide, offer, recommend, or coordinate any health, psychological,

counseling, or academic assistance or services to Ms. Doe.  (Ex. 11 (Julie Doe

Decl.) at 5 ¶ 28; Ex. 12 (John Doe Decl.) at 5 ¶ 24.)

235.   Ms. Doe had previously asked PRHS officials how they could expect

her to attend school if MP would be there, and she expressed to them her fear of

attending classes alongside, in the same hallways as, and on the same campus as MP.  (Ex. 7 (Jane Doe Interrog. Answers) at 20.)

236.   Upon Ms. Doe's return to school, the District had no safety plan in place to protect her from MP or additional harassment from any other student. (Ex. 1 (Weyher Dep.) at 103.)

237.   On February 23, 2015, the same day that Ms. Doe returned from suspension, she heard PRHS students calling her "whore," "slut," "liar," and "psycho."  (Ex. 22 (Jane Doe Dep.) at 56-60; Ex. 7 (Jane Doe Interrog. Answers) at 26; Ex. 24 (Julie Doe Dep.) at 58-59.)  This harassment continued on February 27, 2015 and March 2, 2015.  (Ex. 7 (Jane Doe Interrog. Answers) at 26.)

238.   On February 23, 2015, student BM verbally harassed Ms. Doe during first block, accusing Ms. Doe of lying about MP's sexual assault and trying to frame him.  (Ex.7 (Jane Doe Interrog. Answers) at 22-23.)  Ms. Doe left class, reported the harassment to school counselor Teresa Wilson, and told Ms. Wilson that she was suicidal.  (*Id.* at 23; Ex.47 (Feb. 23, 2105 Email) at GCSD00008719; Ex. 48 at GCSD0000048); Ex.24 (Julie Doe Dep.) at 57.)  Ms. Wilson reported this information to, among others, Assistant Principal Augmon.  (Ex. 47.)  Ms. Wilson expressed to Ms. Doe that she had not been informed about MP's sexual assault against her, the report of the same, or of the District's response to the report and

assault.  (Ex. 7 (Jane Doe Interrog. Answer) at 23.)  Ms. Doe's mother picked her

up from school and met with school counselor Teresa Wilson.  (Ex. 24 (Julie Doe

Dep.) at 57.)  Julie Doe informed Ms. Wilson that her daughter had been sexually

assaulted, school was going to be rough for her, and to call her if anything

happened.  (*Id.* at 57-58.)

239.   Julie Doe told her daughter that, if she was bullied or having a bad

day, to go directly to the counselor's office to talk about it.  (Ex. 24 (Julie Doe

Dep.) at 57.)

240.   Later in the day on February 23, 2015, Julie Doe emailed the District:

> Since [Ms. Doe] will not be in school for the next few days, I went
> to make sure that those absences will be marked as excused.  I also
> need you to look at her absence the day of and the days after she
> reported the sexual assault to the school.  This should not be
> marked as unexcused absences.  The **hostile environment on
> campus** has prevented [Ms. Doe] from going back to school to
> continue her education.

(Ex. 49 (Feb. 23, 2015 email) at GCSD00008579-80 (emphasis added); Ex. 22

(Julie Doe Decl.) at 5 ¶ 29.)  This information was provided to Assistant Principals

Stinson and Augmon.  (Ex. 49 at GCSD8579.)

241.   Ms. Doe did not attend school on February 24, 25, or 26, 2015.  (Ex. 7

(Jane Doe Interrog. Answers) at 24.)

242.   On February 24, 2015, student BM texted Ms. Doe that she had to be a liar about being sexually assaulted because "if you told the truth he wouldn't be at school right now."  (Ex. 7 (Jane Doe Interrog. Answers) at 23-24; Ex. 50 (BM text messaging) at GCSD0000086-93; Ex. 6 (Jane Doe Decl.) at 5 ¶ 30.)  BM also wrote, "Why would you try to hurt that boys future?  No right[.]"  (Ex. 50; Ex. 6 (Jane Doe Decl.) at 5 ¶ 30.)

243.   On February 26, 2015, at the end of that school week, Ms. Doe's mother met with District administrators and teachers to discuss the sexual harssment and hostile environment Ms. Doe was experiencing at PRHS, and options for Ms. Doe's education.  (Ex. 51 (GCSD00000170); Ex. 11 (Julie Doe Decl.) at 6 ¶ 30.)

244.   The District presented four options for Ms. Doe: home bound school, pursuant to which Ms. Doe would take classes from home; a modified school day pursuant to which Ms. Doe would drop two classes and attend school for only half of each day; Ms. Doe changing classes; and Ms. Doe withdrawing altogether and being home schooled.   (Ex. 11 (Julie Doe Decl.) at 6 ¶ 31.)

245.   Julie Doe also provided documentation to the school prepared by Ms. Doe's treating psychologist, Dr. Kara Rothmann, that recent events at school had exacerbated Ms. Doe's major depressive disorder and generalized anxiety disorder.

(Ex. 52 (Rothmann document) at Parent 000262-63; Ex. 11 (Julie Doe Decl.) at 6 ¶ 32.)

246.   The Does discussed these options, and on February 26, 2015, Ms. Doe's mother informed the District:

> The modified classes probably won't work because of the lack of transportation.  I think Home Bound education is too limiting because of the class participation that is required for some of her classes.  **[Ms. Doe] will talk to you about switching her classes around so she can avoid the girl who was giving her a hard time on Monday.  I also want to make sure that the school will take care of any future bullying that [Ms. Doe] could face when she goes back to school.   It is also important that she has no contact with the boy that was involved in the incident**.

(Ex. 53 (Feb. 26, 2015 email) at GCSD00008588 (emphasis added); Ex. 11 (Julie Doe Decl.) at 6 ¶ 33.)  This information was provided to, among others, Assistant Principals Augmon and Stinson.  (Ex. 53 (Feb. 26, 2015 email) at GCSD00008588.)   Ms. Doe had to drop her Chinese II class and switch out of the Chemistry class she shared with BM – and attend a new and unfamiliar Chemistry class – all in an attempt to avoid peer harassment.  (Ex. 7 (Jane Doe Interrog. Answers) at 25.)

247.   On February 26, 2015, that same day, a  so-called "safety plan" was created for Ms. Doe, developed in case Ms. Doe had any thoughts of harming herself.  (Ex. 24 (Julie Doe Dep.) at 61-62; Ex.54 (Plan) at GCSD00000171-72.)

248.   The "safety plan" form itself states that it is part of "Safety planning intervention/A brief intervention to *mitigate suicide risk*." (Ex. 54.)

249.   The safety plan required <u>Ms. Doe</u> to assume the burden in ensuring her environment was safe and staying away from MP and other harassers.  (Ex. 54; Ex. 25 (John Doe Dep.) at 43-45.)

