**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **JANE DOE,** | |
| **Plaintiff,** | **CIVIL ACTION FILE** |
| **v.** | **No. 1:18-CV-05278-SCJ** |
| **GWINNETT COUNTY SCHOOL DISTRICT,** | |
| **Defendant.** | |

## ORDER

Plaintiff[1] filed a Complaint against Defendant[2] on November 16, 2018, alleging that Defendant violated her rights: (1) under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"); and (2) to equal protection of the laws under the Fourteenth Amendment to the United States

---

[1] To protect the identity of Plaintiff, a minor at all relevant times and an alleged sexual assault victim, the Court granted Plaintiff's Motion for Leave to Proceed Under Pseudonym. Doc. No. [16].

[2] Defendant claimed that it was incorrectly identified in the Complaint. See Doc. Nos. [1]; [22], 2. Plaintiff later amended her Complaint to change Defendant's name to "Gwinnett County School District." See Doc. Nos. [51]; [56].

Constitution and federal rights under Title IX pursuant to 42 U.S.C. § 1983. Doc.

Nos. [1]; [56].[3] This matter is before the Court on the Parties' cross motions for

summary judgment. Doc. Nos. [132]; [133]. The Court rules as follows.

## I.    BACKGROUND

The following facts are undisputed unless otherwise stated.[4]

### A.    The Alleged Incident

On February 4, 2015, after school ended, Plaintiff — then a 16-year-old

sophomore at Peachtree Ridge High School ("PRHS") in the Gwinnett County

School District — was waiting for her mother to pick her up from school. Doc. No.

[132-1]  ¶¶ 7, 15. While Plaintiff waited, "MP," [5] another student at PRHS,

---

[3]  All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

[4]  The Court derives the following facts from the Parties' submissions (Doc. Nos. [132-1]; [133-1]; [159]; [160]; [162-1]; [169]; [170-1]) and the record. Pursuant to Local Rule 56.1(B), when a fact is undisputed, the Court includes the fact. For disputed facts, the Court reviews the record to determine if a material dispute exists. Where the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also rules on objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the record.

[5]  Throughout the Complaint and subsequent filings with the Court, Plaintiff refers to this then-minor, alleged "male perpetrator" as "MP," which does not reflect his true initials. Doc. No. [1], 2 n.1; Fed. R. Civ. P. 5.2(a)(3).

approached Plaintiff and informed her that he was going to the Ridge Vision News ("RVN") room located within PRHS. Id. ¶ 16. Plaintiff went with MP to the RVN room because she had never seen it. Id. ¶ 17. Although the RVN room was supposed to be locked after hours, a PRHS video surveillance recording shows that both Plaintiff and MP were able to enter the RVN room at 4:24 pm. Id. ¶¶ 18–19.

Upon entering the RVN room, Plaintiff spoke to male student "R," who was in the adjoining computer classroom wearing headphones and working on a project; "R" asked Plaintiff to close the door to the classroom. Id. ¶ 21. Afterwards, Plaintiff and MP went to a smaller "editing" or "control" room that adjoins the RVN room. Id. ¶ 22. MP turned off the lights in both the main room and editing room, and he closed the door to the editing room. Id. ¶¶ 25–27.[6] Defendant does not dispute that, at some point, MP stood between Plaintiff and the closed door to the room, but it specifies that MP was positioned this way only momentarily. Id. ¶ 28; Doc. No. [160] ¶ 28. Further, Defendant does not deny that Plaintiff performed oral sex on MP but disputes Plaintiff's allegations that the

_____

[6] Defendant objects to the sequence of these events but does not dispute that MP turned off these lights and closed the door. See Doc. No. [160] ¶¶ 25–27.

oral sex was nonconsensual. See Doc. Nos. [132-1] ¶¶ 29–35; [160] ¶¶ 29–35. Defendant also disputes that MP masturbated in front of Plaintiff. Doc. Nos. [132-1] ¶¶ 36–38; [160] ¶¶ 36–38.[7]

Plaintiff left the RVN room at 4:38 pm, fourteen minutes after she initially entered the room with MP; MP exited the RVN room approximately two to three minutes later. Doc. No. [132-1] ¶¶ 40–41. After Plaintiff exited the RVN room, she walked to the front of the school where her mother picked her up and drove her away from campus. Doc. No. [132-1] ¶ 42. Defendant disputes Plaintiff's allegation that she was crying when she left school with her mother. Doc. No. [160] ¶ 42. Later that night, at 11:13 pm, MP's phone records show that he sent the following message to one of his contacts (not Plaintiff):

> Just feels like every time I try to change, something always gets me right back into my bad ways. U know? I am trying hard not to do bad things but I guess I just needa try a little harder. . . Im talking like girls and stuff. Its like so hard not to do stuff.

Doc. No. [132-1] ¶ 43. Defendant adds that the message and other messages sent by MP "conveyed his feelings of shame in a spiritual sense – that he had violated

---

[7] Defendant cites to MP's testimony at the disciplinary hearing, where MP denied masturbating in the RVN room. See Doc. No. [132-11] (Hr'g Tr.), Tr. 203:25–204:02.

his Christian belief in sexual purity before marriage by engaging in consensual oral sex with Plaintiff." Doc. No. [160] ¶ 43.

### B.    The Initial Reports

The next morning, February 5, 2015, Plaintiff went to school and told her female friends, "FM" and "RC," as well as her boyfriend, "A," that MP had sexually assaulted her. Doc. No. [132-1] ¶¶ 44–46. Plaintiff then went to her first class of the day, chemistry. Id. ¶ 46. Her chemistry teacher, Kristen Powell, observed that Plaintiff was crying and upset; Plaintiff was so upset that she was unable to take her chemistry test scheduled for that morning. Id. ¶¶ 47–48. Plaintiff told Ms. Powell that she was "basically raped" the previous day. Id. ¶ 49.

Plaintiff then called her mother, crying, and told her that she had been sexually assaulted, and Plaintiff's mother said she would come pick her up from school. Id. ¶ 50. Afterwards, Plaintiff went to speak with Linda Brimmer, a PRHS teacher with whom Plaintiff felt comfortable, and Plaintiff cried as she told Ms. Brimmer that she had been sexually assaulted. See id. ¶ 51. At around 8:00 am, Ms. Brimmer took Plaintiff to speak with School Resource Officer ("SRO") Tony Lockard. Id. ¶ 52.

5

SRO Lockard interviewed Plaintiff, and Plaintiff told him that she was sexually assaulted and described the assault; SRO Lockard did not record the interview. Id. ¶¶ 53–54. It is disputed what questions SRO Lockard asked Plaintiff. Plaintiff asserts that this interview was "absolutely horrible" for her because SRO Lockard asked "inappropriate and humiliating questions" such as "(1) are you sure you didn't want it; (2) why didn't you fight harder; (3) why didn't you scream louder; or (4) why didn't you try to hurt him," which are questions Defendant asserts SRO Lockard did not ask. Id. ¶¶ 56–57; Doc. No. [160] ¶¶ 56–57.

SRO Lockard then took Plaintiff to an administrative office, where PRHS Assistant Principals Lee Augmon and LaShawnia Stinson, both women, would soon interview Plaintiff. See Doc. Nos. [132-1] ¶ 59–60; [160] ¶ 59–60. Augmon and Stinson began interviewing Plaintiff before her mother arrived; Plaintiff's mother joined them after she arrived. See Doc. No. [132-1] ¶ 63–64. Plaintiff provided a written statement to Augmon and Stinson and later went home and wrote a more detailed second statement. Id. ¶¶ 65–72.

Later that day, SRO Lockard and Assistant Principal Jon Weyher conducted a recorded interview with MP while both of his parents were present.

Id. ¶ 85. MP filled out the top of a statement form, and his mother wrote his statement as he dictated it to her. See id. ¶¶ 107–108. While MP's mother[8] was writing his statement, SRO Lockard and Weyher left the room. Id. ¶ 108.

On February 6, 2015, PRHS administrators required Plaintiff to return to school for additional interviews in which Plaintiff provided her second written statement in the presence of her father, SRO Lockard, and Assistant Principals Weyher, Stinson, and Augmon. Id. ¶¶ 115–118. SRO Lockard videotaped this interview. Id. ¶ 118. During this interview, PRHS officials had Plaintiff go back to the RVN room and walk them through the alleged sexual assault. Id. ¶ 119. While in the editing room, SRO Lockard asked Plaintiff how loud she said stop, why she did not hit MP "in the privates," why she did not grab and squeeze MP's testicles, and why she did not call 911 afterwards. Id. ¶ 123. Plaintiff alleges that school administrators asked her numerous other questions about the alleged assault, such as whether she straddled MP. See id. ¶¶ 123–138.[9] At no time did PRHS school officials inform Plaintiff or her parents that Assistant Principal

---

[8] It is undisputed that MP's mother was an employee of Defendant. Doc. No. [160] ¶¶ 86, 109.

[9] Defendant objects to the substance and/or characterizations of several of Plaintiff's statements of fact as to these matters. See Doc. No. [160] ¶¶ 123–138.

Stinson was the school's Title IX Coordinator, nor did the District Student/Parent Handbook for 2014-2015 provide this information—although the PRHS website listed it. See id. ¶ 139. Further, PRHS officials did not directly tell Plaintiff or her parents about her rights under Title IX or refer them to the District's policy on student reports of sexual harassment and discrimination. See id. ¶ 140.