250.   The safety plan did <u>not</u> ensure MP would have no contact with Ms. Doe.  To the contrary, it set forth coping strategies and steps for <u>Ms. Doe to take</u>, including "not being in the presence of [MP] or [BM]."  (Ex. 54.)

251.   There is nothing in the record to show, and Defendant does not even try to claim, that it ever increased its supervision or monitoring of MP at school or curtailed MP's activities at school.

252.   Ms. Doe returned to school on February 27, 2015.  (Ex. 7 (Jane Doe Interrog. Answers) at 25.)

253.   During second block that day, Ms. Doe observed MP's friends whispering, staring, and pointing at her, and she cried.  (*Id.*)

254.   During fourth block, Ms. Doe observed students looking at and shaking their heads at her.  (*Id.*)

255.   Male student AT said to her, "I wish I was [MP]" and "heard you wanted to suck him up but then you got scared so you just say he forced you."

69

(Ex. 55 (Feb. 27, 2015 email) at GCSD00000098-99); Ex. 11(Julie Doe Decl.) at 6

¶ 34; Ex. 7 (Jane Doe Interrog. Answers) at 25.)  This information was provided to

Assistant Principal Augmon.  (Ex. 55 (Feb. 27, 2015 email) at GCSD00000098-

99.)

 256. Ms. Doe was in shock and deeply disturbed, and she informed her

teacher, Ms. Morall, that she could not take her test that day, was not feeling well,

and had to go to the school nurse because she felt like she was having a panic

attack due to what the male student had said to her.  (Ex.7 (Jane Doe Interrog.

Answers) at 25.)

 257. Ms. Doe's mother reported this to the school that same day, in an

email dated February 27, 2015 stating:

> [Jane Doe] reported to me that several students were giving her a
> hard time today.  She feels very uncomfortable by the pointing and
> whispering from some of her classmates.  One boy even told her
> that he wished he was [MP].  This is unacceptable behavior and I
> would like for the school to put a stop to this immediately.  I would
> also like for you to talk to [Ms. Doe] about this Monday morning.

(Ex. 55 (Feb. 27, 2015 email) at GCSD00000098-99); Ex. 11 (Julie Doe Decl.) at 6

¶ 34.)  This information was provided to Assistant Principal Augmon.  (Ex. 55

(Feb. 27, 2015 email) at GCSD00000098-99.)

 258. Ms. Doe attended school on March 1, 2015.  (Ex. 24 (Julie Doe Dep.)

at 74-75.)

259.   The morning of March 2, 2015, Ms. Doe reported AT's statements and BM's text messages to Ms. Wilson.  (Ex. 7 (Jane Doe Interrog. Answers) at 26.)

260.   Ms. Wilson did not ask to see or copy BM's text messages, and she asked Ms. Doe if the school should talk to AT about his harassment.  (*Id.*)

261.   During second block, MP's friends continued to stare at Ms. Doe and give her dirty looks.  (*Id.*)

262.   During third block, male student TA approached Ms. Doe, smirked, shook his head, and said "You're nasty!"  (*Id.*)  This caused Ms. Doe to cry during class.  (*Id.*)

263.   During lunch, a table of students stopped talking and stared at Ms. Doe as she walked by.  (*Id.*)

264.   During fourth block, Ms. Doe told Ms. Morall she could not stand being in the same class as AT and asked for permission to leave.  (*Id.*)

265.   Ms. Doe left class and reported to Ms. Wilson what AT had said to her and how people were staring.  (*Id.*)  Ms. Wilson told Ms. Doe that she should ignore people and stay calm.  (*Id.*)  Ms. Doe stayed in Ms. Wilson's office until the end of the school day.  (*Id.*)

266.   On March 2, 2015, teacher Linda Brimmer emailed Ms. Wilson,

> I don't know if [MP] was found guilty of sexual misconduct as [Ms. Doe] was found, but watching him on RVN in the mornings has got to be extremely difficult for [Ms. Doe]. If he was found guilty, I don't think it is appropriate for him to be on the morning news show.

(Ex. 10 (Mar. 2, 2015 email) at GCSD00008595-96.)

267. The email was forwarded to Assistant Principal Augmon and

Principal Matthews, and he responded:

> We thank Ms. Brimmer for her input . . . but [MP] has served his consequences and he is moving on . . . we are not going to limit his activities in the manner she is suggesting. We are not in the business of administering double consequences to any student.

(*Id.* at GCSD00008595.)

### **Ms. Doe Fled PRHS and Pleaded for Alternative Education Options**

268. The Does decided that Ms. Doe should not return to PRHS because of

the sexual harassment and the fact Ms. Doe was spending a lot of time in the

counselor's office. (Ex. 24 (Julie Doe Dep.) at 75.)

269. The morning of March 3, 2015, Julie Doe informed the District that

Ms. Doe desired to transfer to another high school, Collins Hill. (Ex. 56 (Mar. 3,

2015 email) at Parent 000193-94; Ex. 11 (Julie Doe Decl.) at 6 ¶ 35.)

270. On March 4, 2015, Julie Doe informed the District that her daughter

"is too scared to go back to [PRHS] at this time so she will be home until we get

the transfer set up."  (Ex. 56 Mar. 4, 2015 email) at Parent 000193-94; Ex. 11

(Julie Doe Decl.) at 6 ¶ 35.)

271.   Later in the day on March 4, 2015, Ms. Wilson informed the Does:

[R]egistration for online classes for this semester is closed.  There
may be some other online class options outside of Gwinnett that may
meet your needs but we do not provide information for those schools.
[**Jane Doe] may be able to ask some of her friends about specific
online schools**.

(Ex. 56 (Mar. 4, 2015 email) at Parent 000194; Ex. 11 (Julie Doe Decl.) at 6 ¶ 35.

(emphasis added)).

272.   On March 4, 2015, John Doe emailed Principal Matthews, Wilson,

and Assistant Principals Augmon, Stinson, and Weyher:

I am writing to you in a state of complete frustration.  Peachtree
Ridge High School has become a hostile environment for [Ms.
Doe] and is blocking her from attaining an education.  Our various
attempts at a resolution have been denied or ruled out by the
school:

We are unable to transfer [Ms. Doe] to a new school at this time
because doing so would mean she loses credit for this semester.
Furthermore, since [Julie Doe] and myself both work
transportation is a real obstacle.  The school is unwilling to help.

The school has thus far thwarted our request for homebound
education by requiring a psychiatrist to fill out your homebound
request form.  [Ms. Doe's] therapist (a licensed psychologist) is
willing to fill out the form, as is her pediatrician, who has a long
history as her doctor.  The requirement for a psychiatrist is a
roadblock the school has imposed on [Ms. Doe]; it is an extra
expense on us, her parents, and even worse, appointments usually

73

must be scheduled a month in advance.  [Ms. Doe] has a right to an education now.

Another option the school offered is to withdraw [Ms. Doe] and sign her up for classes at an online campus.  However, Mrs. Wilson stated today that registration for online classes this semester is already closed.  She could not provide any other option and the burden is now on us to search for a different solution.