After interviewing Plaintiff, Assistant Principal Stinson did not fill out or complete any documentation or report regarding Plaintiff's complaint that MP had sexually assaulted her. Id. ¶ 141. Also, PRHS officials never followed up on her accusations to ask MP if he masturbated in the RVN editing room or if he believed that Plaintiff consented to their sexual encounter. Id. ¶ 143. Further, District administrators did not investigate MP at that time for "lewd exposure or masturbating in front of [Plaintiff] without her consent."[10] Id. ¶ 144. Plaintiff also states that PRHS officials had asked Plaintiff and MP different types of questions during their interviews.[11] Id. ¶ 145.

---

[10] Defendant argues that these assertions by Plaintiff are "not relevant or material to Plaintiff's Motion for Summary Judgment." Doc. No. [160] ¶¶ 141–144. The Court disagrees and finds these assertions relevant to the Court's analysis of Plaintiff's Title IX retaliation claim against Defendant.

[11] Defendant contends that Plaintiff's assertions regarding the questions asked to Plaintiff and MP are "argumentative and more appropriate for a legal brief rather than

After the investigation, Bob Burgess (the District's Director of Discipline and Behavioral Interventions), SRO Lockard, PRHS Principal Jeff Matthews, and Assistant Principals Weyher, Stinson, and Augmon collectively determined that Plaintiff violated Student Conduct Behavior Code Rule 9G.[12] Id. ¶ 146. On February 10, 2015—five days after reporting that she had been sexually assaulted—Plaintiff was suspended until the disciplinary hearing was held on February 17, 2015. Id. ¶¶ 149, 155.

Prior to the disciplinary hearing, Plaintiff's parents were unable to get in touch with the District's Title IX Coordinator and were told to speak with PRHS Principal Matthews instead. Id. ¶ 161.

## C.     The Disciplinary Hearing

Hearing officers presided over Defendant's disciplinary hearing against Plaintiff, and their role was to decide her "guilt or innocence" with regards to her

---

a statement of material facts" and are "not relevant or material to Plaintiff's Motion for Summary Judgment." Doc. No. [160] ¶ 145. The Court disagrees and finds Plaintiff's assertions to be based in fact rather than argument because Plaintiff identifies questions PRHS asked Plaintiff but did not ask MP. The Court also finds that the assertions are relevant to the Court's analysis of Plaintiff's Title IX retaliation claim against Defendant.

[12] The prohibited behavior of Rule 9G is "oral sex or any act of sodomy." Doc. No. [132-28], 22.

alleged rule violation and to "determine the consequences." Id. ¶ 166. On February 18, 2015, a disciplinary hearing was held against Plaintiff and MP. Id. ¶¶ 172–173, 176. Defendant had informed Plaintiff and her parents that "Assistant Principals Jon Weyher, LaShawnia Stinson and Lee Augmon, SRO Tony Lockard" and additional students were "expected to present oral and/or written testimony in support of the charges" at the hearing. Id. ¶ 177. SRO Lockard did not appear at the hearing because he was out of state on a family vacation, and the videos taken by SRO Lockard of PRHS's interviews of MP and Plaintiff were not reviewed at the disciplinary hearing. Id. ¶¶ 183–184.

Assistant Principal Augmon testified for Defendant at the hearing and read Plaintiff's written statements into the record. Id. ¶ 192. Augmon testified that she did not know whether she was "trained to qualify what is sexual assault." Id. ¶ 193. She further testified that if the oral sex was not consensual, then it was not a violation. Doc. No. [160] ¶ 196.

When asked at the hearing how his conduct advanced from kissing Plaintiff to him pulling down his pants, MP testified that he knew Plaintiff would "do those kind of things" based on social media messages exchanged two months prior to the reported sexual assault and described her as having "a blank face that

10

didn't really have any expression, just wanted to do stuff." Doc. No. [132-1] ¶ 207. Defendant's attorney "briefly" cross-examined MP. Id. ¶ 213.

During the hearing, Defendant's attorney asked Plaintiff to demonstrate how loud she had screamed. Id. ¶ 218. In his closing statement, Defendant's attorney referenced men who are "falsely accused" by women, he did not apologize for his "conduct in cross-examining [Plaintiff]," and he contended that none of the PRHS administrators who interviewed Plaintiff believed her. Id. ¶ 223. After deliberating for about ten minutes, the hearing officers found Plaintiff to have violated Rule 9G and made no determination on whether Plaintiff "welcomed" oral sex with MP. Id. ¶¶ 225, 227. In finding Plaintiff to have violated Rule 9G, hearing officers extended her suspension by two days. Id. ¶ 229; Doc. No. [160] ¶ 229. After learning of her second suspension, Plaintiff made the following statement on the record:

> I just feel betrayed by the school. Like, I used to like Peachtree Ridge but but I hate it. I thought Peachtree Ridge was all about protecting kids and putting the kids first. But, like, now I see that's not the case. And like, you can tell that, like, this whole thing, they're just trying to cover this up so the school doesn't look bad. What about other girls that go to Peachtree Ridge. This is a bad example. I don't want any girls to have to go through this, ever.

11

> When people find out about this and girls do get sexually assaulted, they're not going to want to come forward and tell someone, because they're going to be scared they're going to get suspended and they have to go through all of this. Do you know how hard it is? How much I have to repeat my story over and over and over, and that's just so hard. And then at the end, I get suspended for this. It just – like, it doesn't make any sense. And then I have to come in and you guys say y'all don't believe me. Then [MP's] attorney is yelling at me. I didn't ask for this. I didn't ask to get sexually assaulted. I didn't ask to get suspended. It's just not fair. My parents have spent so much money to get an attorney and everything. And then you guys are going to do this to me, do this to our family. You don't know how emotional it is at home. I have nightmares every night. I have nightmares of my own boyfriend date raping me. I feel like nobody can protect me, no one believes me.

Doc. No. [132-1] ¶ 230.

### D.   **Subsequent Incidents**

Plaintiff returned to school on February 23, 2015. Id. ¶ 234. That day, she heard PRHS students calling her "whore" and "slut." Id. ¶ 237. During first block, student "BM" verbally harassed Plaintiff by accusing her of lying about MP's sexual assault and trying to frame him. Id. ¶ 238. Plaintiff did not attend school on February 24, 25, or 26, 2015. Id. ¶ 241. On February 24, 2015, BM sent Plaintiff a text saying "if you told the truth he wouldn't be at school right now[]"

12

and asking her "Why would you try to hurt that boys future? No right[.]" Id. ¶ 242. PRHS then developed a safety plan to make Plaintiff's "environment safe" by ensuring she was not in the presence of MP or BM. See id. ¶ 247; Doc. No. [132-56], 2.[13]

When Plaintiff returned to school on February 27, 2015, she observed friends "whispering, staring, and pointing at her, and she cried" in second block and then observed students "looking at and shaking their heads at her" in fourth block. Doc. No. [160] ¶¶ 252–254. Also, male student "AT" told Plaintiff, "I wish I was [MP]" and "heard you wanted to suck him up but then you got scared so you just say he forced you." Id. ¶ 255.

When Plaintiff attended school on March 2, 2015, MP's friends stared at her and gave her dirty looks during her second block class. Id. ¶ 261. During third block that day, male student "TA" approached Plaintiff, smirked, shook his head, and said "You're nasty!", causing Plaintiff to cry during class. Id. ¶ 262. Later,

_____

[13] First, Plaintiff asserts that Defendant had not developed a safety plan for her upon her initial return to school (Doc. No. [132-1] ¶ 236), a point to which Defendant objects on several factual grounds (Doc. No. [160] ¶ 236). Second, unlike what Plaintiff asserts (Doc. No. [160] ¶ 249), the safety plan did not specify on whom the burden was to take steps to ensure that Plaintiff was not the presence of MP or BM. See Doc. No. [132-56], 2. Rather, "not being in the presence of MP or BM" is just plainly listed after "making the environment safe." Id.

13

during lunch, a table of students stopped talking and stared at Plaintiff as she walked past them. Id. ¶ 263.

On March 3, 2015, Plaintiff's mother informed Defendant that Plaintiff wanted to transfer to another high school, Collins Hill. Id. ¶ 269. Beginning on March 12, 2015, Plaintiff enrolled as a sophomore at Gwinnett Online Campus School. Id. ¶ 275. Even after leaving PRHS, however, Plaintiff continued to endure harassment. For example, student "RH" posted on social media: "When Hoes don't use commons Sense," to which others replied, "It's okay she was just trying to quench her thirst," and "But it's not like she doesn't have enough in her mouth yunno[,]" in reference to Plaintiff. See id. ¶¶ 283–285.

Following her report of sexual abuse, it is disputed whether Plaintiff developed Post-Traumatic Stress Disorder ("PTSD"). See Doc. No. [160] ¶¶ 372–373. It is also disputed whether Plaintiff's social anxiety, depression, suicidal thoughts, and nightmares are a continuation of prior diagnoses or a result of the February 4, 2015 incident.[14] See id. ¶¶ 374–382.