Since (nominally) returning to school on Monday the 23rd, [Ms. Doe] has only been able to make it through one full school day. She is routinely subjected to sexual harassment from others at school.  Comments such as "I wish I was [MP]!" or "You're nasty!" are a daily occurrence.  She has been the victim of retaliation from her peers and has been accused of lying and framing the perpetrator.  Worst of all, she must daily contemplate the possibility of seeing her rapist.

On several occasions these past couple of weeks, [Julie Doe] and I have met with or talked to Ms. Wilson.  We tried to arrive at some kind of workable situation, yet here we are: [Ms. Doe] is still unable to attend your school.  This entire situation has been aggravated by an unjust suspension imposed upon [Ms. Doe] after she voluntarily reported a sexual assault against her person on your campus.  Your administration has done enough damage already. At this point, [Ms. Doe] is at an educational disadvantage compared to her peers.  It is incumbent upon you to repair this situation promptly.

(Ex. 57 (Mar. 5, 2015 email) at GCSD00008504-05; Ex.12 (John Doe Decl.) at 5 ¶ 25.)

273.   On March 6, 2015, John Doe _again_ emailed Principal Matthews and other PRHS administrators, stating:

[Ms. Doe] started the modified day schedule on February the 27th. Although she made it through all of that Friday, she was not able to attend all her classes the following Monday due to harassment she received that day. The support team did not tell us how they would prevent ongoing harassment. From my understanding the administration still has not addressed the retaliation she received from her peer on Monday the 23rd. The administration knew that the bullying continued on to the next day when the same student accused [Ms. Doe] of lying in a text message. Neither my wife nor myself has received any feedback from the administration regarding how this issue was dealt with. You should be responsible for investigating, ending, and preventing harassment. Why is the burden put upon [Ms. Doe] and us, her parents, to make changes to our schedules or her educational program to avoid the perpetrators of harassment, changes that are either impossible to meet or put unreasonable demands upon us?

The best of a range of bad options is to place [Ms. Doe] in Gwinnett Online Campus for the remainder of the semester. This will only make sense if [Ms. Doe] can keep her credits this semester.

In the meantime, I ask you to personally make a request of the superintendent to provide transportation to Collins Hill next school year.

(Ex. 58 (Mar. 6, 2015 email) at GCSD00008509; Ex.12 (John Doe Decl.) at 6 ¶ 26.)

274.   On March 9, 2015, Principal Matthews informed the Does they should contact Gwinnett Online Campus, and that their request for transportation for Ms. Doe to Collins Hill High School was denied. (Ex. 59 (Mar. 9, 2015 email) at

GCSD00010208-12; Ex.12 (John Doe Decl.) at 6 ¶ 27; Ex.11 (Julie Doe Decl.) at 7 ¶ 36.)

## Ms. Doe Struggled with Online Classes and Had to Attend Summer School

275.   Ms. Doe's student profile shows that she was enrolled as a tenth grade student at Gwinnett Online Campus School as of March 12, 2015.  (Ex. 60 (Ms. Doe Student Profile) at GCSD00000175; Ex.6 (Jane Doe Decl.) at 6 ¶ 31.)

276.   This was accomplished only near the end of the school year and after her parents repeatedly pleaded for school officials' assistance and had hired a second set of lawyers.  (Ex. 25 (John Doe Dep.) at 46; Ex. 24 (Julie Doe Dep.) at 111.)

277.   After reporting MP's sexual assault of her, Ms. Doe was out of school for over a month, until approximately March 18, 2015.  (Ex. 61 (Mar. 18, 2015 email) at GCSD00000195; Ex.6 (Jane Doe Decl.) at 6 ¶¶ 32-33.)  By that time she was struggling academically and still had not received content for one of her classes.  (*Id.*)

278.   Prior the the assault, Ms. Doe had a 91% grade in PRHS's pre-AP chemistry course. But by the time she began online classes, her grade had plummeted to 55% due to missed assignments that were marked absent.  (Ex. 62 (Mar. 18, 2015 email) at GCSD00000197; Ex.6 (Jane Doe Decl.) at 6 ¶ 33.)

279.   After the assault, Ms. Doe had to begin her online chemistry class

from the start, and she had significant difficulties completing the class.  (Ex. 61

(Mar. 18, 2015 email) at GCSD00000195; Ex. 63 (Apr. 20, 2015 email) at

GCSD00000205; Ex.6 (Jane Doe Decl.) at 6 ¶ 34.)

280.   As an Online Campus student, Ms. Doe had to sacrifice two of the

four courses she had been taking at PRHS and in-person interaction and activities

with instructors and peers.  (Ex. 6 (Jane Doe Decl.) at 7 ¶ 35.)

281.   Ms. Doe failed on-line chemistry, and she had to attend summer

school to retake it, catch up on credits, and ensure she could graduate on time.

(Ex. 22(Jane Doe Dep.) at 71, 84; Ex. 7 (Jane Doe Interrog. Answers) at 12-13.)

**<u>Ms. Doe Continued to Suffer Ostracization and Student Sexual Harassment</u>**

282.   Even though Ms. Doe had left PRHS, the harassment she suffered

from other students continued.  (Ex. 64 (social media posts) at GCSD0000094; Ex.

6 (Jane Doe Decl.) at 7 ¶ 36; Ex. 22 (Jane Doe Dep.) at 56-60; Ex. 65 (Rothmann

Dep.) at 97-99.)

283.   Referring to Ms. Doe, fellow student RH posted on social media,

"When Hoes don't use commons Sense," to which others replied, "It's okay she

was just trying to quench her thirst," and "But it's not like she doesn't have enough

in her mouth yunno."  (Ex. 64 (social media posts) at GCSD0000094; Ex. 6 (Jane Doe Decl.) at 7 ¶ 36.)

284.   Many of Ms. Doe's friends turned their backs on her, and some of them commented on social media that Ms. Doe was "easy" and a liar.  (Ex. 22 (Jane Doe Dep.) at 56-60; Ex. 65 (Rothmann Dep.) at 91, 97-99.)

285.   On March 30, 2015, student FM informed PRHS officials that PRHS students were bullying Ms. Doe over the internet.  (Ex. 66 (Mar. 30, 2015 email) at GCSD00012738.)  Title IX Coordinator Spraggs informed Assistant Principal Stinson and Principal Matthews of this information.  (*Id.*)

286.   Ms. Stinson admitted that, even though <u>she</u> was the PRHS Title IX Coordinator and was aware of the reports that students were harassing Ms. Doe, she did not investigate.  (Ex. 3 (Stinson Dep.) at 76-77.)