---

[14] Defendant argues that Dr. Eileen Ryan's forensic mental health evaluation is or contains inadmissible hearsay. Doc. No. [160] ¶ 382. Pursuant to Fed. R. Evid. 803(4), Dr. Ryan's mental health evaluation itself is an exception to the rule against hearsay as it is a statement made for medical diagnosis or treatment. And to the extent Defendant

### E.     The Complaint

Plaintiff filed her Complaint on November 16, 2018, asserting three counts against Defendant. See Doc. Nos. [1]; [56]. In Count I, Plaintiff asserts a claim for Post-Report Deliberate Indifference in violation of Title IX. Doc. No. [1] ¶¶ 69–83. In Count II, Plaintiff contends that Defendant retaliated against her for reporting the alleged sexual assault and subsequent harassment in violation of Title IX. Id. ¶¶ 84–88. In Count III, Plaintiff asserts a § 1983 failure-to-train claim. Id. ¶¶ 89–105.

On December 21, 2020, Plaintiff and Defendant each filed a Motion for Summary Judgment. Doc. Nos. [132]; [133]. Both Defendant and Plaintiff

---

objects to Dr. Ryan's evaluation on the basis that she *relies* on hearsay, the Court notes that under Fed. R. Evid. 703, an expert may rely on hearsay to illustrate the basis of the expert's opinion if it is the type of evidence reasonably relied upon by experts in her field. See Smith v. Ortho Pharm. Corp., 770 F. Supp. 1561, 1569–70 (N.D. Ga. 1991); Mizrahi v. Yamaha Motor Corp., U.S.A., No. 17-24484-CIV, 2019 WL 3318527, at *8 (S.D. Fla. July 19, 2019) (stating that an expert is entitled to rely on third-party hearsay). Here, Defendant does not specify exactly which underlying statements constitute hearsay, but the Court infers that Defendant is arguing that Dr. Ryan impermissibly relies on information about Plaintiff gathered from interviews with Plaintiff's mother and former classmate. Cf. Doc. No. [156-11], 191–92. If so, the Court finds that such interviews are the type of evidence reasonably relied upon by experts in Dr. Ryan's field. Cf. United States v. LeClair, 338 F.3d 882, 885 (8th Cir. 2003) (finding that an expert psychologist's report was admissible, even though it relied on hearsay found in a report, because the report was evidence of a type reasonably relied upon by experts in the field). The Court overrules Defendant's objection.

15

responded (Doc. Nos. [154]; [162]) and replied (Doc. Nos. [168]; [170]). This matter is now ripe for review, and the Court rules as follows.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'— that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477

U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the non-movant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. Fitzpatrick, 2 F.3d at 1115 (citations omitted).

The filing of cross motions for summary judgment "does not give rise to any presumption that no genuine issues of material fact exist." 3D Med. Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017). Rather, cross motions for summary judgement "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material

fact exists and that it is entitled to judgment as a matter of law." Id. (citing Shaw

Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004)).

### III.   DISCUSSION

#### A.   **Preliminary Matters**

Before addressing the cross-motions for summary judgment, the Court

addresses two related preliminary matters: whether Plaintiff's Title IX claim is

collaterally estopped and whether to consider extrinsic evidence.

In response to Plaintiff's Motion for Summary Judgment, Defendant

argues that Plaintiff is collaterally estopped from bringing her Title IX deliberate

indifference claim based on the findings made at the joint disciplinary hearing.

Doc. No. [154], 4–6. Defendant further discusses this argument in its own Motion

for Summary Judgment (Doc. No. [133-2], 8–12), in which Defendant contends

that the hearing officers had already "concluded that Plaintiff violated Rule 9G

because they found that the oral sex between Plaintiff and MP was consensual"

(id. at 11). Because Plaintiff was "represented by counsel during the disciplinary

hearing, testified, called other witnesses supporting her contentions[,] and

introduced exhibits," Defendant contends that Plaintiff cannot maintain a claim

under Title IX or otherwise based on nonconsensual oral sex between MP and

Plaintiff on February 4, 2015. Id. at 11–12. Thus, according to Defendant, it is entitled to summary judgment on Plaintiff's Title IX claim. Id. at 12.

The Court previously addressed Defendant's argument at the motion-to-dismiss stage. See Doc. No. [46], 16–18. Under Georgia Law, a party asserting collateral estoppel is required to establish that:

> (1) an identical issue was presented in the prior proceeding; (2) the issue was a critical and necessary part of the prior proceeding; (3) the issue was fully and fairly litigated in the previous proceeding; (4) the parties in the two proceedings were identical; and (5) a final decision was rendered by a court of competent jurisdiction.

Bryant v. Jones, 575 F.3d 1281, 1303 (11th Cir. 2009). Because establishment of these factors requires the Court to consider facts outside of those alleged in Plaintiff's Complaint, the Court decided not to make a collateral estoppel determination at the motion-to-dismiss stage. Doc. No. [46], 18. But because the Court is presently analyzing cross-motions for summary judgment, the Court may now consider extrinsic facts, such as those established by the joint disciplinary hearing transcript. See id. at 17 n.7; see also Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

19

Defendant claims that the hearing officers' findings that the "oral sex between Plaintiff and MP was consensual and that Plaintiff therefore violated Rule 9G" along with the opportunity for Plaintiff to fairly represent herself have a "preclusive effect in future litigation." Doc. No. [133-2], 8 (citing <u>Univ. of Tenn. v. Elliott</u>, 478 U.S. 788 (1986)). Plaintiff responds that Defendant's argument fails under the <u>Elliot</u> standard for issue preclusion. Doc. No. [162], 3.

The Supreme Court has held that "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." <u>Elliott</u>, 478 U.S. at 799 (quoting <u>United States v. Utah Const. & Min. Co.</u>, 384 U.S. 394, 422 (1966)).

First, the Court must determine whether the disciplinary hearing provided Plaintiff "an adequate opportunity to litigate." <u>Id.</u> The Eleventh Circuit has found an *inadequate* opportunity to litigate when "very narrow and perfunctory factual findings tailored solely around [a] limited jurisdiction" resulted from an administrative procedure. <u>Bryant</u>, 575 F.3d at 1302. In the present case, the *only* issue decided at the disciplinary hearing was whether Plaintiff violated Rule 9G,

20

which prohibits the "behavior" of "[o]ral sex or any act of sodomy." Doc. No. [160] ¶ 147. This Court has already determined that "the plain language of Rule 9G does not necessarily require a finding by the hearing officers that the sexual act was 'consensual.'" Doc. No. [46], 17. Yet, Defendant maintains that the finding of the disciplinary hearing warranting issue preclusion was that Plaintiff violated Rule 9G by having consensual oral sex with MP. Doc. No. [133-2], 8. Because the findings of the disciplinary hearing were narrowly focused on whether Plaintiff violated Rule 9G by engaging in oral sex, Plaintiff was not afforded an adequate opportunity to litigate her Title IX or failure-to-train claims at the disciplinary hearing.

Second, this Court "must give [Defendant's] factfinding the same preclusive effect to which it would be entitled in the State's courts." Elliott, 478 U.S. at 799 (quoting Utah Const. & Min. Co., 384 U.S. at 422). Within Title 160 of the Georgia Department of Education, official action—a disciplinary hearing—is governed by O.C.G.A. § 20-2-758. See Ga. Comp. R. & Regs. 160-4-8-.16. According to O.C.G.A. § 20-2-758, "[n]othing in this subpart shall be construed to prohibit, restrict, or limit in any manner any cause of action otherwise provided by law and available to any teacher, school official, employee, or

21

student." Here, Georgia law does not preclude Plaintiff, a former PRHS student, from seeking a Title IX cause of action in federal court. Thus, this Court must treat Defendant's factual findings in its disciplinary hearing as non-preclusive.

In sum, Defendant does not satisfy the Elliott collateral estoppel factors to prevent Plaintiff from bringing a Title IX claim in federal court. In fact, during the disciplinary hearing, Defendant's attorney conceded that there would be a "separate tribunal if there were such an allegation" regarding "whether the school followed all of the federal requirements that [it] may be required to perform." Doc. No. [160] ¶ 197. Because the question of whether Defendant followed mandatory federal requirements was not the identical issue presented in the disciplinary hearing, was not the issue that was "a critical and necessary" part of the hearing, and was not an issue litigated or decided upon in the hearing, the Court is not precluded from analyzing Plaintiff's deliberate indifference claim. See Bryant, 575 F.3d at 1303.

The Court turns to the summary judgment arguments as to each claim.

**B.      Count I – Title IX Deliberate Indifference**

Both Plaintiff and Defendant move for summary judgment for Plaintiff's Title IX deliberate indifference claim. The Eleventh Circuit has determined that

"[s]tudent-on-student sexual harassment rises to the level of actionable Title IX discrimination only if the harassment is 'sufficiently severe.'" Hill v. Cundiff, 797 F.3d 948, 968 (11th Cir. 2015) (quoting Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999)). A plaintiff asserting a Title IX deliberate indifference claim based on student-on-student sexual harassment must establish (1) that the school district was deliberately indifferent to known acts of harassment and (2) that the known harassment was so severe, pervasive, and objectively offensive that it denied the plaintiff the equal access to education that Title IX protects. Id. at 968–69. This high standard is intended to guard against "sweeping liability," because children may regularly interact in immature ways, including "some forms of teasing, shoving, and name-calling that target differences in gender." See id. at 969 (quotation and citation omitted).

Under Eleventh Circuit precedent, a plaintiff must satisfy five elements to assert a Title IX deliberate indifference claim stemming from student-on-student harassment.[15] See Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282,

---

[15] As in the Court's Order denying Defendant's Motion to Dismiss, the Court follows the approach set forth in Hill v. Cundiff, 797 F.3d 948 (11th Cir. 2015) and applies Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282 (11th Cir. 2007) as a five-element test. See Doc. No. [46], 19 n.8.