## Ms. Doe Contended the District Had Violated Her Title IX Rights, and the District Continued Investigating Her

287.   On March 10, 2015, Ms. Doe's attorney, Cari Simon, sent a letter to Gwinnett County Board of Education stating, among other things, "[t]he investigation, hearing, and sanction violated [Ms. Doe's] civil rights guaranteed by Title IX of the Education Amendments of 1972."  (Ex. 67 (Mar. 10, 2015 letter) at Plaintiff 000102.)  Ms. Doe's counsel informed the District that Ms. Doe was appealing the February 18, 2015 disciplinary hearing decision.  (*Id.*)

288.   On March 31, 2015, Ms. Simon emailed the District's attorney, Ms.

Sweeny, informing her of additional ways in which the District violated Ms. Doe's

Title IX rights, including that the District's Title IX Coordinator was not identified

to the Does and she never informed of her Title IX rights as a victim of student-on-

student sexual assault.  (Ex. 68 (Mar. 31, 2015 email) at GCSD000009812.)

289.   On April 2, 2015, SRO Lockard stated in an email:

> MP dropped off his phone and the Board of Ed. wants to do a forensic
> analysis on it to see about previous messages between the two.

(Ex. 69 (Apr. 2, 2015 email) at GCSD00010223; Ex. 4 (Lockard Dep.) at 145-47.)

SRO Lockard arranged for the analysis to be performed.  (*Id.*)

290.   On April 16, 2015, SRO Lockard wrote in an email sent to, among

others, attorney Creighton Lancaster:

> On Tuesday afternoon I met with [MP's] mother and she signed the
> consent to search for his phone.  While there, she got on the phone
> and [MP] indicated that another student, [RH], had shown him some
> nude/provocative pictures of [Ms. Doe] that were sent by [Ms. Doe] to
> [RH].  [MP] said [RH] is an ex-boyfriend and showed him the
> pictures a few months ago.
>
> On Wednesday morning, I went to Peachtree Ridge and interviewed
> [RH] about the pictures.  He denied having the pictures.  I talked to
> [MP's mother]and asked her to find out if MP knows any other
> students that saw the pictures.  Later in the evening, [MP's mother]
> called me and advised that [MP] talked to [RH] about the pictures and
> asked him to come forward with the pictures.  [RH] agreed to show
> the pictures.

> I am in Forsyth for training, so this morning I had Officer David
> Sokol meet with [RH] at Peachtree Ridge.  [RH] showed Sokol the
> pictures, Sokol took pictures of them and saved them to a disc.  Sokol
> then deleted them from [RH's] phone.  [RH] also said that he had
> sexual encounters with [Ms. Doe].

(Ex. 70 (Apr. 16, 2015 email) at GCSD00010430; Ex. 4 (Lockard Dep.) at 158-

59.)

291.   Ms. Doe had sent the photographs to RH, her then-boyfriend, in 2014.

(Ex. 22 (Jane Doe Dep.) at 135-36.)

292.   SRO Sokol sought out RH and met with him with MP in the room.  In

a video previously filed with the Court under seal (*see* Doc 83-5), SRO Sokol can

be observed and heard doing the following:

a.   Telling RH "You know lying during an investigation can get you in
     trouble, right?"

b.   Being handed RH's phone – while MP is in the room – and asking, "Are
     all of these of her?"

c.   Stating to RH, while MP was in the room, "**You know it's illegal to
     have these, too, right?  I mean you could be charged with a crime for
     just possession of these.  You usually are not because <u>I can't blame a
     teenage boy for not deleting them</u>**."

d.   Asking RH, "Did she send them to anybody else?"

e.   Telling RH, "You're not in any trouble."

f.   After trying to email the images to himself, taking photographs of the
     images with his own cell phone.

(*See* Doc. 83-5 (GCSD00008389 video).)  Sokol did not ask RH if he had saved

the images on any other device, sent them to another person, or has shown them to

anyone other than MP.  (*Id.*)  Sokol asked a number of questions regarding whether

RH ever had sex with Ms. Doe, and what exact sexual activities they engaged in.

(*Id.*)

293.    SRO Lockard, despite knowing the images were illegal child

pornography based on Sokol's description, also viewed the images.  (Doc. 88-2

(Lockard Decl.) at 5.)

294.    On May 7, 2015, Lancaster stated, in an email to MP's attorney, Torin

Togut:

> **The school** is attempting to contact KIK to determine if they can
> release any information regarding the communications between [MP]
> and [Jane Doe] that proceeded [sic] the February 4, 2015 incident.
> Can you provide me with the KIK user names used by your client and
> [Jane Doe]?

(Ex. 71(May 7, 2015 email) at GCSD00009817-18 (emphasis added).)

295.    Although the District never discovered the supposed Kik messaging

between MP and Ms. Doe, the District continued relying on those messages as

justification for its disciplinary actions against Ms. Doe.  (Ex. 72  (Excerpt of Def.

Br.) at GCSD00000677-78.)

296.   Even PRHS Title IX Coordinator Stinson understands that those

messages had no relevance in determining whether MP sexually assaulted Ms.

Doe.  (Ex. 3 (Stinson Dep.) at 48-50.)

## MP's Text Messages

297.   The District obtained a report of the forensic analysis of MP's phone.

(Ex. 4 (Lockard Dep.) at 114-118; Ex.73 (Excerpt of Extraction Report) at

GCSD00000950-51.)

298.   The forensic analysis of MP's phone does not show any messaging

between MP and Ms. Doe.  (Ex. 74 (Beck Decl.) at 1.)

299.   However, the analysis reveals that MP – who identifies himself as

"That Sexy Son of a [MP]" – engaged in the following text messaging regarding in

the weeks leading up to February 4, 2015:

a.  On December 11, 2014, MP and several of his contacts, at MP's
suggestion, played a game of "FMK," regarding "Hudson abi Carly."[5]
MP stated:

**Marry Hudson**
**Fuck abi**
**Kill carly but rape her before I kill her**

---

[5] FMK is an acronym for a "game" called "Fuck, Marry, Kill," in which three
people  are listed, and are then rated in order of the respondent's preference –
whether he/she would fuck, marry, or kill the person.  *See* https://en.wikipedia.org/
wiki/Fuck,_Marry,_Kill

(*Id.* at GCSD00001350.)

b. On December 24, 2014, MP sent a text message stating:

**"Squad call!  Yo my buddy JJ here is in need of some <u>pussy</u> so help him out, grab his number help me get this guy some girls."**

(*Id.* at GCSD00002114.)

c. The same day, he sent a text message stating,

"**Come to my church, hella <u>hoes</u> bro, and a good church**."

 (*Id.* at GCSD00002112.)

d. On December 28, 2014, MP sent out a series of text messages:

 **"#freemyniggasesan"; "#freemyniggaducky"; "#freemyniggaslick"; "I'm white . . And Caucasian . . . half and half."**

(*Id.* at GCSD00001430.)

e. On January 10, 2015, MP messaged a contact to ask if the person was "**still trapping**?"[6]  (*Id.* at GCSD00001497.)

f. On January 11, 2015, MP sent text messages stating:

"**How much u get an O for?" and "Yo, my bud wants some acid. You know anyone**. . . "

(*Id.* at GCSD00001498, 1500.)