23

1293 (11th Cir. 2007). First, the defendant must be a recipient of federal funds under Title IX. Id. Second, an "appropriate person" must have actual knowledge of the discrimination or harassment. Id. Third, the discrimination or harassment, of which the funding recipient had actual knowledge under element two, must be "severe, pervasive, and objectively offensive." Id. (citing Davis, 526 U.S. at 633). Fourth, "a funding recipient is liable for student-on-student harassment only if 'the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities.'" Id. (quoting Davis, 526 U.S. at 633). In considering this element, the Court analyzes the conduct of the funding recipient — not the alleged harasser — to ensure that it is liable only if its deliberate indifference subjected the plaintiff to discrimination. Id. (citing Davis, 526 U.S. at 640–41). And fifth, the plaintiff must demonstrate that the discrimination or harassment "effectively bar[red] the victim's access to an educational opportunity or benefit." Id. (citing Davis, 526 U.S. at 633); Hill, 797 F.3d at 970. The Court will address each element in turn.

### 1.    *Defendant is a Recipient of Federal Funds*

First, Plaintiff must show that Defendant is a recipient of federal funds. Williams, 477 F.3d at 1293. Because it is undisputed that Defendant is a recipient

of federal funds (Doc. No. [160] ¶ 1), Plaintiff satisfies the first element of the

<u>Williams</u> test.

### 2.    *Appropriate Persons with Actual Knowledge*

Second, Plaintiff must prove that an "appropriate person" had actual

knowledge of the alleged discrimination or harassment. <u>Williams</u>, 477 F.3d at

1293. "[A]n 'appropriate person'. . . is, at a minimum, an official of the recipient

entity with authority to take corrective action to end the discrimination." <u>Gebser</u>

<u>v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290 (1998). This individual must also

be "high enough up the chain-of-command that his acts constitute an official

decision by the school district itself not to remedy the misconduct." <u>Hill</u>, 797 at

971 (citation omitted).

Plaintiff contends that Defendant had actual knowledge of her sexual

harassment by MP through eight individuals who are appropriate persons: PRHS

Principal Matthews, Assistant Principals Augmon, Stinson, and Weyher, James

Taylor (Executive Director of Academic Support), Bob Burgess (Director of

Discipline and Behavioral Interventions), Wayne Rikard (Chief of the District's

School Police Department), and SRO Lockard. <u>See</u> Doc. No. [132], 5–6. Plaintiff

also asserts that Defendant had actual knowledge of ongoing harassment that

Plaintiff endured after reporting the sexual assault because she reported such harassment to Assistant Principals Stinson and Augmon, Title IX Coordinator Joyce Spraggs, and Principal Matthews. Id. at 6–7.

In its Motion for Summary Judgment, Defendant states the standard for a Title IX claim and lists the elements that it argues Plaintiff does not satisfy, but it fails to address the "appropriate person" prong. Doc. No. [133-2], 7–8. In its response to Plaintiff's Motion for Summary Judgment, however, Defendant argues that it did not have actual knowledge of "some of the alleged post-suspension harassment." Doc. No. [154], 15–17.

First, as to the appropriate person prong, Defendant does not contest or even address whether the alleged appropriate persons listed above knew of Plaintiff's encounter with MP. See generally Doc. Nos. [133-2]; [154]. After reviewing the record, the Court finds that Plaintiff has satisfied this prong because Principal Matthews and the PRHS Assistant Principals had the authority to discipline students for misconduct or otherwise remedy misconduct,[16] so those four individuals at the very least were "appropriate persons."

---

[16] In Hill, the Eleventh Circuit found that principals and assistant principals "were appropriate persons capable of putting the Board on actual notice of sexual harassment

26

Second, Plaintiff argues that Defendant had actual knowledge, through its appropriate persons, of the sexual harassment at issue—namely, (1) the alleged sexual assault by MP and (2) the alleged harassment that Plaintiff endured from other students after reporting the alleged sexual assault by MP. Doc. No. [132], 5–7. As an initial matter, the Court notes that Plaintiff and Defendant strongly dispute whether these incidents constitute the type of harassment contemplated under Title IX. Compare id. at 4–12 (arguing that the sexual encounter with MP and subsequent harassment from other students are actionable under Title IX) with Doc. No. [154], 10–12 (arguing that Plaintiff was not sexually assaulted and that the harassment she experienced upon returning to school was not actionable under Title IX). Whether these incidents constitute harassment under Title IX, however, is a question the Court addresses below when discussing the third

_____

and discrimination" in part because they had authority to discipline students for sexual harassment. Hill, 797 F.3d at 971. Considering their roles and authority at PRHS, this Court finds that the PRHS principal and assistant principals had similar authority to discipline and thus qualify as appropriate persons. On the other hand, the Eleventh Circuit has held that a school security guard was not an appropriate person. See Floyd v. Waiters, 133 F.3d 786, 788, 793 & n.15 (11th Cir.1998), vacated by 525 U.S. 802 (1998), reinstated in 171 F.3d 1264 (11th Cir.1999). For purposes of summary judgment, it is sufficient for the Court to determines that the principals and assistant principals are appropriate persons without determining whether SRO Lockard and the other listed individuals are appropriate persons.

27

element of this test. What the Court must ask itself here is what Defendant knew of the alleged harassment through the appropriate persons. Hill, 797 at 948. First, it is undisputed that Defendant had actual knowledge of the alleged sexual assault by MP.[17] See Doc. No. [160] ¶¶ 59–68. Second, Plaintiff claims to have endured harassment from other students and a hostile school environment after reporting her alleged sexual assault and being suspended, and the record shows that Defendant had actual knowledge of at least some of that alleged harassment. See Doc. No. [160] ¶¶ 238, 240, 246, 255, 257, 266–267, 269–273, 283, 285.[18] Thus, the Court finds that Plaintiff satisfies the second element of the Williams test for

_____

[17] The Court notes that the facts of this case differ from those of Hill, where the school district was found to have had actual knowledge, *prior* to the sexual assault directly at issue, of several of the harasser's acts that occurred before the assault. See Hill, 797 at 971–72. Here, besides text messages from MP that Defendant learned of after the alleged sexual harassment at issue occurred, Defendant is not alleged to have had actual knowledge of prior incidents involving MP. Yet in Hill, the Eleventh Circuit found that actual knowledge of the sexual assault formed *after* the incident occurred was sufficient for purposes of this prong. See Hill, 797 at 972 ("And it is undisputed that the Board became aware of the rape-bait scheme and the rape when Principal Blair interviewed Simpson and Doe and discovered these events."). Thus, the Court finds that actual knowledge of MP's alleged sexual harassment, even if formed after the incident occurred, may constitute sufficient actual knowledge for purposes of this analysis.

[18] Defendant claims that it did not have actual knowledge of "some of the alleged post-suspension harassment." Doc. No. [154], 15–17. But it is undisputed that Defendant had knowledge of other forms of post-suspension harassment that Plaintiff claims to have endured. See Doc. No. [160] ¶¶ 238, 246, 255–257, 261–264.

28

summary judgment purposes because there is no genuine dispute that Defendant had actual knowledge of Plaintiff's alleged sexual harassment by MP and of the post-suspension incidents involving other students.

### 3.    *Severe, Pervasive, and Objectively Offensive*

Third, Plaintiff must show that the sexual harassment or discrimination of which Defendant had actual knowledge was "severe, pervasive, and objectively offensive." Williams, 477 F.3d at 1282 (citing Davis, 526 U.S. at 633). "Whether gender-oriented conduct rises to the level of actionable [Title IX] harassment . . . depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." Hill, 797 F.3d at 972 (quoting Davis, 526 U.S. at 651). To be considered "severe, pervasive, and objectively offensive," "the behavior must be serious enough to have a 'systemic effect' of denying equal access to an education." Id. (quoting Davis, 526 U.S. at 652). A single incident of student-on-student harassment, even if severe, generally cannot have a sufficiently systemic effect to satisfy this element. Id.; see also Williams, 477 F.3d at 1298 (indicating that single incidents are "rarely actionable"). In some

29

circumstances, a sexual assault along with other harassment or discrimination surrounding the assault may satisfy this element. See Williams, 477 F.3d at 1298.

In this case, Plaintiff alleges two primary types of harassment: (1) the sexual assault by MP and (2) the post-assault and -suspension taunting by other students. Doc. No. [132], 4–12. And unlike in many other cases where it was uncontested or assumed that the primary underlying incident constituted sexual harassment,[19] the Parties here dispute whether Plaintiff's sexual encounter with MP was nonconsensual and/or sexual assault and whether the taunting Plaintiff experienced from other students after she reported the encounter with MP and was suspended is the type of harassment contemplated under Title IX. Compare Doc. No. [132], 4–12 (arguing that Plaintiff was sexually assaulted by MP and that subsequent harassment from other students are actionable under Title IX) with Doc. No. [154], 10–12 (arguing that Plaintiff was not sexually assaulted and that the harassment she experienced upon returning to school was not actionable

---

[19] For example, in Williams, which concerned a motion to dismiss, the Eleventh Circuit accepted as true the plaintiff's allegations that she was sexually assaulted. Williams, 477 F.3d at 1288 & n.2. And in Hill, which concerned only the defendant's motion for summary judgment, there appeared to be no dispute that the plaintiff had been sexually assaulted after having been used as bait in a sting operation, and, in any event, the Eleventh Circuit referred to the underlying incident as a rape because it viewed the facts in the light most favorable to the nonmoving party. See Hill, 797 F.2d at 955 n.2.