---

[6] The term "trappin' or trapping" originates from Atlanta Georgia and means "[t]he act of dealing or selling illegal drugs for the accumulation of wealth. Drug dealers often partake in 'Trappin.'"  *See* https://www.urbandictionary.com/define.php?term=Trappin.

300.   Even after February 5, 2015, when he learned that Ms. Doe had reported him for sexual assault, MP texted the following:

    a.   On March 2, 2015, he texted "Princess Sydney" regarding wearing disposable panties.  (*Id.* at GCSD00001673)

    b.   On March 4, 2015, he sent a text message, "HAPPY NIGGA DAY!" (*Id.* at GCSD 00001675)

    c.   On March 12, 2015, he text messaged "Princess Sydney," stating "Going to the game tonight?"  She responded, "Which game."  He stated "The sex game with me."  (*Id.* at GCSD00001689.)

    d.   "I will have sex with u" (*Id.* at GCSD00002860.)

**Ms. Doe Suffered Continuing Student
Sexual Harassment During the 2015-2016 Academic Year**

301.   For the 2015-2016 academic year, Ms. Doe attended Collins Hill High School ("CHHS"), a school in the District.  (Ex. 22 (Jane Doe Dep.) at 71-72.)

302.   Students at CHHS found out about what happened at PRHS and harassed Ms. Doe because of it.  (Ex. 22 (Jane Doe Dep.) at 72; Ex. 65 (Rothmann Dep.) at 96-97.)

303.   Student S told Ms. Doe: "We all know that you got suspended from school because you got caught sucking dick."  (Ex. 22 (Jane Doe Dep.) at 72-73; Ex. 7 (Jane Doe Interrog Answers) at 27.)

304.   For weeks S would go out of her way to find Ms. Doe, tried to physically block Ms. Doe's movement and pour milk on her head, and said she

wanted to fight Ms. Doe.  (Ex. 22 (Jane Doe Dep.) at 72-73; Ex. 65 (Rothmann

Dep.) at 96-97; Ex. 7 (Jane Doe Interrog Answers) at 27.)

305.   Ms. Doe reported this sexual harassment to CHHS administrators.

(Ex. 22 (Jane Doe Dep.) at  74; Ex. 65 (Rothmann Dep.) at 96-97; Ex.7 (Jane Doe

Interrog Answers) at 27.)

306.   The school administrators told Ms. Doe to stay away from S.  (Ex. 22

(Jane Doe Dep.) at  74.)

307.   Ms. Doe was asked during her deposition whether S continued to

harass her, and she testified:

> Yeah, she did.  And I was just really ducking and dodging her at
> school.  I used to go to silent lunch on purpose for weeks just, so I
> didn't have to see her at lunch.  And eventually the silent lunch
> teacher got mad at me and was like you need to stop coming to silent
> lunch because you're not even assigned, like why are you still
> coming.  And after that he didn't let me come into silent lunch
> anymore.

 (Ex. 22 (Jane Doe. Dep.) at 74-75.)

308.   Because of the harassment that followed Ms. Doe from PRHS to

CHHS, Ms. Doe left the District for her senior year and finished high school in

another school district at Cambridge High School.  (Ex. 22 (Jane Doe Dep.) at 101-

02.)

**SRO Lockard Failed to Preserve the Crime Scene, and
the District Failed to Inform the Does of DNA Testing Confirming
that MP's Seminal Fluid was Found on the Editing Room Carpet**

309.   On April 3, 2015, SRO Lockard requested a crime scene investigation (Ex. 4 (Lockard Dep. at 153); Ex. 75 (Crime Scene Investigation Report) at GCSD00008370-71.)

310.   Prior to that time, SRO Lockard had not taken any steps to secure the scene of the reported assault to ensure that evidence was not destroyed.  (Ex. 4 (Lockard Dep.) at 153-555.)  He did not create a diagram or take any photographs of the editing room.  (*Id.*)  Moreover, he took no steps to preserve the chair in which MP's reported sexual assault against Ms. Doe occurred; the chair was disposed of prior to the crime scene investigation.  (*Id.*)

311.   DNA testing was conducted of samples from the RVN editing room carpet.  (Ex. 4 (Lockard Dep.) at 153-56; Ex. 75 (Crime Scene Investigation Report).)

312.   On June 2, 2016, a report came back that the carpet tested positive for MP's seminal fluid.  (Ex. 4 (Lockard Dep.) at 156-57, 162-63; Ex. 76 (GBI Forensic Sciences Division testing results) at GCSD00000918-19.)

313.   In a video recording taken of a District SRO informing MP and his mother of this fact, MP's mother falsely claimed that her son had stated he was

86

"not sure" if he ejaculated when, in fact, he is captured on video clearly stating he did not ejaculate.  (*Compare* Ex.77 (GCSD000008388 video); Ex. 4 (Lockard Dep.) at 130-31 *and* Ex. 13 (Tr. of GCSD00000018 video) at 15.)

314.   Prior to discovery in this litigation, no person had ever made the Does aware that MP's semen was found on the editing room carpet.  (Ex.6 (Jane Doe Decl.) at 7 ¶ 37; Ex. 11 (Julie Doe Decl.) at 7 ¶ 37; Ex. 12 (John Doe Decl.) at 7 ¶ 34.)

### High School Student-on-Student Sexual Harassment in the District

315.   Approximately 596 instances of high school student-on-student sexual misconduct were reported to have occurred in the District during the 2012-2013 academic year.  (Ex. 78 (Sexual Misconduct Records) at GCSD00013527-37); Ex. 79 (Oct. 29, 2020 Correspondence from W. Buechner) at 1-2.)

316.   Approximately 487 instances of high school student-on-student sexual misconduct were reported to have occurred in the District during the 2013-2014 academic year.  (Ex. 78  at GCSD00013538-42; Ex. 79 (Oct. 29, 2020 Correspondence from W. Buechner) at 1-2.)

317.   Approximately 405 instances of high school student-on-student sexual misconduct were reported to have occurred in the District during the 2014-2015

academic year.  (Ex. 78  at GCSD00013543-46; Ex. 79 (Oct. 29, 2020

Correspondence from W. Buechner) at 1-2.)

### Lack of Title IX Training for School Officials

318.   From 2013 to 2019, Joyce Spraggs was the District-level Title IX

Coordinator and Director of Equity and Compliance.  (Ex. 5 (Spraggs Dep.) at 12.)

319.   Title IX Coordinator  Spraggs trained school-level Title IX

Coordinators through a PowerPoint entitled, "Title VII, IX & Sexual Harassment:

Awareness Training for Gwinnett County School System Staff," which is 37-pages

long.  (Ex. 5 (Spraggs Dep.) at 21-22; Ex. 80 (PowerPoint) GCSD00008741-813.)