30

under Title IX). Thus, the Court first assesses whether there is a genuine issue of material fact as to whether these incidents were the type of sexual harassment contemplated under Title IX. Then the Court will assess whether such harassment was severe, pervasive, and objectively offensive.

<p style="margin-left: 2em;"><strong>a)    There is a genuine issue of material fact as to whether Plaintiff's sexual encounter with MP constituted sexual harassment, but the Court finds that the post-suspension taunting Plaintiff experienced did not rise to the level of Title IX sexual harassment</strong></p>

To start, Plaintiff and Defendant strongly contest whether Plaintiff's sexual encounter with MP was nonconsensual and thereby actually constituted sexual harassment. <u>See</u> Doc. No. [154], 10–11. Because the Court is reviewing this matter on cross motions for summary judgment, the Court reviews the record and facts in the light most favorable to the non-movant as to each motion for summary judgment. After reviewing the record and cited facts, the Court finds that a material issue of fact exists as to whether Plaintiff's sexual encounter with MP was nonconsensual and/or sexual harassment.

Plaintiff also argues that she was harassed on the basis of sex when other students made fun of her for reporting that she was sexually assaulted. Doc. Nos. [132], 9–10; [162], 17. For example, Plaintiff provides evidence that, when she

returned to school after her suspension, students at PRHS called her "slut" and "whore" and otherwise taunted her about reporting the alleged sexual assault. See, e.g., Doc. No. [160] ¶¶ 237–240, 242–243. Defendant, however, argues that these incidents amounted to the type of insults, teasing, and name-calling that do not give rise to a Title IX claim because they "were not based on her sex, but rather were related to" the alleged sexual assault. Doc. No. [154], 11–12.

As discussed above, context drives the inquiry into whether harassment is actionable under Title IX. See Williams, 477 F.3d at 1297. The Eleventh Circuit has found that events occurring after an alleged sexual assault, including comments about the sexual assault, may be part of the constellation of factors giving rise to a Title IX claim. Stinson ex rel. K.R. v. Maye, 824 F. App'x 849, 852, 857–58 (11th Cir. 2020); see also Goodwin v. Pennridge Sch. Dist., 389 F. Supp. 3d 304, 309, 315–16 (E.D. Pa. 2019) (noting among other factors that a student had been called a "slut" and was the subject of rumors concerning her sexual activity and her alleged sexual assault). However, the Eleventh Circuit has also established that taunting by other students, even if it targets gender, generally does not give rise to or support a Title IX claim. Hawkins v. Sarasota Cnty. Sch. Bd., 322 F.3d 1279, 1288 (11th Cir. 2003); see also GP by and Through JP v. Lee Cnty. Sch. Bd., 737 F.

32

App'x 910, 914–15 (11th Cir. 2018) (determining that a student's conduct of pushing, pulling the hair of, knocking books away from, and shaking the chair of plaintiff was the type of teasing, shoving, pushing, and gender-specific conduct that is upsetting but that does not approach the level of "objectively offensive" harassment that can give rise to Title IX damages).

Even when considering the facts of this case under the competing standards of the cross motions for summary judgment, the Court finds that Plaintiff has not created a genuine issue of material fact that the post-suspension taunting she experienced could support a Title IX claim. Even if the taunting Plaintiff experienced was related to her alleged sexual assault—which the Court concedes one could infer—the Court finds that it did not approach the type of objectively offensive harassment that can support a Title IX claim. While the Court does not condone these other students' conduct, the Court agrees with Defendant that these insults fall within the category of teasing contemplated in Hawkins. Further, the Court notes that Defendant took steps to address at least some of the alleged post-suspension harassment. See, e.g., Doc. No. [160] ¶¶ 255, 257 (stating that a PRHS assistant principal confronted one of the alleged harassers and warned him not to engage in negative conduct directed at Plaintiff,

after which the alleged harasser stated that he would discontinue taunting Plaintiff). Accordingly, the Court finds that Plaintiff's allegations as to other students making fun of or taunting her after she reported the alleged sexual assault do not support her Title IX claim.

> **b)** **The Court finds that the alleged incidents were not sufficiently severe, pervasive, or objectively offensive to sustain a Title IX claim**

The Court now assesses whether the incidents discussed above (including the taunting) were severe, pervasive, and objectively offensive. As to the alleged sexual assault, Plaintiff argues that the nonconsensual, "continuous" series of events—including MP exposing his penis to her, putting his penis in her mouth, and masturbating to ejaculation—constituted rape, which is "severe, pervasive, and objectively offensive conduct." Doc. No. [132], 8–9. And Plaintiff further argues that the harassment she endured from other students after reporting MP's sexual assault[20] also was "severe, pervasive, and objectively offensive." Id. at 9–

---

[20] Plaintiff states that this harassment continued "even after she transferred out of PRHS." Doc. No. [132], 9. Defendant argues that the Court should ignore any allegations concerning harassment that occurred at Collins Hill High School ("CHHS")—a school to which Plaintiff transferred—because the Complaint does not refer to such incidents. See Doc. No. [154], 14–15. Plaintiff counters that, under the governing pleading standards, she adequately pleaded her claims and did not have to discuss harassment at CHHS with particularity. See Doc. No. [170], 6–8. The Court first notes that the

34

10. In response, Defendant states that Plaintiff's allegations of harassment are "insufficiently severe, pervasive and objectively offensive to establish an actionable hostile environment." Doc. No. [154], 12.

In Defendant's Motion for Summary Judgment, it maintains that Plaintiff's allegations of harassment do not rise to the level of being "severe, pervasive, and objectively offensive." Doc. No. [133-2], 15. Defendant also claims that PRHS ensured that Plaintiff and MP did not have contact while at school and on the bus and that Plaintiff's counselor prepared a no-contact safety plan. Id. at 17. In response, Plaintiff reiterates the arguments she made in her Motion for Summary

---

Complaint does not mention CHHS or any harassment that occurred there, while it does focus on harassment that Plaintiff suffered "at PRHS" and that PRHS students caused. See Doc. No. [1] ¶¶ 69–83. Under a liberal construction, the Court can construe these facts as including post-transfer harassment caused by *PRHS* students. E.g., Doc. No. [160] ¶¶ 282–285. But the Court agrees with Defendant that the Complaint did not adequately put Defendant on notice of harassment that occurred at CHHS or that was caused by CHHS students. E.g., id. ¶¶ 302–308. While Plaintiff correctly quotes Fed. R. Civ. P. 8(a)(2) as only requiring a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," the governing pleading standards also require the pleader to state "the grounds upon which [the claim] rests." See Brown v. Jefferson Cnty. Sheriff's Dep't, 806 F. App'x 698, 700 (11th Cir. 2020) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Here, the Complaint simply did not state or provide any indication that the claim rested upon allegations of harassment that occurred at CHHS or was caused by CHHS students. Thus, the Court ignores allegations of such harassment.

35

Judgment and asserts that Defendant must view the events in context rather than in isolation. Doc. No. [162], 14–19.

After careful review, the Court determines that the relevant incidents—including the alleged sexual assault, the suspension hearing, and post-suspension incidents with other PRHS students—were not sufficiently severe, pervasive, and objectively offensive to have a systemic effect on Plaintiff's education. As stated above, a single incident of severe one-on-one student harassment generally cannot have a systemic effect of denying a student equal access to an education. Hill, 797 F.3d at 972; Hawkins, 322 F.3d at 1289 (stating that to be actionable under Title IX, "gender discrimination must be more widespread than a single instance of one-on-one peer harassment and that the effects of the harassment touch the whole or entirety of an educational program or activity"). This case differs from Hill and Williams in that Plaintiff has not shown that MP had engaged in prior sexual misconduct of which Defendant was aware.[21] Moreover, the Court rejects Plaintiff's argument that MP's discreet acts

---

[21] In Hill, the harassing student had "accumulated a disciplinary history of violence and sexual misconduct." Hill, 797 F.3d at 958–61. And in Williams, Plaintiff alleged that Defendant knew of the assaulting student's previous "disciplinary and criminal problems, particularly those involving harassment of women, at other colleges." Williams, 477 F.3d at 1290.

in the alleged assault collectively constituted a "continuous series of events" such that this case involves pervasive incidents. <u>See</u> Doc. No. [132], 8–9. The Court acknowledges that MP is alleged to have undertaken multiple distinct physical acts to complete the alleged sexual assault, but such a series of acts does not necessarily constitute a series of events sufficient to create pervasiveness under Title IX. To start, any individual physical or sexual assault could be construed to encompass a series of distinct physical acts, and if the Court were to accept Plaintiff's breakdown of the alleged assault as a "continuous series of events" for Title IX purposes, then the Court does not see how anyone could ever distinguish between a single incident and a pervasive series of incidents. Further, <u>Williams</u> is distinguishable from this case. In <u>Williams</u>, the Eleventh Circuit found a "continuous series of events" because that matter involved allegations of a "ringleader who lured the victim to his territory and then conspired with two friends to commit two separate acts of sexual assault" over a two-hour period. <u>Williams</u>, 477 F.3d at 1298. The Court found that the planning and separate acts of assault were enough to "meet the requirements of severity and objective offensiveness," which combined with other facts to show pervasive discrimination. <u>See</u> <u>id.</u> No such series of events occurred here, as the facts show

37

at most that MP engaged in one instance of sexual conduct that lasted no more than fifteen minutes, and possibly as little as four minutes. See Doc. Nos. [132-1] ¶ 40; [133-1] ¶ 144. Also, this Court would not be the first to determine that a single alleged assault by one individual differs from the acts alleged in Williams. See Ross v. Corp. of Mercer Univ., 506 F. Supp. 2d 1325, 1358–59 (M.D. Ga. 2007). Thus, even though this single incident of alleged sexual assault could be construed as severe and objectively offensive, the Court finds that it is not pervasive and cannot have had a systemic effect under Title IX. See id. at 1358.