320.   The PowerPoint covers Title VI; Title VII, discrimination based on

race, color, religion, national original, age, pregnancy, and disability; the Equal

Employment Opportunity Commission; and school employee confidentiality.  (Ex.

80 (PowerPoint) GCSD00008741-813.)  The part of the presentation that addresses

sexual harassment and Title IX focuses entirely on employee-on-employee sexual

misconduct in the work environment and employee/adult-on-student sexual

harassment, the vast majority consisting of mandatory reporting requirements and

instructing employees how to maintain professional relationship boundaries with

students and act as good role models.  (*Id.* at GCSD00008745-808.)  Only two

slides of the Powerpoint address student-on-student sexual harassment. (*Id.* at GCSD00008773, 8775.)

321.   Title IX Coordinator Spraggs trained other administrators and staff through an online video. (Ex. 5 (Spraggs Dep.) at 14-19, 81; Ex. 81 (Online Video) at GCSD0000001). The video was entitled, "Title VI, VII, IX and Sexual Harassment, Awareness Training for Gwinnett County School System Staff." (*Id.*)

322.   The video is nearly identical to the PowerPoint, and it minimally addresses student-on-student sexual harassment on only two slides of the 38-page presentation / video. (*See* Ex. 80(PowerPoint) at GCSD 8741-813; Ex. 81 (Online Video) at GCSD 1.)

323.   The video was something a staff member could take self-paced on a computer, and it was at most 24 minutes long. (Ex. 5 (Spraggs Dep.) at 14-18, 38-41.)

324.   The video has some information the PowerPoint does not: additional information regarding workplace employee-on-employee sexual harassment and standard precautions to be utilized by school staff when dealing with bodily fluids and infectious diseases. (*See* Ex. 81.)

325.   There is nothing in the training regarding standards to be utilized in investigating student reports of sexual assault or harassment; retaliation; or the District's policy regarding student reports of sexual harassment.  (*See* Exs. 80-81.)

326.   District Title IX Coordinator Spraggs testified, that with respect to school-level <u>Title IX Coordinators</u>, it was important they were properly trained, but she was not sure if – prior to February 2015 –  she conducted face-to-face training. (Ex. 5 (Spraggs Dep.) at 19-22.)

327.   Ms. Spraggs does not not remember providing training to school-level Title IX Coordinators on how victims of sexual assault respond to assault or the types of questions that are regarded as victim-blaming.  (Ex. 5 (Spraggs Dep.) at 23-25.)

328.   Moreover, she **provided no Title IX training to disciplinary hearing officers**.  (Ex. 5 (Spraggs Dep.) at 31.)

329.   The District has a complaint and grievance policy and procedure for student reports of sexual harassment (Ex. 5 (Spraggs Dep.)  at 43-44; Ex. 82 (Policy & Procedure) at GCSD00008840-42.)

    a.  The District's Policy was entitled "Policy J- Students," and described as "Student Complaints and Grievances."  (Ex. 82 at GCSD00008839.)

    b.  The District's Procedure was entitled "Procedure J-Students," and described as "Student Complaints and Grievances." (*Id.* at GCSD00008840-42.)

c. Part of "Step I" included that, if a student was not satisfied that a complaint was resolved satisfactorily, there would be meeting with the principal, and the principal would inform the parent in writing of his/her decision on the complaint. (*Id.* at GCSD00008840.)

d. **If a student sexual harassment incident was "of such gravity that [it] results in out-of-school suspension or referral to a disciplinary panel, [it] must be immediately reported to the district Title IX Coordinator**." (*Id.* at GCSD00008841 (emphasis added).)

The District did not comply with its own policy and procedure with respect to Ms. Doe's report of sexual assault.

330.   Spraggs does not recall ever providing training on this policy and procedure to Title IX Coordinators (Ex. 5 (Spraggs Dep.) at 44.)

331.   Mr. Weyher described only two annual trainings that he received from the District. (Ex. 1 (Weyher Dep.) at 11.) The first was the training for administrators conducted by Ms. Spraggs at the beginning of each year, and the second was the staff PowerPoint. (*Id.* at 20, 26, 28.)

332.   Mr. Weyher received <u>no</u> training on the following:

a. How to interview a student who reported sexual assault;

b. The impact of interviewing victim of sexual assault multiple times about the assault;

c. The impact on sexual assault victims of being asked to reenact an assault;

    d.  The types of questions to be asked of a student who reports sexual

        assault;

    e.  How victims of sexual assault react to assault;

    f.  The average reporting time for a child to report sexual assault;

    g.  The impact of sexual assault on a child;

    h.  How to interview a reported perpetrator;

    i.  The increased susceptibility of a child who was subjected to sexual

        assault to future sexual assault;

    j.  Retaliation against a student who reported sexual assault; or

    k.  Accommodations to be provided to a student who reported sexual assault.

(Ex. 1 (Weyher Dep.) at 28-36.)

    333.  Weyher had no training on how to investigate a student's report of

sexual assault, other than to take it to the Title IX Coordinator and not investigate

it on his own.  (Ex. 1 (Weyher Dep.) at 32-33.)

    334.  With respect to retaliation against a student who reports sexual

assault, Mr. Weyher claimed the <u>District</u> could not retaliate against a student; it

was only other students who could retaliate against a complainant.  (Ex. 1 (Weyher

Dep.) at 34.)

335.    During the time that PRHS Assistant Principal/ Title IX Coordinator
Stinson was employed by the District – from 2002 through 2017 – she had no
training on how to interview a student who reports sexual assault.  (Ex. 3 (Stinson
Dep.) at 10, 26-27.)

336.    Stinson could not remember any training about interviewing a student
who reports sexual assault, other than that the interviewer should make the
reported victim comfortable, and she was not sure of how to do that.  (Ex. 3
(Stinson Dep.) at 27.)

337.    Stinson did not recall receiving any training on the most effective
ways to interview a victim of sexual assault, the impact on a sexual assault victim
of being interviewed multiple items about a sexual assault, the impact on a sexual
victim of being asked to revisit the scene of an assault, the impact on a victim of
being asked to recreate or demonstrate what happened, or the types of questions to
ask of a victim, and she did not try to get any additional training on interviewing
students who reported sexual assault once she started working at District.  (Ex. 3
(Stinson Dep.) at 27-29.)

338.    Stinson received no training specific to interviewing reported
perpetrators, common defenses of reported perpetrators, or the variety of ways a
victim responds to sexual assault.  (Ex. 3 (Stinson Dep.) at 27-30.)

339.   Ms. Stinson received no training on what it means to retaliate against a student who reports sexual assault.   (Ex. 3 (Stinson Dep.) at 34.)

340.   Ms. Stinson received no training on the prevalence of sexual assault in public high schools.  (Ex. 3 (Stinson Dep.) at 34.)

341.   Ms. Stinson recalled no District policies regarding student-against-student sexual harassment, and she received no training on them.  (Ex. 3 (Stinson Dep.) at 34-35.)