Moreover, while some courts have found that a series of incidents relating to a sexual assault—such as subsequent verbal harassment from students—may qualify as sufficiently severe, pervasive, and objectively offensive, see Stinson, 824 Fed. App'x at 857–58; Goodwin, 389 F. Supp. 3d at 315–16, the Court finds that the alleged taunting in this case does not rise to the level of sufficient severity, pervasiveness, or objective offensiveness to support a Title IX claim. First, this finding flows in part from the Court's finding above that the alleged taunting here does not give rise to a Title IX claim. Also, the Court finds that the authority in Hawkins and similar cases makes clear that such conduct, even if one could consider it to be sexual harassment, is generally not so severe,

38

pervasive, and objectively offensive to have a systemic effect of denying equal access to education. <u>Hawkins</u>, 322 F.3d at 1288. The Court acknowledges that Plaintiff has presented evidence that she left PRHS, suffered academically, and experienced other educational setbacks that Plaintiff ascribes to the harassment she suffered. But under the legal authority guiding and binding this Court, the incidents that allegedly caused Plaintiff's setbacks were not sufficiently severe, pervasive, or objectively offensive to sustain her Title IX claim.

### 4.   *Deliberate Indifference*

For the fourth element, Plaintiff must show that Defendant was deliberately indifferent "where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Hill</u>, 797 F.3d at 973 (quoting <u>Davis</u>, 526 U.S. at 648). "A clearly unreasonable response [by Defendant] causes students to undergo harassment or makes them more vulnerable to it." <u>Id.</u> (citing <u>Williams</u>, 477 F.3d at 1295–96). If there is a genuine issue of material fact as to whether Defendant responded unreasonably to Plaintiff's report of sexual assault in a manner that caused Plaintiff to undergo or be vulnerable to further harassment, then this question is best left to a jury to decide. <u>Cf.</u> <u>id.</u> Thus, the Court considers whether Defendant's response to Plaintiff's report of the alleged

sexual assault and subsequent harassment was unreasonable and caused Plaintiff to undergo or be vulnerable to further harassment.

Plaintiff argues that Defendant's unreasonable response to her alleged sexual assault by MP included: (1) not treating her report as one of sexual assault or a Title IX matter; (2) school administrators interviewing her differently from how they interviewed MP; (3) school officials ignoring the consistencies in her report and accepting the inconsistencies in MP's version of events; (4) school officials justifying MP's behavior; (5) school district officials encouraging and allowing MP's mother to write his official statement; (6) conducting a biased disciplinary hearing; and (7) refusing to provide her with any "support, accommodations, or resources in response to her sexual assault report." Doc. No. [132], 10–18. Plaintiff attributes this deliberate indifference to further discrimination that she endured as well as her being barred from access to educational opportunities. Id. at 18–23. Plaintiff also claims that Defendant acted with deliberate indifference by "allowing sex stereotypes to factor into its decision to disbelieve her report and discipline here." Id. at 4, 23–26. In response, Defendant denies that it acted with deliberate indifference and claims that MP's mother writing his official statement was irrelevant. Doc. No. [154], 17–31.

40

In Defendant's Motion for Summary Judgment, it argues that it was not deliberately indifferent in the following ways: (1) PRHS administrators concluding that the oral sex between Plaintiff and MP was consensual; (2) PRHS administrators conducting the investigation in the manner that they did; (3) hearing officers concluding that the oral sex between Plaintiff and MP was consensual; (4) the School District conducting the disciplinary hearing in the manner that it did; (5) the School District responding to Plaintiff's allegation of harassment after returning to PRHS from suspension; and (6) the School District responding to Plaintiff's requests for academic accommodations. Doc. No. [133-2], 17–36. In maintaining that it did not respond with deliberate indifference to Plaintiff's allegations of harassment and sexual assault, Defendant also claims that Plaintiff was not subjected to further discrimination nor effectively barred from access to an educational opportunity or benefit. Id. at 36. In response, Plaintiff maintains that Defendant's response to her reports "is a textbook example of deliberate indifference." Doc. No. [162], 22.

After carefully considering the arguments and reviewing the record, the Court finds that Plaintiff has not created an issue of material fact as to whether Defendant was deliberately indifferent to Plaintiff's alleged discrimination in a

41

manner that prevented Plaintiff from having equal access to an education. While Plaintiff has presented evidence supporting her frustration with the manner in which Defendant conducted its disciplinary hearing, the fact remains that Defendant relatively quickly conducted an investigation into the alleged incident and held a disciplinary hearing stemming from that investigation. That timing differs from the timing in Williams, where the defendants failed for months to conduct a disciplinary hearing concerning the alleged incident. See Williams, 477 F.3d at 1299. To be sure, Plaintiff has presented evidence of numerous acts and omissions during the investigation and hearing process—such as the questions Plaintiff was asked during the investigation and SRO Lockard's absence from the hearing—that could be construed as shortcomings. But the fact that Plaintiff disagrees with the outcome of Defendant's investigation and findings in the hearing process does not make Defendant's response clearly unreasonable in light of the known circumstances. Willams, 477 F.3d at 1295. And whereas in Williams the defendants did nothing to prevent additional attacks by the plaintiff's assailants, Defendant here took some steps to separate MP and Plaintiff (see Doc. No. [133-1] ¶ 191), and it also attempted to address the post-suspension taunting by other students (see, e.g., Doc. No. [160] ¶¶ 255, 257).

42

The "deliberate indifference standard is rigorous and hard to meet." Hill, 797 F.3d at 975. After carefully considering all the events and circumstances, the Court finds that Plaintiff has not created a genuine issue of fact as to whether Defendant was deliberately indifferent.[22]

For the reasons discussed above, the Court finds that Defendant's Motion for Summary Judgment as to Count I is due to be granted, and Plaintiff's Motion for Summary Judgment as to Count I is due to be denied.[23]

### C.   Count II – Title IX Retaliation

The Supreme Court has recognized an implied private right of action under Title IX for "[r]etaliation against a person because that person has complained of [or reported] sex discrimination." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 178 (2005); see also id. ("[W]e hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex."). The

_____

[22]  Given this finding, the Court does not discuss whether Defendant's acts barred Plaintiff's access to an education opportunity or benefit.

[23]  To be clear, even though the Court finds that an issue of fact would remain as to whether Plaintiff was sexually assaulted, the fact that the Court finds that Plaintiff cannot carry her burden as to other elements of her Title IX claim precludes summary judgment for Plaintiff and entitles Defendant to summary judgment.

43

Eleventh Circuit has stated that Title VII's retaliation framework applies. See Saphir ex rel. Saphir v. Broward Cnty. Pub. Sch., 744 F. App'x 634 (11th Cir. 2018); McCullough v. Bd. Of Regents of the Univ. Sys. of Ga., 623 F. App'x 980, 982 (11th Cir. 2015); Bowers v. Bd. of Regents of Univ. Sys. of Ga., 509 F. App'x 906, 911 n.7 (11th Cir. 2013). Under that framework, Plaintiff must show the following to establish a prima facie retaliation case: (1) she reported the sexual assault and subsequent harassment; (2) she suffered an adverse action; and (3) there is a causal connection between the two. Saphir, 744 F. App'x at 639. "A retaliation claim does not depend on the success of the underlying harassment claim." Terry v. Young Harris Coll., 106 F. Supp. 3d 1280, 1297 (N.D. Ga. 2015). Rather, Title IX's anti-retaliation provision protects a student "so long as she can show a good faith, reasonable belief" that the practices violated Title IX. Id. (citation omitted).

In her Motion for Summary Judgment, Plaintiff argues that she prevails on her Title IX retaliation claim because (1) she engaged in protected activity by reporting the alleged sexual assault and participating in the investigation, (2) she suffered material adverse actions by Defendant, and (3) there is a causal link between Plaintiff's protected activity and the adverse actions Defendant took against her. Doc. No. [132], 27–31. In response, Defendant claims that Plaintiff is

44

not entitled to summary judgment on her Title IX retaliation claim due to triable issues of fact as to whether Plaintiff can establish a prima facie case and because Plaintiff failed to present any evidence of pretext. Doc. No. [154], 35–38.

In Defendant's Motion for Summary Judgment, it states that it is entitled to summary judgment on Plaintiff's Title IX retaliation claim because Defendant did not suspend her in retaliation for her complaint that MP had sexually assaulted her. Doc. No. [133-2], 36–40. Defendant also asserts that it is entitled to summary judgment on Plaintiff's remaining Title IX retaliation claims, including that teachers retaliated against her by giving failing grades and that Defendant refused to give academic accommodations to Plaintiff for retaliatory reasons.[24] Id. at 40. In response, Plaintiff argues that Defendant retaliated against her for reporting the alleged sexual assault. Doc. No. [162], 32–36.