342.   SRO Lockard has been employed by the District since 2004.  (Ex. 4 (Lockard Dep.) at 20, 31.)

343.   Prior to his employment by the District, SRO Lockard worked for the Gwinnett County Police Department, from 1995-2004.  (Ex. 4 (Lockard Dep.) at 14, 20.)  During that time, he was never part of the Special Victim's Unit, which was responsible for investigating sex crimes.  (*Id.* at 16.)

344.   SRO Lockard could not recall, during the nine years he served as a police officer for Gwinnett County, ever investigating a sexual assault where the victim was a minor or that occurred within a school setting. (Ex. 4 (Lockard Dep.) at 17.)

345.   SRO Lockard had no forensic interviewing training, which is specialized training in techniques on how to interview a minor who has reported sexual assault.  (Ex. 4 (Lockard Dep.) at 18-19.)

346.   Lockard could not recall whether he received training regarding interviewing minors who report being sexually assaulted before the 2014-2015 academic year, and could not remember anything specific about training that he may have received at a later time.  (Ex. 4 (Lockard Dep.) at 41.)

347.   SRO Lockard does not recall ever utilizing any protocol or model policy when investigating a student's report of sexual assault.  (Ex. 4 (Lockard Dep.) at 34-35.)

348.   In fact, the District provided **no Title IX training for SROs** prior to 2016.  (Ex. 5 (Spraggs. Dep.) at 58.)

349.   SRO Lockard could remember no Title IX training that he received prior to February 2015 or any training specific to interviewing minors who report sexual assault.  (Ex. 4 (Lockard Dep.) at 38-43.)

350.   SRO Lockard has never received training on trauma-informed investigation of reports of sexual assault, the impact of trauma on a sexual assault victim's memory, the impact of repetitive questioning on a victim of sexual assault, interview techniques that can help minimize trauma that a sexual assault

victim suffers, or offender-focused investigation of reports of sexual assault. (Ex. 4 (Lockard Dep.) at 41-42.)

351.   When asked if he was aware of any District policies that address student-on-student sexual assault, Lockard stated, "I am not sure, ma'am." (Ex. 4 (Lockard Dep.) at 45.)

352.   Lockard testified that, in determining whether there was probable cause to criminally charge a student accused of sexual assault, he would look at the physical evidence, which would include <u>only</u> video surveillance footage and "marks on an individual." (Ex. 4 (Lockard Dep.) at 59-60.)

353.   Assistant Principal Augmon has been employed by the District since February 2000. (Ex. 2 (Augmon Dep.) at 9.)

354.   Augmon testified under oath at the disciplinary hearing against Ms. Doe: "I don't know that I'm trained to qualify what is sexual assault" because she had never before investigated a sexual assault. (Ex. 9 (Hrg. Tr) at Plaintiff 000373-74, 378.)

355.   Prior to February 2015, Augmon had never before handled a Title IX complaint. (Ex. 2 (Augmon Dep.) at 24.)

356.   Prior to February 2015, the District's annual Title IX training was the only such training that Ms. Augmon received. (Ex. 2 (Augmon Dep.) at 16-17.)

357.   Ms. Augmon received no training on interviewing students who report sexual assault, how victims respond to sexual assault, or investigating student reports of sexual assault. (Ex. 2 (Augmon Dep.) at 18-19, 59.)

358.   Ms. Augmon, during her deposition, could not remember receiving any training regarding retaliation or even what retaliation means.  (Ex. 2 (Augmon Dep.) at 18.)

359.   When asked about victim blaming questions, she said "I'm not familiar with what a victim blaming question would be."  (Ex. 2 (Augmon Dep.) at 42.)

360.   Hearing Officer Graves testified, that if she had any training, she could not remember any details about it that were specific to student-on-student sexual assault, other than importance of sharing information, making a report, acting promptly, and being attentive and listening.  (Ex. 33 (Graves Dep.) at 26-31.)

## Lack of Title IX Education and Training for Students and Parents

361.   There is no evidence in the record of the District providing any training or education to students and parents on student-against-student sexual misconduct and identifying, investigating, reporting, stopping, and remediating the effects of sexual harassment.  Title IX Coordinator Stinson did not provide this

type of training to students.  (Ex. 3 (Stinson Dep.) at 33.)   District Title IX

Coordinator Spraggs did not provide any Title IX training or education to students

in the District.  (Ex. 5 (Spraggs Dep.) at 118.)

362.   No other PRHS official deposed in this matter could recall, based on

personal experience, any such training for students that occurred prior to February

2015.  (Ex. 1 (Weyher Dep.) at 14-15; Ex. 2 (Augmon Dep.) at 21.)

363.   The Gwinnett County Public Schools 2014-15 Student/Parent

Handbook Middle and High School ("Student/Parent Handbook") did not identify

the name of the District's Title IX Coordinator or an email address for the Title IX

Coordinator.  (Ex. 26 (2014-15 Student/Parent Handbook) at GCSD00009286; Ex.

5 (Spraggs Dep.) at 120-21.)

364.   The Student/Parent Handbook did not state whether any person served

as a Title IX Coordinator at PRHS, nor did it identify the name or contact

information of that person.  (*Id.*)

365.   The Student/Parent Handbook did not contain any definition or

description of Title IX.  (*See* Ex. 26 (2014-15 Student/Parent Handbook).)

366.   The Student/Parent Handbook did not describe a student's rights

under Title IX.  (*See id*.)  The Handbook did not describe what constitutes sexual

harassment under Title IX, nor did it state that Title IX prohibits the District from

discriminating on the basis of sex.  (*See id.*)  The Handbook's varying description
of "harassment" are utterly confusing; it described "harassment" as "[r]epeated
words (verbal or written), conduct, or action that annoys, alarms, or causes distress
and serves no legitimate purpose."  (*See id*. at GCSD0000929.)

367.   The Student/Parent Handbook did not explain that student sexual
harassment can constitute discrimination on the basis of sex or a violation of Title
IX.  (*See id*.)

368.   The Student/Parent Handbook did not identify who served as the
District Title IX Coordinator.   (*See id.* at GCSD00009278-313.)

## Dr. Nan Stein Has Opined that the District's Title IX Training Was Inadequate

369.   Dr. Nan Stein is Senior Research Scientist and Project Director at
Wellesley College Center for Research on Women.  (Ex. 87 (Stein Report) at
45.)  She has a Doctorate in Education from Harvard University and has
conducted research into sexual harassment and sexual violence in K-12 schools
for nearly 40 years, focusing specifically on how school districts can prevent
and respond to sexual harassment and violence.  (*Id.* at 4.)  She has written
dozens of academic articles that have been published in peer-reviewed journals,
including law journals; published one academic book and contributed many
chapters for edited volumes; and provided technical assistance to school

districts and state education departments about strategies to prevent sexual

harassment and gender violence in K-12 schools.  (*Id.* at 4-5.)