### 1.    *Reporting*

As to the first element of this test, the Court finds that Plaintiff has shown that she reported the sexual assault and subsequent harassment. The Court finds that Plaintiff's reports of these incidents constitute protected activity under Title

---

[24] Because Plaintiff does not raise such Title IX retaliation claims in her Motion for Summary Judgment, the Court will not address them further.

45

IX. See Yegidis v. Bd. of Trs. of Fla. Gulf Coast Univ., No. 209CV353FTM36DNF, 2011 WL 13294516, at *6 (M.D. Fla. Jan. 21, 2011) (listing cases finding that similar reports or complaints qualified as protected conduct). It is also undisputed that Plaintiff reported that she had been sexually assaulted by MP to PRHS administrators, including Ms. Powell, Ms. Brimmer, SRO Lockard, and PRHS Assistant Principals Augmon, Stinson, and Weyher. See Doc. No. [160] ¶¶ 49, 51, 53, 67, 116–118. And it is undisputed that Plaintiff reported the subsequent harassment by other students to school officials. See id. ¶¶ 238, 246, 255–257, 261– 264. Because it is undisputed that Plaintiff reported the sexual assault and subsequent harassment to PRHS officials, and because the Court finds that these reports were protected conduct under Title IX, the Court deems this element satisfied.

### 2.   *Adverse Action*

Next, the Court finds that Plaintiff has satisfied the adverse action element. An adverse action is one that would dissuade a reasonable person from making or supporting a charge of discrimination. Bowers, 509 F. App'x at 911–12 (citing Burlington N. & Santa Fe Ry., 548 U.S. 53, 68 (2006)). It is undisputed that after Plaintiff reported being sexually assaulted by MP, she was suspended twice—

once five days after her report and then again after the disciplinary hearing—totaling ten days of out-of-school suspension. Doc. No. [160] ¶¶ 149, 155, 229.[25] In the high school setting, the Court finds that suspensions of this severity would dissuade a reasonable person from reporting the assault as Plaintiff did. Thus, the Court concludes that there is no genuine issue of fact as to whether Plaintiff suffered an adverse action by Defendant after reporting that she was sexually assaulted by MP.

### 3.     *Causal Connection and Burden-Shifting Analysis*

Finally, a plaintiff must show a causal link between the protected activity and the adverse action. Bowers, 509 Fed. App'x at 911. "To demonstrate causation, 'a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" Id. (quoting Shannon v. BellSouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002)). "Causation may be inferred by a close temporal

---

[25] And although Plaintiff's subjective view of the adversity of Defendant's act is not controlling, Bowers, 509 F. App'x at 912, the Court notes that it is undisputed that after learning of her second suspension due to the disciplinary hearing, Plaintiff said, "When people find out about this and girls do get sexually assaulted, they're not going to want to come forward and tell someone, because they're going to be scared they're going to get suspended and they have to go through all of this." Doc. No. [160] ¶ 230.

proximity between the protected activity and the adverse action." Id. If Plaintiff shows a causal connection and thus "establishes a prima facie case of retaliation, the burden shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse action." Kocsis v. Fla. State Univ. Bd. of Trs., 788 F. App'x 680, 686–87 (11th Cir. 2019) (citing Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009)). If Defendant carries this burden, Plaintiff must show concrete evidence in the form of specific facts demonstrating that Defendant's proffered reason was merely a pretext to mask discriminatory actions. Id. at 687. One way Plaintiff can show discriminatory intent is through circumstantial evidence, such as evidence that Defendant systemically treated similarly situated students differently. See Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019).

As addressed above, it is undisputed that Defendant was aware of the protected conduct because Plaintiff reported the sexual assault to PRHS administrators, including Ms. Powell, Ms. Brimmer, SRO Lockard, and PRHS Assistant Principals Augmon, Stinson, and Weyher. See Doc. No. [160] ¶¶ 49, 51, 53, 67, 116–118. It is also undisputed that Defendant was aware of the subsequent harassment Plaintiff endured from other students. See id. ¶¶ 238, 246, 255–257,

48

261–264. These undisputed facts establish that Defendant was made aware of the protected conduct.

Plaintiff's report of the sexual assault instigated the investigation. Doc. No. [132-4], 16. Further, it is undisputed that Plaintiff reported the sexual assault to PRHS officials on February 5, 2015 (Doc. No. [160] ¶¶ 49, 51, 53, 67, 116–118), and she was suspended five days later on February 10, 2015 (id. ¶ 149). Plaintiff was then suspended once more after the disciplinary hearing. Id. ¶ 229. Considering the temporal proximity between Plaintiff's report and the adverse actions, along with the fact that Defendant punished Plaintiff for engaging in sexual conduct after she reported that incident as a sexual assault, the Court finds that Plaintiff has shown that the protected activity and the adverse actions were not wholly unrelated. Thus, Plaintiff has made a prima facie case of causation.

In response, Defendant argues that it had a legitimate, non-discriminatory reason for the adverse actions. Specifically, Defendant asserts that it suspended Plaintiff because "she violated Rule 9G by engaging in consensual oral sex with MP" (Doc. No. [154], 37), not because she reported an alleged sexual assault (Doc. No. [133-2], 38). Defendant also argues that its suspension of MP disproves any causal connection. Doc. No. [154], 36. The Court finds that Defendant has carried

49

its "exceedingly light" burden to rebut the presumption of retaliation because a jury rationally could conclude from this proffered reason that Defendant was not motivated by retaliatory animus. See Nemeth v. Auburn Univ., No. 3:19-CV-715-RAH-JTA, 2021 WL 3375669, at *4 (M.D. Ala. Aug. 3, 2021).

Thus, to defeat summary judgment, Plaintiff must show that Defendant's stated reason was mere pretext to mask its retaliatory reason. Id.; Garrett v. Univ. of S. Fla. Bd. of Trs., 824 F. App'x 959, 966 (11th Cir. 2020) ("To establish that a proffered reason is merely pretextual, a plaintiff must present concrete evidence in the form of specific facts that the proffered reason is not the real reason." (quotation omitted)). The "but for" causation test at this stage is demanding and requires Plaintiff to show that, but for her protected activity, Defendant would not have punished her. See Nemeth, No. 3:19-CV-715-RAH-JTA, 2021 WL 3375669, at *4. To establish pretext, Plaintiff must show such inconsistencies, incoherencies, or similar weaknesses in Defendant's proffered reason that a reasonable jury could find that the proffered reason is unbelievable. See id.

Plaintiff argues in her initial brief that there is evidence of Defendant's discriminatory intent in the form of its ambiguous statements during its investigation, administrators' refusal to consider not charging Plaintiff with

50

violation of a school rule, and the fact that Defendant cannot otherwise "offer any legitimate justification for the actions it took." Doc. No. [132], 31. And in response to Defendant's opposition, Plaintiff argues that before suspending Plaintiff, PRHS officials never used information from Plaintiff's reports to ask MP if he masturbated in the RVN editing room or if he believed that Plaintiff consented to it. Doc. No. [132-1] ¶ 143. Plaintiff also argues that District administrators did not investigate MP for "lewd exposure or masturbating in front of [Plaintiff] without her consent." Id. ¶ 144.

This element presents a close call due to the close temporal proximity between Plaintiff engaging in protected activity and Defendant punishing her for the incident that was the subject of her protected activity. But temporal proximity alone typically is not enough to carry a retaliation claim at this stage. Nemeth, No. 3:19-CV-715-RAH-JTA, 2021 WL 3375669, at *4–5 (citing King v. Sec'y, U.S. Dep't of the Army, 652 F. App'x 845, 847 (11th Cir. 2016)). Plaintiff must present more evidence to show that Defendant retaliated against her "because" she reported the sexual assault. See Saphir, 744 F. App'x at 639. And, importantly, even considering the close temporal proximity found here, the fact that Defendant punished her *after* she reported it does not necessarily mean that it

punished her *because* of it for purposes of a Title IX retaliation claim. See Nemeth,

No. 3:19-CV-715-RAH-JTA, 2021 WL 3375669, at *5.

The facts that Plaintiff ushers in her favor, including Defendant's allegedly

poor management of the investigation, its refusal to fully consider Plaintiff's

version of events, and the unduly antagonistic nature of the disciplinary

proceedings, are admittedly frustrating when viewed in the light most favorable

to Plaintiff. But while Defendant's alleged mishandling of the investigation and

disciplinary proceedings, viewed in the light most favorable to Plaintiff, may call

into question the fairness of these processes, it does not equate to retaliatory

animus. Further, those facts relate more to Plaintiff's deliberate indifference claim

than they show retaliation. And Plaintiff's briefing fails to identify concrete facts

showing retaliation. Further, even if Defendant's disciplinary proceedings were

as flawed as Plaintiff alleges, Plaintiff does not show that Defendant instituted

those proceedings to retaliate against Plaintiff for reporting a sexual assault.

Indeed, while Plaintiff attempts to show weaknesses in Defendant's proffered

reason by arguing that it cannot offer any legitimate justification for the actions

it took against Plaintiff, the Court finds that a reasonable jury could believe

Defendant's proffered reason: That school officials investigated the incident,

52

found the sexual conduct at issue to have been consensual, and then punished Plaintiff for having violated relevant school rules. In short, "[t]he evidence shows that [Plaintiff] was punished based on the tribunal's decision that she engaged in consensual oral sex at school, not because she reported a sexual assault." A.P. v. Fayette Cnty. Sch. Dist., No. 3:19-CV-109-TCB, 2021 WL 3399824, at *5 (N.D. Ga. June 28, 2021).