370.   Dr. Stein served as an expert consultant to the Civil Rights Division of

the U.S. Department of Justice in a Title IX and Title IV case in the Hawaii

public schools.  (*Id.* at 5.)  She served as a Gender Equity Specialist for the

Massachusetts Department of Education for 14 years, in which capacity she

provided technical assistance and training to school district personnel and

students on Title IX and other state and federal civil rights laws.  (*Id.*)  She was

at the forefront of identifying sexual harassment as a problem that interfered

with educational opportunity, and she has conducted federally funded research

about sexual harassment and teen dating violence.  (*Id.* at 6.)  She also has

practical on-the-ground experience; she was employed as a middle school social

studies teacher in Dayton, Ohio, and a few years later as a drug and alcohol

counselor at another school district in Somerville, Massachusetts.  (*Id.*)

371.   Dr. Stein has opined, in this case:

> [M]y opinion is that the Gwinnett County Public School (GCPS)
> did not provide administrators, faculty, staff, or students with
> sufficient or in some cases, any training on peer-to-peer (or
> student-to-student) sexual harassment and Title IX. Nor were the
> assistant principals trained sufficiently or at all in ways to conduct
> an investigation of sexual harassment or sexual assault that
> occurred in the school. They did not know how to interview a
> victim; did not know how to respond to such a report; did not

know how to respond post-report, and had no training on how to prevent retaliation. Moreover, there was no identification by name in the Student Handbook (2014-2015) of either the school-based Title IX coordinator or the district-wide coordinator. Nor did the high school-based Title IX coordinator identify herself (Ms. Stinson) to either Jane Doe or her parents as such; nor did she offer any guidance on student rights under Title IX to Jane Doe and her family during the investigation.

***

In my opinion, the GCPS deviated from the appropriate standard of care and failed to ensure the equal educational opportunity of Jane Doe by permitting sexual assault to occur on campus and to abuse the plaintiff in the investigation that occurred after she came forward to tell the school authorities that she had been sexually assaulted in an unlocked classroom that should have been locked once school was dismissed. For her bravery, she was emotionally tortured, suspended, and ultimately had to withdraw from school due to the persistent retaliation that was heaped upon her return to school. Had GCPS provided proper training to administrators, faculty, and staff, and utilized an appropriate standard of care, Jane Doe likely would not have suffered the abusive aftermath from the school administrators, or at the school board hearing for coming forward as she did. She was doubly assaulted – first by the classmate, and then by the school administrators.

(*Id.* at 37-38.)

## The District's Actions Caused Ms. Doe to Suffer PTSD and Other Injuries

372.   On or near March 11, 2015, Ms. Doe's regular treating psychologist, Dr. Kara Rothman, diagnosed Ms. Doe with Post-Traumatic Stress Disorder (PTSD).  (Ex. 65 (Rothmann Dep.) at 37-40, 99-100; Exs. 83-84 (Rothmann Letters) at GCSD000012422-23.)

373.   In a letter dated May 6, 2015, Dr. Rothman explained:

101

> [Ms. Doe's] current diagnosis of PTSD is related to her recent
> sexual assault . . . [Ms. Doe] has reported sleep disturbance,
> frequent nightmares, decreased appetite, irritability, extreme
> distress when thinking about returning to Peachtree Ridge High
> School, fearing something bad is going to happen, increased
> difficulty concentrating, avoidance of going to Peachtree Ridge
> High School or seeing her perpetrator, and exaggerated negative
> expectations about herself and her future. During sessions, [Ms.
> Doe] has been observed to be jittery and more pessimistic about
> her life in general since her assault. Her affect/mood has also been
> notably more depressed. While [Ms. Doe] has never wavered on
> what happened during her assault, she has frequently questioned if
> it was worth reporting her attack due to the immense consequences
> that this has caused in her life and the lack of support she has felt
> from school staff and peers.

(Ex. 65 (Rothmann Dep.) at 37-40; Ex. 84 (Rothman Dep. Ex. 1) at

GCSD000013422.)

374.   Ms. Doe also experienced panic attacks "over attending the school

hearing and facing the student that assaulted her." (Ex. 65 (Rothmann Dep.) at 87.)

375.   Ms. Doe experienced increased anger after reporting the sexual assault

to the District.  (Ex. 65 (Rothmann Dep.) at  94-95; Ex. 22 (Jane Doe Dep.) at 112-

13.)

376.   Ms. Doe suffers from distrust of others, especially adults in positions

of authority.  (Ex. 7 (Pl. Interrog Answers) at 7.)

377.   Ms. Doe has also suffered severe social anxiety, which she did not

suffer from prior to reporting sexual assault to the District and has been very

depressed.  (Ex. 22 (Jane Doe Dep.) at 112.)   She has nightmares and flashbacks that are due less to the sexual assault than to "getting suspended." (*Id.* at 112-13, 118-19.)  She also has been suicidal.  (*Id.* at 113.)

378.   Ms. Doe describes having nightmares of "me back then when I was, you know, 16 and walking through school and people just laughing at me and, and having just nightmares of the hearing.  And then I'd have nightmares of me getting like raped by just random people that I just don't know."  (*Id.* at 119.)

379.   She also has regular headaches and grinds her teeth.  (Ex. 7 (Pl. Interrog Answers) at 7.)

380.   Dr. Eileen Ryan, a Professor and Vice Chair of Clinical Services in the Department of Psychiatry and Behavioral Health at Ohio State University Wexner Medical Center, and also an attending psychiatrist at the Children's Crisis Unit at Nationwide Children's Hospital, has decades of experience in clinical child psychiatry and child forensic psychiatry.  (Ex. 85 (Dr. Ryan CV).)

381.   Dr. Ryan conducted a forensic mental health evaluation of Ms. Doe and reviewed Ms. Doe's treatment records.  (Ex. 86 (Excerpt of Dr. Ryan Report) at 1.)

382.   Dr. Ryan has opined, with respect to Ms. Doe, among other things:

> It is my opinion to a reasonable degree of medical certainty that [Ms. Doe] has developed a chronic form of PTSD secondary to the

sexual assault at Peachtree [Ridge] High School, and more saliently the inappropriate and inadequate response of the Gwinnett County Public School System, and her symptomatology is likely to persist indefinitely.  It is likely that these symptoms will continue to negatively impact her relationships and her social and occupational functioning significantly.

***

It is my opinion to a reasonable degree of medical certainty, [Ms. Doe] will live with the psychiatric, emotional and behavioral impacts of the sexual violence she experienced at Peachtree Ridge High School and the negative response of school personnel indefinitely.

***

In my opinion to a reasonable degree of medical certainty, future treatment will need to include ongoing cognitive-behavior therapy, with likely additions of other modalities such as cognitive processing therapy (more specific to PTSD with dissociation), as well as pharmacotherapy by a psychiatrist as symptoms of PTSD and depression intensify with developmental and environmental stressors.

(Ex. 86 (Excerpt of Dr. Ryan Report) at 19-20, 24-25.)