Moreover, the "but for" aspect of this test weakens Plaintiff's argument. It may factually be true that, but for Plaintiff reporting her sexual encounter with MP, Defendant would not have punished her. But that is true because Defendant likely would not have known about the underlying incident at all if Plaintiff had not reported it. This is not akin to a case where an employee is terminated for complaining about an issue and the employer presents pretextual reasons unrelated to the complaint. See, e.g., Bird v. Univ. of Fla. Bd. of Trs., No. 1:18-CV-221-AW-GRJ, 2020 WL 9550223, at *14 (N.D. Fla. Sept. 1, 2020). Here, context indicates that Defendant would have punished Plaintiff for what Defendant found to be consensual sexual conduct even if Plaintiff had not reported the same incident as a sexual assault. Thus, while the Court acknowledges that Defendant punished Plaintiff because (or, more relevantly, *after*) Plaintiff reported the

alleged sexual assault, the Court finds that Plaintiff has not shown the kind of "but for" causation necessary to defeat Defendant's proffered reason.

For these same reasons, the Court also finds that Plaintiff's Motion for Summary Judgment on this count fails. Thus, the Court finds that Defendant's Motion for Summary Judgment as to Count II is due to be granted, and Plaintiff's Motion for Summary Judgment as to Count II is due to be denied.

**D.     Count III – Failure to Train Under 42 U.S.C. § 1983**

In Plaintiff's Motion for Summary Judgment, she contends that Defendant is liable under 42 U.S.C. § 1983 for depriving Plaintiff of her Fourteenth Amendment equal protection rights. Doc. No. [132], 31. Plaintiff bases this argument on three grounds: (1) Defendant failed to provide adequate Title IX training to school employees; (2) Defendant's failure to train resulted from its policy; and (3) Defendant's policy of inadequate training caused the violation of Plaintiff's constitutional rights. Id. at 33–40. In response, Defendant asserts that Plaintiff fails to establish an underlying constitutional violation, a previous pattern of similar constitutional violations, that the need for additional training was "so obvious," and any causal connection between the alleged lack of Title IX training and any alleged constitutional violation. Doc. No. [154], 38–44.

In Defendant's Motion for Summary Judgment, it makes the same arguments as in its response to Plaintiff's Motion for Summary Judgment. Doc. No. [133-2], 40–44. In response, Plaintiff claims that Defendant "ignores numerous cases where courts have found an 'obvious need for training'" in peer-on-peer sexual abuse circumstances. Doc. No. [162], 37. Plaintiff also states that Defendant knew there was an obvious need for training in their schools but still provided wholly inadequate training to employees. Id. at 39.

> Section 1983 provides that:
>
> > Every person who, under the color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Although the Supreme Court has held that counties (and other local government entities) are "persons" within the scope of § 1983, and subject to liability, Plaintiff cannot rely upon the theory of respondeat superior to hold Defendant liable. See Monell v. Dept. of Soc. Servs., 436 U.S. 658, 692 (1978) (finding that § 1983 "cannot be easily read to impose liability vicariously on

55

governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"). "It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (citations omitted). Thus, to state a § 1983 claim against Defendant, Plaintiff must show that: (1) her constitutional rights were violated; (2) Defendant had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. See McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing Canton, 489 U.S. at 388). And "[t]o establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. Normally random acts or isolated incidents are insufficient to establish a custom or policy." Depew v. City of St. Marys, Georgia, 787 F.2d 1496, 1499 (11th Cir. 1986).

Because the Court's analysis of whether or not Plaintiff established a policy or custom determines the outcome of this Count, the Court discusses only that prong. The Court finds that Plaintiff has not created an issue of fact as to whether Defendant maintained a custom or policy of inadequate training on Title IX,

harassment, and sexual assault. This matter differs from cases involving a series of violations, see, e.g., Depew, 787 F.2d at 1499–1500 (featuring "several incidents involving the use of unreasonable and excessive force by police officers"), in that this case alleges a failure to train *absent* a pattern of violations. To succeed on such a claim, a plaintiff must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." Id. Section 1983 liability based on a single incident is appropriate only in "a narrow range of circumstances." See Tims v. Dale, No. CIV.A. 13-0317-CG-C, 2014 WL 3955219, at *5 (S.D. Ala. Aug. 13, 2014); see also Fleurant v. City of Port St. Lucie, No. 19-14032-CV, 2019 WL 12021808, at *8 (S.D. Fla. June 27, 2019), report and recommendation adopted sub nom. Fleurant v. City of Port St. Lucie, Fla., No. 2:19-CV-14032, 2019 WL 12025011 (S.D. Fla. July 16, 2019) (stating "that the single incident theory is extremely narrow"); Borton v. City of Dothan, 734 F.Supp.2d 1237, 1256 (M.D. Ala. 2010) (noting that the Eleventh Circuit has

"repeatedly rejected" attempts to establish single-incident failure-to-train claims). The Supreme Court hypothesized one example of a failure to train that would succeed under this theory, stating that the need to train police officers in the constitutional limitations on the use of deadly force in the context of apprehending fleeing felons would be so obviously necessary that failing to so train may support a claim. <u>Canton</u>, 489 U.S. at 390 & n.10.

Plaintiff has presented evidence that Defendant did not train school employees on how to respond to, address, and remedy reports of sexual assault. For instance, Assistant Principal Augmon testified that she "d[oesn't] know that [she's] trained to qualify what is sexual assault." Doc. No. [160] ¶ 193. Additionally, the materials that District Title IX Coordinator Spraggs used to train other administrators and staff did not include "standard to be utilized in investigating student reports of sexual assault or harassment; retaliation; or the District's policy regarding student reports of sexual harassment." <u>Id.</u> ¶ 325. Also, PRHS Assistant Principal/Title IX Coordinator Stinson did not recall receiving training on the most effective ways to interview a victim of sexual assault, nor did she receive training specific to interviewing reported perpetrators. <u>Id.</u> ¶¶ 337–338. And SRO Lockard could "not recall ever utilizing any protocol or

model policy when investigating a student's report of sexual assault." Id. ¶ 347.

Plaintiff's evidence also shows that Title IX Coordinator Stinson and District Title

IX Coordinator Spraggs did not train or educate students as to "student-against-

student sexual misconduct identifying, investigating, reporting, stopping, and

remediating the effects of sexual harassment." Id. ¶ 361.

Even with these facts, however, the Court finds that Defendant's alleged

failures to train did not constitute a custom or policy for § 1983 purposes, and the

Court also finds that it was not sufficiently plain or obvious that the failure to

train would result in the deprivation of a constitutional right. See Hill, 797 F.3d

at 977–78. First, the facts do not show a history of abuse by employees or other

prior acts or incidents that would have put Defendant on notice (1) of the need

for corrective measures or (2) that failing to train employees was likely to result

in the violation of a constitutional right. See Belcher v. City of Foley, Ala., 30 F.3d

1390, 1397–98 (11th Cir. 1994). And the Court finds that the record evidence does

not show that the failure to train was obvious and would lead to the highly

predictable violation of a constitutional right. See Connick v. Thompson, 563 U.S.

51, 64 (2011); see also Tims, No. CIV.A. 13-0317-CG-C, 2014 WL 3955219, at *5

(finding that it was not so obvious that training was needed for police officers to

refrain from sexually assaulting members of the public). In hindsight, one could argue that better Title IX training may have helped avoid some of the incidents that occurred in this case. But that is not the question or scope of analysis. Instead, the Court must ask whether the deprivation of a constitutional right would clearly result from the failure to train. The Court finds that the evidence does not support such a finding. And as a sister court in the Eleventh Circuit has noted, the narrow "single incident" theory of liability generally has not been applied in cases involving a school's failure to adequately respond to reports of sexual harassment and assault. Doe v. Sch. Bd. of Miami-Dade Cnty., 403 F. Supp. 3d 1241, 1265 (S.D. Fla. 2019); see also Davis v. Fulton Cnty., No. 1:08-CV-3241-CAM-ECS, 2010 WL 11500519, at *18 (N.D. Ga. Mar. 2, 2010), report and recommendation adopted, No. 1:08-CV-3241-CAM, 2010 WL 11508699 (N.D. Ga. Mar. 25, 2010) (also declining to find a failure-to-train § 1983 violation predicated on a single incident of sexual harassment). Thus, given the "extremely narrow" scope of a single-incident failure-to-train claim, the Court finds that Plaintiff has not met her burden to create a genuine issue of material fact that Defendant's failure to train as to Title IX issues was so obvious and would so obviously lead to the violation of one's constitutional rights that Plaintiff can sustain a § 1983

deliberate indifference claim. Thus, the Court finds that Defendant's Motion for Summary Judgment as to Count III is due to be granted, and Plaintiff's Motion for Summary Judgment as to Count III is due to be denied.

**CONCLUSION**

For the reasons discussed above, the Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. No. [132]) as to all counts, and the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. No. [133]) as to all counts. As no further issues remain outstanding, the Court **DIRECTS** the Clerk to enter judgment for Defendant and close this case.

**IT IS SO ORDERED** this 1st day of September, 2021

_s/Steve C. Jones_

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**